UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

EMPIRE MERCHANTS, LLC, and EMPIRE
MERCHANTS NORTH, LLC

     Plaintiffs,

    -against-

RELIABLE CHURCHILL LLLP, BREAKTHRU
BEVERAGE GROUP, LLC, CHARLES
MERINOFF, ARLYN B. MILLER, GREGORY
L. BAIRD, TUSHAR C. PATEL,
NILESHKUMAR JASBHAI PATEL (a/k/a NICK
PATEL), PRATIBHA PATEL (a/k/a PANNA
PATEL), TECH PRIDE OF AMERICA, INC.
(d/b/a HAPPY 40 LIQUORS; HAPPY 40 WINES
& SPIRITS; HAPPY 40 DISCOUNT LIQUORS),
ANIL PATEL, DILIP C. PATEL, PRAKASH
PATEL, J & R COMPANY LLC (d/b/a NORTH
EAST LIQUORS), JATIN B. PATEL (a/k/a
JATTINKUMAR B. PATEL), VLAMIS
LIQUORS LLC (d/b/a VLAMIS' CUT RATE
LIQUORS), SAM LIQUORS INC., BIN LUO
(a/k/a CHEN), BAO LIQUORS INC., BAO
XIONG ZHENG (a/k/a BAO XING ZHENG;
BAO XION ZHENG), OUR LIQUOR, INC.,
ALEXANDER J. LEW, TING WEI, LTT
WHISKEY INC., KE YAO, YI FENG GAO, and
JOHN DOE DEFENDANTS NOS. 1–50,

     Defendants.

---

No. 16 Civ. 5226 (ARR)


FIRST AMENDED COMPLAINT

JURY TRIAL DEMANDED

## TABLE OF CONTENTS

NATURE OF THE CASE ................................................................................1

PARTIES ...................................................................................................20

JURISDICTION AND VENUE ...................................................................26

STATEMENT OF THE CASE....................................................................28

I. THE LIQUOR INDUSTRY ............................................................28

    A. The Three-Tiered System of Liquor Distribution Is Heavily Regulated by Federal and State Laws .............................................................28

    B. Empire's Background and Role in the Liquor Industry.........................31

II. DEFENDANTS' CRIMINAL ENTERPRISE DIRECTLY HARMED EMPIRE............34

    A. Overview of the Scheme .................................................................34

    B. Each Defendant's Role ...................................................................40

        1. The Maryland Wholesalers ........................................................40

        2. The Cecil County Retailers........................................................56

        3. The New York Retailers .............................................................71

    C. Empire Merchants Was Directly Harmed by the Enterprise's Illegal Activity ........................................................................................83

III. DEFENDANTS AFFIRMATIVELY CONCEALED THEIR FRAUDULENT SCHEME FROM EMPIRE AND THE PUBLIC..................................................84

IV. CHARLES MERINOFF HAS CONSISTENTLY SOUGHT TO GAIN EFFECTIVE CONTROL OF EMPIRE....................................................87

V. THE BREAKTHRU DEFENDANTS RETALIATED AGAINST THE EMPIRE COMPANIES FOR THE FILING OF THIS ACTION....................................90

    A. Breakthru Retaliates Against Empire's Affiliate, Empire North, by Breaching and Threatening to Terminate Its Services Agreement with Empire North ................................................................................91

        1. Empire North's Services Agreement with Sunbelt....................91

2.      Breakthru Reduces Empire North's Services in Breach of the Services Agreement the Day After This Action Is Filed .........................96

3.      Breakthru Threatens to Terminate Empire North's IT and Other Services on an Arbitrary January 31, 2017 Cut-Off Date.........................98

B.      Breakthru Terminates Empire's Insurance Coverage ..........................101

C.      Breakthru Makes a Sham "Acquisition Proposal" to Devalue the Empire Companies and Harm Their Industry Standing ...................................101

D.      Lloyd Sobel Divulges Empire's Privileged Litigation Strategy to Empire's Adversary in a Lawsuit ........................................................................103

CLAIMS FOR RELIEF ..............................................................................................103

FIRST CLAIM FOR RELIEF (VIOLATIONS OF RICO, 18 U.S.C. § 1962(C) – BY EMPIRE AGAINST THE RICO DEFENDANTS) ......................................103

THE RICO ENTERPRISE ..................................................................................104

PATTERN OF RACKETEERING ACTIVITY .........................................................111

Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343.....................................................................................................111

Multiple Instances of Money Laundering in Violation of 18 U.S.C. § 1956 .................117

Multiple Instances of Violation of the Travel Act, 18 U.S.C. § 1952 ...........................119

SUMMARY OF THE PATTERN OF RACKETEERING ACTIVITY ALLEGED AGAINST EACH RICO DEFENDANT...................................................................120

INJURY AND CAUSATION .................................................................................123

SECOND CLAIM FOR RELIEF (CONSPIRACY TO VIOLATE RICO, 18 U.S.C. § 1962(D) – BY EMPIRE AGAINST THE RICO DEFENDANTS) ..............................123

THIRD CLAIM FOR RELIEF (VIOLATION OF 42 U.S.C. § 1985 – BY EMPIRE AGAINST BREAKTHRU AND RELIABLE CHURCHILL) .....................................125

FOURTH CLAIM FOR RELIEF (TORTIOUS INTERFERENCE WITH CONTRACT – BY EMPIRE AGAINST ALL DEFENDANTS EXCEPT BREAKTHRU).................126

FIFTH CLAIM FOR RELIEF (DECEPTIVE TRADE PRACTICES UNDER NEW YORK GENERAL BUSINESS LAW § 349 – BY EMPIRE AGAINST ALL DEFENDANTS EXCEPT BREAKTHRU) ...................................................129

SIXTH CLAIM FOR RELIEF (UNFAIR COMPETITION – BY EMPIRE AGAINST ALL DEFENDANTS EXCEPT BREAKTHRU)...........................................................130

SEVENTH CLAIM FOR RELIEF (COMMON LAW FRAUD – BY EMPIRE AGAINST RELIABLE CHURCHILL LLLP, CHARLES MERINOFF, AND ARLYN B. MILLER)....................................................................................................132

EIGHTH CLAIM FOR RELIEF (UNJUST ENRICHMENT – BY EMPIRE AGAINST ALL DEFENDANTS EXCEPT BREAKTHRU)...........................................................133

NINTH CLAIM FOR RELIEF (CIVIL CONSPIRACY – BY EMPIRE AGAINST ALL DEFENDANTS EXCEPT BREAKTHRU) .....................................................135

TENTH CLAIM FOR RELIEF (BREACH OF CONTRACT – BY EMPIRE NORTH AGAINST BREAKTHRU) ...............................................................................137

ELEVENTH CLAIM FOR RELIEF (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – BY EMPIRE NORTH AGAINST BREAKTHRU)..................................................................................................137

TWELFTH CLAIM FOR RELIEF (ANTICIPATORY BREACH OF CONTRACT – BY EMPIRE NORTH AGAINST BREAKTHRU)..............................................139

THIRTEENTH CLAIM FOR RELIEF (TORTIOUS INTERFERENCE WITH CONTRACT – BY EMPIRE NORTH AGAINST RELIABLE CHURCHILL )...........139

FOURTEENTH CLAIM FOR RELIEF (PROMISSORY ESTOPPEL – BY EMPIRE NORTH AGAINST BREAKTHRU) .............................................................140

PRAYER FOR RELIEF ...............................................................................................141

DEMAND FOR JURY TRIAL .....................................................................................143

Plaintiffs Empire Merchants, LLC ("Empire") and Empire Merchants North, LLC ("Empire North" or "EMN") (collectively, "Plaintiffs" or the "Empire Companies"), by and through their attorneys, Gibson, Dunn & Crutcher LLP, for their Complaint against Reliable Churchill LLLP, Breakthru Beverage Group, LLC, Charles Merinoff, Arlyn B. Miller, Gregory L. Baird, Tushar C. Patel, Nileshkumar Jasbhai Patel (a/k/a Nick Patel), Pratibha Patel (a/k/a Panna Patel), Tech Pride of America, Inc. (d/b/a Happy 40 Liquors; Happy 40 Wines & Spirits; and Happy 40 Discount Liquors), Anil Patel, Dilip C. Patel, Prakash Patel, Sam Liquors Inc., Bin Luo (a/k/a Chen), Bao Liquors Inc., Bao Xiong Zheng (a/k/a Bao Xing Zheng; Bao Xion Zheng), Our Liquor, Inc., Alexander J. Lew, Ting Wei, LTT Whiskey Inc., Ke Yao, Yi Feng Gao, and John Doe Defendants Nos. 1–50, allege as follows:

## NATURE OF THE CASE

1.      Empire brings this action to seek redress for Defendants' reprehensible criminal scheme to smuggle wine and spirits, worth millions of dollars, into New York to avoid New York's high excise taxes and deny New York wholesalers such as Empire the distribution rights to which they were entitled.  Starting in at least 2008,[1] two of the largest liquor wholesalers in Maryland—Reliable Churchill LLLP ("Reliable Churchill") and Republic National Distributing Company ("RNDC")[2] (collectively, along with their principals and agents, the "Maryland Wholesalers")—conspired with retailers in rural Cecil County, Maryland (the "Cecil County

---

[1]  Aaron Elstein, *High Taxes and Limited Enforcement Have New York City Awash in Illegal Booze and Cigarettes*, CRAIN'S (Nov. 13, 2016), http://www.crainsnewyork.com/article/20161113/SMALLBIZ/ 161119958/new-york-city-is-awash-in-illegal-booze-and-cigarettes-thanks-to; Declaration of Mackenzie Barker ¶ 3 (Dec. 2, 2016) ("Barker Declaration") (Ex. X); Declaration of Jatin Patel ¶ 3 (Dec. 5, 2016) ("Jatin Patel Declaration") (Ex. Y).

[2]  As explained *infra*, Section II.B.1.b, RNDC is not a named defendant to this action because there is less overlap between the products that RNDC and Empire, respectively, sell and the products that Reliable Churchill and Empire, respectively, sell.  Nevertheless, RNDC and its agents are named as non-party co-conspirators because they participated in the same smuggling enterprise as all other Defendants.

Retailers"), and retailers in New York City (the "New York Retailers") to secretly ship alcohol products from Maryland to New York, for illegal sale in New York. Specifically, the Maryland-based liquor wholesalers delivered millions of dollars of alcohol to Cecil County Retailers, who then sold the alcohol to complicit New York Retailers, who, in turn, secretly smuggled the alcohol in trucks across state lines to New York. The direct victims of this criminal scheme were the New York distributors, including Empire, because every case of alcohol smuggled into New York from Maryland was a lost sale by New York's authorized distributors—of which Empire is the largest—with exclusive distribution arrangements to sell the very same alcohol that Reliable Churchill and RNDC smuggled into New York.

2.      Defendants' criminal conduct violates not only the Racketeer Influenced and Corrupt Organizations ("RICO") Act, 18 U.S.C. §§ 1961–1968, but also tortiously interferes with Empire's contracts and exclusive distributorships with numerous suppliers, constitutes deceptive trade practices under New York law, and amounts to common law unfair competition and fraud, among other torts. Moreover, it has resulted in the unjust enrichment of Defendants at Empire's expense. Empire now seeks redress for the many millions of dollars it lost as a direct result of Defendants' illicit conduct.

3.      Empire is the New York metropolitan area's leading distributor of fine wines and spirits and employs over 1,300 employees. It has become the market leader through many years of hard work and quality service. Empire now counts over 10,000 restaurants, bars, hotels, nightclubs, and retail outlets among its customers. Indeed, some of the largest and best-known liquor and wine manufacturers in the world—including Diageo plc, Moet-Hennessy USA, Inc., Brown-Forman Corp., and E. & J. Gallo Winery—have historically relied on Empire to be their sole and exclusive distributor in the New York metropolitan area. Since 2007, Empire has had

an exclusive distribution contract with Diageo, the largest producer of liquor and spirits in the world, which produces notable brands such as Johnnie Walker, Crown Royal, Smirnoff, Ketel One, and Captain Morgan. Thus, only Empire is permitted to sell those brands in the New York metropolitan area. Given Empire's exclusive contracts with such major liquor manufacturers, it is estimated that, during the relevant time period, six out of every 10 bottles of spirits legally sold in metropolitan New York were distributed by Empire.

4.     Unbeknownst to Empire, though, Defendants secretly went to extraordinary lengths to illegally break into New York's substantial liquor market. Through their illicit bootlegging scheme, Reliable Churchill and RNDC were able to secure millions of dollars of sales destined for New York, even though neither Reliable Churchill nor RNDC is a licensed distributor there. Every time Defendants illegally sold a case of RNDC and Reliable Churchill alcohol in New York, New York's authorized distributors—of which Empire is the largest—lost a sale.

5.     Empire and other licensed distributors in New York were not the only victims of Defendants' illicit conspiracy. The alcohol industry is heavily regulated at the federal and state levels. These regulations are intended to promote transparency, protect consumers, and ensure a level playing field in the liquor distribution business. In addition to requiring entities to register and obtain a license before distributing liquor to retailers in each state, Maryland and New York require all entities that distribute alcohol to report their sales monthly and to pay excise taxes on those sales. Each state sets its own excise tax on liquor. Whereas the Maryland state excise tax for liquor distributed in Maryland was approximately $1.50 per gallon at various times relevant to this Complaint, the total excise tax for liquor distributed in New York City at the same time

was nearly $7.44 per gallon.[3]  These excise taxes are paid by the wholesaler and passed on to the retailer, who ultimately passes on the cost to the retail consumer as a part of the price of the liquor.[4]  Through well-developed federal and state regulations, distributors and other entities are prohibited from exploiting discrepancies in excise taxes between states by bootlegging alcohol across state lines.  But Defendants intentionally flouted these laws and regulations to obtain for themselves lucrative pecuniary and reputational benefits:  They paid the lower excise tax in Maryland and then re-sold the liquor in New York without alerting New York's tax authorities to the sales, thereby avoiding New York's higher excise tax.  In so doing, Defendants deprived New York State and New York City (and their respective residents) of tens of millions of dollars in tax revenue.

6.     The Maryland Wholesalers—Reliable Churchill and RNDC—were willful and knowing participants in this criminal scheme.[5]  To conceal their participation in the scheme, they recruited and incentivized Cecil County Retailers to join the smuggling scheme and had the Cecil County Retailers take steps designed to hide their involvement from the public, regulators, and Empire Merchants

7.     Two Cecil County Retailers—Vlamis Liquors and North East Liquors— have settled Empire's claims and agreed to cooperate with Empire's ongoing investigation and

---

[3] *Id.* ¶¶ 5, 7.

[4] *Id.* ¶ 5.

[5] *See* Aff. of M. Lisa Ward in Support of Seizure Warrants at 9, *United States v. Republic Nat'l Distrib. Co.*, No. 16-cr-00258, ECF No. 38-3 (D. Md. Aug. 1, 2016) ("[M]embers of management for [the Maryland Wholesalers] had been to visit [one of the Cecil County Retailers] . . . and were aware of and encouraged the illegal sales to New York . . . .") ("Lisa Ward Affidavit") (Ex. B); Ex. Y at ¶ 4 (Jatin Patel Declaration) ("Reliable Churchill and [RNDC] were aware of the scheme and . . . were themselves communicating with the New York smugglers.").  Please note that where an exhibit is a document that has been previously filed in another case, the pin cite refers to the page number stamped and assigned by the original court in which the document was first filed.

prosecution of their co-conspirators.[6]  Employees at those settling Cecil County Retailers have provided declarations (attached hereto as Exhibits X and Y) that include details of Reliable Churchill's and RNDC's willful and knowing participation this criminal scheme.

8.      The Maryland Wholesalers pressured their sales representatives to increase their sales numbers, and then provided those same sales representatives with compensation structures that financially incentivized them to find new sources of sales, including through illegal smuggling to out-of-state retailers.  To avoid detection, the Maryland Wholesalers did not sell directly to out-of-state retailers.  Instead, they used and relied upon retail stores in rural Cecil County Maryland to secretly ship the Wholesalers' liquor to the New York Retailers for sale in New York.  This provided the Maryland Wholesalers cover to deny responsibility for their willful involvement, permitting them to disclaim knowledge of what happened to the goods once sold to the Cecil County Retailers and then illegally smuggling to New York by the New York Retailers.  For example, one RNDC employee—believed to be Assistant Director of Operations Eugene Gerzsenyi—told an undercover agent posing as an affiliate of a Cecil County Retailer that "a lot of money could be made through the 'back door' sales of liquor to New York, but that, if asked, [RNDC] would deny knowledge of such sales."[7]  But, in fact, these Maryland Wholesalers, including Reliable Churchill, knew exactly what they were doing as knowing participants in this bootlegging scheme.

---

[6]  Settlement Agreement between Empire Merchants, LLC and Jatin Patel, et al., *Empire Merchants, LLC v. Reliable Churchill LLLP, et. al.*, No. 16-CV-05226 (E.D.N.Y.) ("Jatin Patel Settlement Agreement") (Dec. 5, 2016) (Ex. EE); Settlement Agreement between Empire Merchants, LLC and Vlamis Liquors Inc., et al., *Empire Merchants, LLC v. Reliable Churchill LLLP, et. al.*, No. 16-CV-05226 (E.D.N.Y.) (Dec. 2, 2016) ("Vlamis Settlement Agreement") (Dec. 2, 2016) (Ex. KK).

[7]  Ex. B at 11 (Lisa Ward Affidavit).

9.      On certain occasions, the Maryland Wholesalers directly asked Cecil County Retailers to accept bulk orders of liquor from out-of-state retailers.[8]  Even without a direct request, though, the Maryland Wholesalers provided financial incentives intended to ensure the participation of the local Cecil County Retailers in the smuggling scheme.  Reliable Churchill, for example, provided large volume discounts to Cecil County Retailers that applied both to the alcohol that was sold to New York buyers as well as any alcohol sold in the retail stores to legitimate customers.[9]  But only those stores that ordered enough alcohol could obtain these large volume discounts, and the local Cecil County market was too small to obtain the large volume discounts that provided Cecil County Retailers a competitive edge, making it obvious these Cecil County Retailers were buying these massive amounts of product for sale out-of-state. As a result, there were significant financial pressures on liquor stores to sell to New York smugglers and obtain the discounts offered by the Maryland Wholesalers.  Through these financial pressure points, the Maryland Wholesalers were able to incentivize the local Cecil County stores to accept business from the New York smugglers seeking to place large bulk orders of alcohol.  Indeed, RNDC even offered illegal discounts and accounts-receivable abatements to the Cecil County Retailers for the primary purpose of enticing the Cecil County Retailers to sell RNDC products to the New York Retailers.

---

[8]  Ex. Y at ¶ 5 (Jatin Patel Declaration).

[9]  Ex. X at ¶ 6 (Barker Declaration).  "As a result, the stores involved in the out-of-state alcohol sales were able to pass these volume discounts onto their legitimate customers, sometimes making the prices in those stores meaningfully lower than the prices in stores not involved in . . . similar sales.  As a result, stores not involved in sales to out-of-state buyers, like Vlamis Liquors prior to 2010, were at a competitive disadvantage and were losing market share to stores that were involved in such out-of-state sales."  *Id.*  In this way, the Cecil County Retailers were pressured by the Maryland Wholesalers to join the scheme.  *Id.* ¶ 7 ("I and others at Vlamis Liquors felt pressure to increase the size of our purchases, far beyond what Vlamis Liquors' legitimate retail business could support, in order to obtain the distributors' volume discounts and compete with other Cecil County liquor retailers involved in sales of liquor out-of-state.").

10.     The Cecil County Retailers explicitly discussed the bootlegging scheme with Reliable Churchill employees.  As the manager for one of the settling Cecil County Retailers, Vlamis Liquors Inc., has described in his declaration, the culpable retailers discussed with Reliable Churchill salesmen and supervisors that price increases in Maryland would hurt their smuggling business and inquired whether those price increases were planned in New York as well.[10]  On other occasions, the Cecil County Retailer explicitly discussed the volume of "back door" sales—a code phrase used to describe smuggling activities—by competitors in Cecil County.[11]  Indeed, another settling Cecil County Retailer, Jatin Patel, understood that the Maryland Wholesalers must have had direct conversations with the New York smugglers, who seemed to know the prices the Maryland Wholesalers would set for liquor before the wholesalers even disclosed those prices to the Cecil County Retailers (which gave the New York Retailers substantial leverage in price negotiations).[12]

11.     The Maryland Wholesalers, including Reliable Churchill, took elaborate steps to advance, protect, and conceal the bootlegging scheme.  For example, the Maryland Wholesalers, including Reliable Churchill, helped ensure that there were no labels or stickers on the cases of liquor that revealed the source of the liquor were the Maryland Wholesalers, including Reliable Churchill.[13]  Typically, before a case of liquor is shipped to a local Maryland retailer, a sticker is placed on the case identifying the distributor of the liquor and other information that would reveal the Maryland source of the liquor.  The New York smugglers preferred to receive cases of

---

[10] *Id.* ¶ 18 (Barker Declaration).

[11] Ex. X at ¶ 19 (Barker Declaration).

[12] Ex. Y at ¶ 16 (Jatin Patel Declaration).

[13] Plea Agreement at 8, *United States v. Luo*, No. 15-cr-00311, ECF No. 34 (D. Md. July 21, 2015) ("Bin Luo Plea Agreement") (Ex. E); Ex. X at ¶ 17 (Barker Declaration); Ex. Y at ¶¶ 19–20 (Jatin Patel Declaration).

liquor from the Cecil County Retailers without these labels, in order to avoid law enforcement and regulatory detection.  The Maryland Wholesalers, including Reliable Churchill, preferred to have the stickers removed so that, once smuggled to New York, the alcohol could no longer be traced to the Maryland Wholesalers.  The Maryland Wholesalers, including Reliable Churchill, knowing of the New York Retailers' objective in this regard, provided Cecil County Retailers the opportunity to order cases without labels on them, and explained to them that if the retailers ordered larger quantities (*e.g.*, a pallet of liquor), there would be no labels on them.[14] Even in smaller quantities that contained the stickers, the Maryland Wholesalers, including Reliable Churchill, assisted in the removal of the stickers.  To avoid detection of the scheme, Reliable Churchill provided instructions to the Cecil County Retailers on methods to remove the stickers—including removal by use of "a torch."[15]

12.     The Maryland Wholesalers (and the local Cecil County Retailers) also used code words to hide their activities, referring to cases of liquor smuggled to New York as "going out the back door"[16] and to New York smugglers as the people from "upstate" (understood as a euphemism for New York because there is no Maryland county "upstate" from Cecil County in Maryland.).[17]  And many of the smugglers who drove across federal highways from New York

---

[14]  *Id.*

[15]  *See* Ex. X at ¶ 17 (Barker Declaration).

[16]  Indictment at ¶¶ 24(b), (c), *United States v. Republic Nat'l Distrib. Co.*, No. 16-cr-00258, ECF No. 1 (D. Md. May 24, 2016) ("RNDC Indictment") (Ex. A); Ex. X at ¶ 19 (Barker Declaration).  As further explained, the RNDC Indictment in Maryland was dismissed at federal government's request based on a conflicts issue, not the merits of the underlying allegations.

[17]  *See* Ex. Y at ¶ 11 (Jatin Patel Declaration).

to pick up liquor from the "back door" of Cecil County Retailers purposely used only first names to avoid identification.[18]

13.     The New York Retailers typically paid for the large quantities of bootlegged alcohol they were purchasing in cash—as much as $15,000 to $20,000 at a time delivered in plastic bags.  The Cecil County Retailers, in turn, laundered this cash through their bank accounts, and then paid RNDC and Reliable Churchill from those accounts.[19]  The Defendants engaged in all of these acts of concealment for one purpose:  to avoid detection and discovery of their criminal scheme by law enforcement, regulatory authorities, and the New York distributors, such as Empire, that they were victimizing.

14.     The Maryland Wholesalers, including Reliable Churchill, spun lies to ensure that the Cecil County Retailers continued with smuggling scheme.  When, for example, one Cecil County Retailer expressed concern over their smuggling activities, a Reliable Churchill salesman and supervisor falsely described Reliable Churchill and Empire Merchants as owned by the same company in order to reassure the Retailer that the illegal smuggling did not harm Empire Merchants.[20]

15.     Through this criminal scheme, RNDC and Reliable Churchill sold massive volumes of liquor to rural Cecil County Retailers, far in excess of what Cecil County Retailers could possibly sell to consumers nearby, thereby padding the Maryland Wholesaler's bottom line

---

[18] *See* Trial Tr. at 90, *Republic Nat'l Distrib. Co. v. Tech Pride of Am., Inc.*, No. C-12-1545 (Md. Cir. Ct. Cecil Cty. Oct. 20, 2014) ("*RNDC v. Tech Pride* Trial Tr.") (Ex. C); *see also Republic Nat'l Distrib. Co. v. Tech Pride of Am.*, No. 07-c-12-1545, slip op. at 1–2 (Md. Cir. Ct. Cecil Cty. Dec. 19, 2014) ("Unidentified people from New York, identified only as 'the New Yorkers,' would drive to Maryland to purchase most of these bulk quantities of liquor from the Defendants.") ("*RNDC v. Tech Pride* Opinion") (Ex. F); Ex. X at ¶¶ 8–9 (Barker Declaration).

[19] Ex. A at ¶ 19 (RNDC Indictment).

[20] Ex. X at ¶ 20 (Barker Declaration).

9

with tens of millions of dollars of illegal sales, the proceeds of which should have gone to Empire Merchants as the exclusive distributor of those products in New York.  Indeed, while Cecil County, Maryland has an estimated adult population of only approximately 78,000 people,[21] it would have taken hundreds of thousands of people, or more, in a City like New York (where this bootlegged alcohol typically was smuggled and then sold) to drink all of the alcohol these Maryland Wholesalers were providing.  For example, one of the Cecil County Retailers had an 1,800 square foot store and, before the smuggling scheme, typically sold five or ten cases of alcohol a week.  But after this this retailer began participating in the scheme, that same store's sales increased to 3,000 cases a month—more alcohol than can possibly be stored in an establishment of that small size making only legitimate sales.  Counsel for the owner of the store acknowledged that, "overnight[,] everybody in Chesapeake City did not turn into an alcoholic.  This liquor was purchased on a daily basis going up to New York."[22]  Like all distributors in this heavily regulated industry, RNDC and Reliable Churchill had to keep close track of their sales in each of their markets, including Cecil County, Maryland.  Even after Reliable Churchill was warned in 2012 that its excess sales to Cecil County Retailers were being smuggled into New York, the company continued to fill excessively large orders from small Cecil County Retailers, into at least 2014.

16.     Reliable Churchill and RNDC's participation in the scheme was active and pervasive.  Numerous employees, including supervisors, had knowledge of and participated in the criminal scheme, over a more than five-year period.  Multiple Reliable Churchill salespeople,

---

[21] *QuickFacts:  Cecil County, Maryland*, U.S. Census Bur., http://www.census.gov/quickfacts/table/PST045215/24015 (last visited Dec. 9, 2016).

[22] Trial Tr. at 7:22–25, *Republic Nat'l Distrib. Co. v. Spirit 213, LLC*, No. C-12-1624 (Md. Cir. Ct. Cecil Cty. Oct. 20, 2014) ("*RNDC v. Spirit 213* Trial Tr.") (Ex. D).

their supervisors, and a "vice president of finance" all participated in and furthered the bootlegging operation.[23]  The bootlegging at Reliable Churchill was so pervasive and substantial that one involved Reliable Churchill salesman reportedly "earned more in commissions than the Reliable Churchill President earned in salary."[24]

17.    The Maryland Wholesalers—Reliable Churchill and RNDC— and their complicit employees and salespeople benefitted the most from this criminal scheme.  As a result of their ability to illegally tap into the United States' largest metropolitan market for alcohol—New York—Reliable Churchill and RNDC earned huge revenues and profits far in excess of what they could have or did earn through Maryland sales alone.[25]  Indeed, while the adult population of the entire State of Maryland is approximately 4.7 million people,[26] there are an estimated more than 6.7 million adults residing in New York City alone.[27]  Reliable Churchill bootlegged a staggering amount of liquor to break into this larger market.  From only June 2008 through June 2012, and through only five co-conspirator Cecil County Retailers, Reliable Churchill sold over 272,000 cases (containing over 5.8 million bottles) of bootlegged liquor destined for New York, resulting in gross revenues of more than $40 million.  And, as discussed further below, its

---

[23] Transcript at 92:19–25, *United States v. Republic Nat'l Distrib. Co.*, No. 16-cr-00258, (D. Md. Sept. 9, 2016) (law enforcement affidavit described "record[ing] a conversation about bootlegging with the . . . vice president of finance" at the second wholesaler, Reliable Churchill").  Reliable Churchill is referred to in this hearing transcript as the "second wholesaler" because the allegations against it remain under seal.

[24] Ex. X at ¶ 19 (Barker Declaration).

[25] Due to contractual restrictions and licensing requirements, the Maryland Wholesalers would not otherwise have had access to the New York market.

[26] *QuickFacts:  Maryland*, U.S. Census Bur., http://www.census.gov/quickfacts/table/PST045215/24,24015 (last visited Dec. 9, 2016).

[27] *QuickFacts:  New York City, New York*, U.S. Census Bur., http://www.census.gov/quickfacts/table/PST045215/3651000,36 (last visited Dec. 9, 2016).

bootlegging continued into at least 2014.  Employees at Reliable Churchill and RNDC were able to obtain excess (and unjust) commissions resulting from these illegal sales.

18.     In addition to increased revenues from illicit smuggling sales, these Maryland Wholesalers also obtained substantial indirect financial and reputational benefits from the criminal scheme.  Specifically, by unlawfully smuggling and selling millions of dollars' worth of extra liquor and wine to consumers in New York, the Maryland Wholesalers received additional bonuses, and avoided penalties, from certain liquor suppliers in return for far exceeding sales targets in supplier contracts.  These bonuses and corresponding penalties are typically based on the number of liquor cases sold, also referred to as "depletions."  Based on industry custom and practice, it is likely that these bonuses amounted to millions of dollars.  In addition, the Maryland Wholesalers' overstated "depletions" resulting from their participation in this scheme garnered for them unearned reputations as distributors who could outperform suppliers' expectations, likely providing Reliable Churchill and RNDC better contractual terms and additional exclusive supplier contracts in Maryland.  These benefits to these Maryland Wholesalers—Reliable Churchill AND rndc—and their complicit employees were based, in whole or in part, on the Maryland Wholesalers' smuggling alcohol to New York and theft of sales from Empire.

19.     The complicit Cecil County and New York retailers similarly received substantial monetary rewards from their involvement in this criminal scheme.  The Cecil County Retailers took electronic and telephonic orders from their co-conspirator New York Retailers and relayed them to the Maryland Wholesalers.  In return, the Cecil County Retailers received discounts on the liquor intended to be smuggled into New York and accounts-receivable abatements from the Maryland Wholesalers.  The Cecil County Retailers often benefitted financially from the extra business.  They were able to purchase, and sell at a profit (albeit at lower margins), larger

volumes of liquor than they otherwise would have from the Maryland Wholesalers because of their additional (and illegal) customers in New York.  Through this scheme, small rural retailers in Cecil County were able to sell large quantities of alcohol to New York retailers, turning the local Cecil County Retailers overnight into "multi-million-dollar-a-year businesses."[28]  For example, one Cecil County Retailer, in a *10-day* period in October and November of 2010, purchased over $360,000 worth of liquor from Reliable Churchill meant for smuggling to New York.  Another Cecil County Retailer, over a *nine*-day span in June 2011, purchased over $300,000 worth of liquor from Reliable Churchill for bootlegging to New York.  And a third Cecil County Retailer "said his sales soared to about 500 cases per week—up from 10—as more New Yorkers started showing up at his back door to pick up orders."[29]  This Cecil County Retailer stated that bootlegging from Maryland to New York happened "every day."[30]

20.     There were also substantial financial benefits to the New York Retailers engaged in this illicit scheme.  The complicit New York Retailers could certainly have purchased these same large quantities of liquor from licensed New York wholesalers, such as Empire.  They chose not to do so, motivated by pure greed:  They sold smuggled liquor distributed from Reliable Churchill and RNDC in order to pocket the difference between the Maryland and New York excise taxes and deprive Empire and other licensed New York wholesalers of sales to which they were contractually entitled.[31]  By willfully avoiding the payment of the much higher New York State and New York City excise tax on alcohol, the complicit New York Retailers and

---

[28]  *See* Ex. C at 7:18–19 (*RNDC v. Tech Pride* Trial Tr.).

[29]  Elstein, *supra* note 1.

[30]  *Id.*

[31]  *See* Ex. A at ¶ 16 (RNDC Indictment).  Federal agents have video surveillance of New York Retailers picking up cases at certain Cecil County Retailers, as well as recorded conversations between Cecil County Retailers' employees and certain New York Retailers.  *See* Ex. X at ¶ 23 (Barker Declaration).

their co-conspirators deprived New York State and New York City of millions of dollars in tax revenue.

21.     The criminal scheme was partially revealed in late May 2016, with the indictment of RNDC and a number of its co-conspirator employees (including Eugene Gerzsenyi, Jason Lockerman, and Lisa Robbins) for federal wire fraud and money laundering offenses arising out of this criminal bootlegging scheme.[32]   That indictment was the result of a multi-year investigation by the United States Attorney's Office for the District of Maryland, which also resulted in the conviction of eight (8) co-conspirators (primarily smugglers in New York and Maryland retailers) involved in the smuggling ring.[33]   While Reliable Churchill was not indicted at that time, it has long been under investigation for the same smuggling activity and negotiating to resolve potential charges against the company.

22.     Prior to the filing of the criminal indictment against RNDC, Defendants' efforts at concealment were highly successful.  Indeed, starting in 2013 and continuing thereafter, Charles Merinoff and Arlyn Miller, two high-level executives at the Sunbelt Beverage Company, LLC ("Sunbelt"), one of the ultimate parent companies to Reliable Churchill,[34] affirmatively misled

---

[32]  On or about October 28, 2016, the government, with the consent of all defendants, moved to dismiss the RNDC Indictment, and that motion was granted by the Court on October 31.  The dismissal was based not on the merits of the government's charges, but, rather, on "the conduct of counsel" and, in particular, the government's failure to timely disclose a conflict issue—namely, that the Assistant United States Attorney handling the matter was married to the agent who swore out the affidavit filed seeking attachments of RNDC's bank accounts.  *See* Ex. Z, Letter from United States Attorney Rod J. Rosenstein to The Honorable Marvin J. Garbis, *United States v. Republic Nat'l Distrib. Co.*, No. 16-cr-00258, ECF No. 56 (D. Md. Oct. 12, 2016).  The allegations against RNDC and Reliable Churchill remain meritorious.

[33]  Ex. A ¶ 10 (RNDC Indictment); *accord id.* ¶ 9 (Defendants RNDC, Eugene Gerzsenyi, Jason Lockerman, and Lisa Robbins "did knowingly conspire, combine, confederate, and agree with each other and with Anil Patel, Dilip Patel, Jatin Patel, Nilesh Patel, Tushar Patel, Bin Luo, Bao Zheng, Alexander Lew, [and] Ting Wei . . . to knowingly devise a scheme and artifice to defraud . . . registered New York wholesalers.").

[34]  As explained more fully *infra*, Section I.B, Sunbelt Beverage Company, LLC is affiliated with Charmer Industries, Inc. ("Charmer") as part of the "Charmer Sunbelt Group."  Charmer is one half of the

Empire about Reliable Churchill's involvement in, and knowledge of, this criminal scheme. However, by 2013, when the press reported that federal prosecutors in Maryland were targeting RNDC and Reliable Churchill for bootlegging alcohol from Maryland to New York, Miller, speaking on behalf of Reliable Churchill and her boss Merinoff, minimized and lied to Empire representatives from Bulldog Ventures to deceive them and prevent them from discovering the true facts. These lies lulled the Empire representatives into a false sense of security. The lies that Miller told at the time were in furtherance of one of the scheme's principal objectives: to cover up the existence of the conspiracy and Reliable Churchill's active participation in it. Thus, Reliable Churchill brazenly continued to take steps to conceal its involvement in the smuggling scheme. Indeed, even after the federal government began investigating Reliable Churchill's conduct, it to smuggle liquor into New York through Cecil County Retailers into at least 2014.

23.     In his capacity as an executive for Charmer and the Sunbelt Entities (presented to the public as The Charmer Sunbelt Group), Merinoff knowingly and actively participated in the bootlegging scheme for pecuniary gain. On information and belief, his involvement was also in furtherance of his scheme to wrest control over Empire's New York operations from Empire's other principals. Because of the ownership structures of the different relevant entities, Merinoff profited more when Reliable Churchill made a sale, as opposed to when Empire made a sale. But Reliable Churchill's stealing sales from Empire also furthered Merinoff's ultimate goal: to coerce the principals of Empire to cede control over Empire as an independent operation by

---

Empire Merchants, LLC joint venture; Bulldog Ventures Ltd. ("Bulldog Ventures") is the other half. Sunbelt Holding, Inc. and Sunbelt Beverage Company, LLC (the "Sunbelt Entities") were the ultimate owners of Reliable Churchill up to and including January 1, 2016. On that date—January 1, 2016— Sunbelt Holding, Inc. and Wirtz Beverage Holdings, LLC, along with other related entities, contributed certain equity interests to form Breakthru Beverage Group, LLC. See *Breakthru Beverage Group Launches*, Breakthru Beverage Grp., http://www.breakthrubev.com/news/breakthru-beverage-group-launches (Jan. 4, 2016). Breakthru is now Reliable Churchill's ultimate parent entity.

combining it completely with the larger Charmer Sunbelt Group (now merged into Breakthru), which Merinoff controlled.  By harming Empire, Merinoff intended to make Empire look weaker in the eyes of suppliers and, consequently, more reliant on the rest of The Charmer Sunbelt Group to stay in suppliers' good graces.  Moreover, Merinoff intended to diminish the value of Empire so that when Empire's other principals eventually contemplated selling their Empire interests to take a minority interest in The Charmer Sunbelt Group, they would be paid less than their Empire interests should have been worth.  Indeed, the Maryland bootlegging scheme was of a piece with other actions by Merinoff intended to undermine Empire, which, while not the subject for any claim for damages in this lawsuit, are instructive.  Merinoff—at first in his capacity as an executive of Charmer and the Sunbelt Entities, and then, as an executive of the Sunbelt Entities—arranged to have the Sunbelt Entities pay Empire CEO Lloyd Sobel substantial deferred compensation so that Sobel would be compromised to favor the Sunbelt Entities' interests over Empire.  Indeed, within two months of Sobel being fired from Empire for refusing to stop receiving such compensation, he officially re-joined forces with Merinoff at Breakthru as an Executive Vice President of Commercial Development.

24.     After Empire filed its initial Complaint on September 20, 2016, Defendants Reliable Churchill, Merinoff, and Baird, along with non-party Lloyd Sobel, conspired with Breakthru Beverage Group, LLC ("Breakthru") (collectively, the "Breakthru Defendants") to systematically harass and retaliate against Empire and its affiliate Empire North[35] through a series of vindictive and retaliatory acts designed to damage and threaten the viability of Empire and Empire North.  This retaliation served a triple purpose:  (i) to punish Empire for filing its lawsuit and seeking to enforce its rights, (ii) to try to deter Empire from cooperating with law

---

[35]  As discussed in more detail *infra*, Section II.A, Empire and Empire North have overlapping ownership.

enforcement's long-running investigation of the very same bootlegging scheme at issue in this lawsuit, and (iii) to try to weaken the Empire Companies and force them to give in to Breakthru's efforts to gain control of Empire.  Thus, in addition to the many millions of dollars Empire Merchants lost as a direct result of Defendants' unlawful smuggling, the Empire Companies seek to enjoin the Breakthru Defendants from continuing their pattern of harmful retaliation.

25.    More specifically, the Breakthru Defendants' unlawful retaliation against Empire and its affiliate, Empire North, after Empire filed its initial complaint in this action on September 20, 2016, included the following actions:

a.    On September 21, 2016, the very next day after this lawsuit was filed, Breakthru—of which Merinoff is the Co-Chairman—reduced the quality and level of services it owes Empire North under a longstanding Services Agreement, despite the fact that neither Breakthru nor Empire North were originally named parties to this action.

b.    One month later, on October 21, 2016, Breakthru's outside litigation counsel—the very same counsel representing Merinoff, Baird, and Reliable Churchill in this suit—threatened a complete shutdown of the critical IT and other services Breakthru provides to Empire North by an arbitrary deadline of January 31, 2017, even though the services are contractually required to run until at least June 30, 2017, pursuant to the Services Agreement.[36]

c.    On November 11, 2016, shortly after Breakthru hired Sobel (Empire's ex-CEO), it made a sham "acquisition offer" for the Empire Companies and simultaneously publicized this sham offer to the press.[37]  The sham offer was intended to harm the Empire Companies both by

---

[36] *See* Letter from Sean F. O'Shea to Board of Managers of Empire Merchants, LLC (Oct. 21, 2016) (Ex. AA).

[37] *See* Letter from W. Rockwell Wirtz, Co-Chairman, Breakthru Beverage Grp., to Board of Managers of Empire Merchants, LLC (Nov. 11, 2016) (Ex. BB); Greg Trotter, *Breakthru Beverage Makes Offer for New York Wholesaler That Is Suing Its Execs*, CHI. TRIB. (Nov. 11, 2016),

presenting an unreasonably low valuation of the Empire Companies, and because it implied that the Empire Companies' principals were interested in selling the business (they were not) in order to create uncertainty among the Empire Companies' suppliers about Empire's future.

        d.   Finally, on November 17, 2016, Sobel, while employed and paid by Breakthru, and with Breakthru's knowledge and consent, voluntarily filed a declaration on behalf of Empire's litigation *adversary*—a major supplier, Bacardi—in a lawsuit in Florida concerning Bacardi's termination of Empire in New York.  That declaration purported to disclose the substance of Empire's attorney-client communications and litigation strategy that Sobel would only have learned while CEO of Empire.  There was no legitimate justification, business or otherwise, for Sobel to disclose Empire's confidential and privileged information; he did it, presumably with the knowledge, consent, and support of the Breakthru Defendants, simply to harm Empire and in breach of obligations he still owed Empire.

        26.   The fallout from the Maryland bootlegging scheme has been far-reaching and ongoing.  In connection with this scheme, the federal government has secured eight guilty pleas: five for wire fraud[38] and three for conducting a wholesale liquor business without a permit.[39]

---

http://www.chicagotribune.com/business/ct-wirtz-breakthru-empire-merchants-1112-biz-20161111-story.html.

[38]  *See* Bin Luo Plea Agreement at 1; Plea Agreement at 1, *United States v. Patel*, No. 15-cr-00298, ECF No. 8 (D. Md. Aug. 10, 2015) ("Anil Patel Plea Agreement") (Ex. G); Plea Agreement at 1, *United States v. Patel*, No. 15-cr-00309, ECF No. 9 (D. Md. Sept. 30, 2015) ("Dilip Patel Plea Agreement") (Ex. H); Plea Agreement at 1, *United States v. Patel*, No. 15-cr-00515, ECF No. 8 (D. Md. Oct. 13, 2015) ("Jatin Patel Plea Agreement") (Ex. I); Plea Agreement at 1, *United States v. Zheng*, No. 15-cr-00311, ECF. No. 40 (D. Md. Aug. 7, 2015) ("Bao Zheng Plea Agreement") (Ex. J).

[39]  *See* Plea Agreement at 1, *United States v. Patel*, No. 15-cr-00516, ECF No. 6 (D. Md. Oct. 21, 2015) ("Tushar Patel Plea Agreement") (Ex. K); Plea Agreement at 1, *United States v. Wei*, No. 15-cr-00581, ECF No. 5 (D. Md. Dec. 3, 2015) ("Ting Wei Plea Agreement") (Ex. L); Plea Agreement at 1, *United States v. Lew*, No. 15-cr-00323, ECF. No. 9 (D. Md. Aug. 10, 2015) ("Alexander Lew Plea Agreement") (Ex. M).

Furthermore, on information and belief, Reliable Churchill remains under investigation for its participation in this bootlegging scheme.

27.     While more incriminating evidence of this racketeering enterprise's scheme continues to be revealed, based on what is already known, it is evident that Defendants' racketeering activity has caused Empire at least tens of millions of dollars in lost sales damages. And Empire is also entitled to redress for Defendants' tortious interference with Empire's supplier contracts, violation of statutory and common law New York business and unfair competition laws, fraud, and unjust enrichment.  Accordingly, Empire should be recompensed for every case of liquor whose sale it lost as a result of the bootlegging scheme, as well as for any contractual penalties it incurred or bonuses it lost as a result.  Moreover, this Court should enter an injunction enjoining Breakthru from terminating its Services Agreement with Empire North before June 30, 2017, at a minimum, and enjoining the Breakthru Defendants from taking further retaliatory actions against the Empire Companies.  Empire is entitled to treble damages under the RICO statute, as well as attorneys' fees.  Moreover, given the pervasiveness of Defendants' misconduct and its impact on the public, punitive damages should be imposed on all Defendants in connection with Empire's New York law claims.  In addition, this Court should enter equitable relief to prevent these Defendants from engaging in future bootlegging and retaliatory activity that would harm Empire, Empire North, and other New York-licensed distributors.

## PARTIES

<u>PLAINTIFF</u>

28.     Plaintiff Empire Merchants, LLC is a Delaware limited liability company with its principal place of business at 16 Bridgewater Street, Brooklyn, New York 11222.  Empire is a joint venture partnership between Bulldog Ventures Ltd. and Charmer Industries, Inc.  Empire was formed on July 14, 2006.

29.     Plaintiff Empire Merchants North, LLC is a Delaware limited liability company with its principal place of business at 16 Houghtaling Road, Coxsackie, NY 12051.  Empire North is a joint venture partnership owned 25% by Bulldog Ventures, 25% by Flatbush Enterprises, Inc., and 50% by Charmer.  Empire North was formed on May 7, 2007.

<u>MARYLAND WHOLESALERS AND THEIR PRINCIPALS, OFFICERS, AND AGENTS</u>

30.     Defendant Reliable Churchill LLLP is a Maryland Limited Liability Limited Partnership with its principal place of business at 7621 Energy Parkway, Baltimore, Maryland 21226.  Reliable Churchill was formed on August 21, 2001.  Through 2016, Reliable Churchill was ultimately owned by Sunbelt Holding, Inc. and Sunbelt Beverage Company, LLC (collectively, the "Sunbelt Entities").  Beginning in 2016, Reliable Churchill was ultimately owned by defendant Breakthru Beverage Group, LLC.[40]

31.     Breakthru Beverage Group, LLC is a Delaware Limited Liability Company that was formed in 2016 and has its principal place of business in New York.

32.     Defendant Charles Merinoff resides in New Jersey.  Until Breakthru's formation on January 1, 2016, Charles Merinoff served as the Chief Executive Officer and Chairman of the Board of Managers of the Sunbelt Entities, and was described as "the chairman and chief

---

[40]  *See infra* Section II.B (explaining the relationships among the entities referenced in this Complaint).

executive officer of The Charmer Sunbelt Group."[41]  On or about January 1, 2016, Merinoff

became the Co-Chairman of Breakthru.[42]  From Empire's inception until November 9, 2015, he

served on Empire's Board of Managers.

33.     Defendant Arlyn B. Miller resides in New Jersey.  Until 2016, Miller was

described as "Executive Vice President and General Counsel" of the Charmer Sunbelt Group,[43]

meaning that she was general counsel for the Sunbelt Entities.  On or about January 1, 2016,

Miller became Executive Vice President and General Counsel for Breakthru.[44] During all

relevant times, Miller served as counsel for, and provided legal advice to, Reliable Churchill.  On

information and belief, Miller, with the assistance of outside counsel, oversaw Reliable

Churchill's response to the government's investigation of the bootlegging scheme. In her role at

The Charmer Sunbelt Group, Miller provided legal advice to Empire from the company's

inception until the Fall of 2015 regarding, *inter alia*, the negotiation of supplier contracts and the

resolution of labor issues, but she was never a director, officer, or employee of Empire.

34.     Defendant Gregory L. Baird resides in South Carolina and, during times relevant

to the Complaint, maintained a residence in Maryland.  Baird was President of Reliable Churchill

from 1999 through the late 2000s, after which time he became an Executive Vice President of

Sales for the Sunbelt Entities and eventually The Charmer Sunbelt Group's President and Chief

---

[41]  *See Leadership Team*, Charmer Sunbelt Grp., http://www.charmer-sunbelt.com/About%20Us/Pages/
Leadership%20Team.aspx (last visited Dec. 9, 2016).

[42]  *See Executive Leadership*, Breakthru Beverage Group,
http://www.breakthrubev.com/About#Leadership (last visited Dec. 9, 2016).

[43]  *See Leadership Team*, Charmer Sunbelt Grp., http://www.charmer-sunbelt.com/About%20Us/Pages/
Leadership%20Team.aspx (last visited Dec. 9, 2016).

[44]  *See Executive Leadership*, Breakthru Beverage Group,
http://www.breakthrubev.com/About#Leadership (last visited Dec. 9, 2016).

Operating Officer.[45]  As Executive Vice President of Sales for the Sunbelt Entities, Baird was responsible for and oversaw sales for Reliable Churchill through at least approximately 2010, when he became President and Chief Operating Officer.  From January 1, 2012, until October 22, 2015, he served on Empire's Board of Managers.  On or about January 1, 2016, Baird became the President and CEO of Breakthru.[46]

<u>CECIL COUNTY RETAILERS AND THEIR PRINCIPALS, OFFICERS, AND AGENTS</u>

35.     Defendant Tushar C. Patel resides in New York and was the proprietor, owner and/or operator of Panna, LLC's liquor store, Northside Liquors, located at 701 N. Bridge St., Elkton, Maryland 21921.[47]

36.     Defendant Nileshkumar Jasbhai Patel (a/k/a Nick Patel) resides in New York and was the owner of Panna, LLC (d/b/a Northside Liquors).  Nileshkumar Patel is Defendant Pratibha Patel's relative.

37.     Defendant Pratibha Patel (a/k/a Panna Patel) resides in New York and was the owner or operator of Panna, LLC (d/b/a Northside Liquors).  Pratibha Patel is defendant Tushar Patel's wife.

38.     Defendant Tech Pride of America, Inc. (d/b/a Happy 40 Liquors, Happy 40 Wines & Spirits, and Happy 40 Discount Liquors) is a Maryland corporation with its principal place of

---

[45]  *See* Stephen Patten, *Greg Baird Promoted to President of The Charmer Sunbelt Group*, Beverage J. (Feb. 21, 2015), http://www.beveragejournalinc.com/new/easyblog/entry/greg-baird-promoted-to-president-of-the-charmer-sunbelt-group; *Leadership Team*, Charmer Sunbelt Grp., http://www.charmer-sunbelt.com/About%20Us/Pages/Leadership%20Team.aspx (last visited Dec. 9, 2016).

[46]  *See Executive Leadership*, Breakthru Beverage Group, http://www.breakthrubev.com/About#Leadership (last visited Dec. 9, 2016).

[47]  Panna, LLC (d/b/a Northside Liquors) was a Maryland limited liability company with its principal place of business at 701 N. Bridge St., Elkton, Maryland 21921.  Panna, LLC was formed by Defendant Tushar Patel on March 24, 2008.  Defendants Tushar Patel and Nileshkumar Jasbhai Patel owned Defendant Panna, LLC.  Panna, LLC no longer legally exists.  Its existence was terminated by the State of Maryland on October 1, 2012, as the result of a failure to file its 2011 property return.

business at 600 East Pulaski Highway, Elkton, Maryland 21921.  Tech Pride of America, Inc. was formed on April 28, 2003.

39.    Defendant Anil Patel resides in Delaware and was the President of Defendant Tech Pride of America, Inc. and the proprietor of its liquor store, Happy 40 Discount Liquors, located at 600 East Pulaski Highway, Elkton, Maryland 21921.

40.    Defendant Dilip C. Patel resides in Delaware and was the proprietor of Chesapeake Wine & Spirits, LLC's[48] liquor store located at 2726 Augustine Herman Highway, Chesapeake City, Maryland 21915, as well as an officer of Shree Sai Shradha Inc.[49]

41.    Defendant Prakash Patel resides in Virginia.  Prakash Patel is affiliated with Shree Sai Shradha Inc., Spirit 213, LLC[50] and the liquor store owned by these entities, Chesapeake Wine & Spirits, located at 2728 Augustine Herman Highway, Chesapeake City, Maryland 21915.

42.    Collectively, the Defendants listed in paragraphs 35 through 41, and 57 through 59, are referred to as the "Cecil County Retailers."

---

[48]  Chesapeake Wine & Spirits, LLC was a Maryland limited liability company with its principal place of business at 155 Yearling Row, Chesapeake City, Maryland 21915.  Chesapeake Wine & Spirits, LLC was formed on April 4, 2001.  Chesapeake Wine & Spirits, LLC no longer legally exists.  Its existence was terminated by the Comptroller of the State of Maryland on October 1, 2012, as the result of a failure to file its 2011 property return.

[49]  Shree Sai Shradha Inc. was a Maryland corporation with its principal place of business at 2728 Augustine Herman Highway, Chesapeake City, Maryland 21915, operating as Chesapeake Wine & Spirits.  Shree Sai Shradha Inc. was formed on February 27, 2009.  Shree Sai Shradha Inc. no longer legally exists.  Its existence was terminated by the Comptroller of the State of Maryland on October 1, 2013, as a result of an unspecified delinquency.

[50]  Spirit 213, LLC was a Maryland limited liability company with its principal place of business at 2728 Augustine Herman Highway, Chesapeake City, Maryland 21915 and its registered address at 333 Walnut Drive, Chesapeake City, Maryland 21915.  Spirit 213, LLC was formed on March 18, 2009.  Spirit 213, LLC no longer legally exists.  Its existence was terminated by the State of Maryland on October 1, 2015, as the result of a failure to file its 2014 property return.

NEW YORK RETAILERS AND THEIR PRINCIPALS, OFFICERS, AND AGENTS

43.     Defendant Sam Liquors Inc. is a New York corporation with its principal place of business at 1139 Flatbush Avenue, Brooklyn, New York 11226.

44.     Defendant Bin Luo (a/k/a Chen) resides in New York upon information and belief and is the owner and operator of Sam Liquors Inc.

45.     Defendant Bao Liquors Inc. is a New York corporation with its principal place of business at 98-10 Northern Boulevard, Corona, New York 11368.

46.     Defendant Bao Xiong Zheng (a/k/a Bao Xing Zheng; Bao Xion Zheng) resides in New York and is the owner, operator and Chief Executive Officer of Defendant Bao Liquors Inc.

47.     Defendant Our Liquor, Inc. is a New York corporation with its principal place of business at 185-02 Horace Harding Expressway, Fresh Meadows, New York 11365.

48.     Defendant Alexander J. Lew resides in New York.  Alexander Lew is employed by or otherwise affiliated with Our Liquor, Inc.

49.     Defendant Ting Wei resides in New York.  Ting Wei is employed by or affiliated with New York liquor retailers.

50.     Defendant LTT Whiskey Inc. was incorporated in New York on June 5, 2007.  Its principal place of business is 134-42 Guy R. Brewer Blvd., Jamaica, New York 11434.

51.     Defendant Ke Yao resides in New York.  Ke Yao is employed by or affiliated with New York liquor retailers.

52.     Defendant Yi Feng Gao resides in New York.  Yi Feng Gao is employed by or affiliated with New York liquor retailers.

53.     Collectively, the Defendants listed in paragraphs 44 through 53 are referred to as the "New York Retailers."

JOHN DOE DEFENDANTS

54.     John Doe Defendants Nos. 1–50 are other entities or persons, including wholesalers and retailers in Maryland and New York, who participated in, furthered, and/or combined, conspired, or agreed with others to perform the unlawful acts alleged herein.

NON-PARTY LLOYD SOBEL

55.     Non-Party Edward Lloyd Sobel resides in New York and was CEO at Empire until September 20, 2016.  On November 7, 2016, Breakthru named Sobel as its Executive Vice President of Commercial Development.[51]

SETTLING CECIL COUNTY RETAILER DEFENDANTS

56.     Settling Defendant Jatin B. Patel (a/k/a Jattinkumar B. Patel) resides in Maryland and was the proprietor of J & R Company LLC's liquor store, North East Liquors, located at 107 North East Plaza, #4, North East, Maryland 21901.

57.     Settling Defendant J & R Company LLC (d/b/a North East Liquors) is a Maryland limited liability company with its principal place of business at 13815 Briarwood Drive, Apt. 1232, Laurel, Maryland 20708.

58.     Settling Defendant Vlamis Liquors LLC (d/b/a Vlamis' Cut-Rate Liquors) ("Vlamis Liquors") is a Maryland limited liability company with its principal place of business at

---

[51]  *See* Annie Hayes, *Breakthru Appoints Empire CEO*, THE SPIRITS BUSINESS (Nov. 7, 2016), http://www.thespiritsbusiness.com/2016/11/breakthru-appoints-former-empire-ceo/.

801 N. Bridge St., Elkton, Maryland 21921.  Vlamis Liquors LLC owns and operates a liquor store doing business as Vlamis' Cut-Rate Liquors at 801 N. Bridge St., Elkton, Maryland 21921.

RNDC NON-PARTY CO-CONSPIRATORS

59.     Non-Party Republic National Distributing Company, LLC is a Delaware limited liability company with its principal place of business at 809 Jefferson Highway, New Orleans, Louisiana 70121.  RNDC was formed on August 24, 2006.  RNDC is registered to do business in the State of Maryland and has offices at 8201 Stayton Drive, Jessup, Maryland 20794.

60.     Non-Party Eugene Gerzsenyi resides in Maryland and was RNDC's Assistant Director of Operations.

61.     Non-Party Jason Lockerman resides in Maryland and was a salesman for RNDC. Prior to working at RNDC, Lockerman was employed by Reliable Churchill.

62.     Non-Party Lisa Robbins resides in Maryland and was an accounting manager for RNDC.  Prior to working at RNDC, Robbins was employed by Reliable Churchill.

63.     Non-Party Robert Malloy resides in Maryland and was a salesman for RNDC.

64.     Non-Party Christopher K. Berg resides in Maryland and was a salesman for RNDC.

65.     Non-Party Richard Fe resides in Maryland upon information and belief and was a salesman for RNDC.

**JURISDICTION AND VENUE**

66.     This Court has subject matter jurisdiction over Empire's federal law claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).  This Court has supplemental subject matter jurisdiction over Empire's state law claims pursuant to 28 U.S.C. § 1367(a) because those

claims are so closely related to the federal claims brought herein, and arise from a common nucleus of operative facts, so as to form part of the same case or controversy.

67.     Personal jurisdiction is proper over all Defendants in this district pursuant to C.P.L.R. §§ 301, 302(a)(1)–(3); 18 U.S.C § 1965(a)–(b); and/or Federal Rule of Civil Procedure 4(k).

68.     The exercise of personal jurisdiction over Defendants is reasonable and proper because, as a result of the illegal bootlegging scheme detailed herein, all of the Defendants, directly or indirectly through agents, supplied goods, namely liquor, in the State of New York. From these illicit and frequent contracts, Defendants derived substantial revenue and thereby caused tens, if not hundreds, of millions of dollars of injury to Plaintiff's New York liquor wholesale business, thereby devaluing its property located in the State of New York.  At all relevant times, Defendants' illicit bootlegging was directed at retail liquor sales exclusively in the State of New York.  Defendants also committed tortious acts within the State of New York, including the New York Retailers' fraudulent sales, amounting to tortious interference with contract.  Additionally, the New York Retailers own and use property in the State of New York. And Breakthru "consent[ed] . . . to the non-exclusive jurisdiction of competent . . . federal courts in the State of New York" for certain disputes—such as those raised in this complaint—related to the Services Agreement.

69.     Venue is proper in this Court pursuant to 18 U.S.C. § 1965 because each defendant resides, is found, has an agent or transacts his affairs in this District and because the ends of justice require that other parties residing in any other district be brought before the Court. In addition, venue is proper pursuant to 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims herein occurred in this District.  Furthermore, pendent

venue is proper because all claims arise out of the same nucleus of operative facts.  Moreover, Breakthru "consent[ed] to venue in . . . federal courts in the State of New York" for certain disputes—such as those raised in this complaint—related to the Services Agreement.

## STATEMENT OF THE CASE

I.    **THE LIQUOR INDUSTRY**

   A.    **The Three-Tiered System of Liquor Distribution Is Heavily Regulated by Federal and State Laws**

   70.    There are three tiers of entities in the United States' alcohol industry: (1) suppliers, or producers/manufacturers, which make alcoholic products in distilleries and vineyards; (2) wholesalers, or distributors, which warehouse and distribute to retailers the products in each state; and (3) retailers, like bars, restaurants, and liquor stores, which sell alcoholic beverages to consumers.  Federal and state laws prevent suppliers and distributors from entering into certain relationships, and engaging in certain transactions, with retailers.[52]  For example, the Federal Alcohol Administration Act's "tied house" provision prohibits liquor industry members from "induc[ing] . . . any retailer, engaged in the sale of distilled spirits, wine, or malt beverages, to purchase any such products . . . by furnishing, giving, renting, lending, or selling to the retailer . . . money, services, or other thing[s] of value."[53]  The Federal Alcohol

---

[52]  *See generally Trade Practices Laws and Regulations*, Alcohol & Tobacco Tax & Trade Bureau, U.S. Dep't of Treasury, http://www.ttb.gov/trade_practices/laws_regs_tp.shtml (last updated Apr. 30, 2013) (listing certain Federal Alcohol Administration Act provisions); *see also* N.Y. Alco. Bev. Cont. Law § 101 (prohibiting "manufacturer[s] or wholesaler[s]" from being "interested directly or indirectly in any premises where any alcoholic beverage is sold at retail").

[53]  27 U.S.C. § 205(b).

Administration Act also outlaws "commercial bribery" aimed at inducing retailers to purchase products.[54]  States' liquor laws contain similar provisions.[55]

71.    Additionally, federal and state laws require participants in the liquor industry to obtain licenses and to conduct their business in an open and non-discriminatory fashion.  Federal law, for example, prohibits "engag[ing] in the business of purchasing for resale at wholesale distilled spirits, wine, or malt beverages" without "a basic permit issued . . . by the Secretary of Treasury."[56]  New York law similarly prohibits persons from "engag[ing] or participat[ing] in the manufacturing or sale of liquor, wine, or beer in th[e] state without obtaining the appropriate license therefor."[57]  Maryland and New York state law both require wholesalers to "provide monthly reports of the quantities of liquor transferred or distributed for retail sale" in their respective states.[58]

72.    Both Maryland and New York state law prohibit the practice of discriminating in prices by giving rebates or discounts to some retailers and not to others.  Maryland law, for example, makes it unlawful for a licensed wholesaler to "discriminate directly or indirectly in price, discounts, or the quality of merchandise sold between . . . one retailer and another retailer," Md. Code Ann. Al. Bev. § 2-217(b)(1), and for nonresident wholesalers to "discriminate directly

---

[54]  *See id.* § 205(c).

[55]  *See* Md. Code Ann. Al. Bev. § 2-316(a) ("The purpose of this section is to eliminate . . . the practice of wholesalers granting secret discounts, rebates, allowances, free goods, or other inducements to selected license holders that contribute to a disorderly distribution of alcoholic beverages."); N.Y. Alco. Bev. Cont. Law §§ 101-b(2)(a) ("It shall be unlawful for any person who sells liquors or wines to wholesalers or retailers . . . to grant, directly or indirectly, any discount, rebate, free goods, allowance or other inducement of any kind whatsoever, except a discount or discounts for quantity of liquor or for quantity of wine . . . .").

[56]  27 U.S.C. § 203(c).

[57]  N.Y. Alco. Bev. Cont. Law § 123(1)(a); *see* N.Y. Alco. Bev. Cont. Law § 62 (discussing wholesaler's liquor license in New York).

[58]  Ex. A at ¶¶ 6, 8 (RNDC Indictment).

or indirectly in price between license holders," Md. Code Ann. Al. Bev. § 2-124(f).  New York

law has similar prohibitions.[59]  In addition, both Maryland and New York law require

wholesalers to post a schedule of prices with the state liquor authority and to adhere to them in

all sales to retailers.[60]  These laws exist, in part, to prevent liquor industry participants from

taking advantage of different states' tax and regulatory schemes.  During various times relevant

to this Complaint, the difference in excise tax between Maryland and New York City was almost

$6 per gallon of liquor.[61]

73.     The largest suppliers and wholesalers in the liquor industry typically enter into

exclusive distribution agreements whereby one wholesaler in each state is given the exclusive

right to distribute that supplier's products in-state.  These agreements sometimes include

performance bonuses or penalties:  Wholesalers can earn additional money if they exceed

suppliers' expectations regarding depletions; conversely, wholesalers who underperform

suppliers' expectations face sanctions, including financial penalties and potentially termination.

On information and belief, both RNDC and Reliable Churchill are parties to distribution

agreements that grant them exclusive rights to distribute certain products in Maryland.

---

[59]  *See, e.g.*, N.Y. Alco. Bev. Cont. Law § 101-b(2).

[60]  *See* N.Y. Alco. Bev. Cont. Law § 101-b(3) ("No brand of liquor or wine shall be sold to or purchased by a wholesaler, irrespective of the place of sale or delivery, unless a schedule, as provided by this section, is transmitted to and received by the liquor authority, and is then in effect.").  At all times relevant to this Complaint, the relevant Maryland laws were substantially similar to those of New York, but Maryland's price listing provision has been repealed as of July 1, 2016.  Md. Code Ann. Art. 2b § 12-103(c) (*repealed by* 2016 Md. Laws Ch. 41 (Sen. B. 724)) ("The Comptroller is authorized and directed, by regulation, to require the filing . . . by any manufacturer [or] wholesaler . . . of schedules of prices at which wines and liquors are sold . . . and further to require the filing of any proposed price change."); *see also* Md. Code Regs., 03.02.01.05 (2006); Administrative Release AB-36 (Feb. 1, 2007), http://taxes.marylandtaxes.com/Resource_Library/Tax_Publications/Administrative_Releases/Alcohol_Tax_Releases/ar_ab36.pdf ("State Regulation 03.02.01.05 titled 'Price Filings[sic]' requires wholesalers, manufacturers and nonresident wineries to post prices for each brand and size of wine and distilled spirits sold to retailers in this state.").

[61]  Ex. A at ¶¶ 5, 7 (RNDC Indictment).

Moreover, on information and belief, retailers are aware that these exclusivity agreements exist in Maryland and New York because they are only able to purchase certain brands of liquor from one wholesaler.

**B.    Empire's Background and Role in the Liquor Industry**

74.    Empire is a 50-50 joint venture liquor wholesaler formed on July 14, 2006, between Charmer (owned by members of the Merinoff and Drucker families) and Bulldog Ventures[62] (owned by members of the Magliocco family), and now has over 1,300 employees and 10,000 customers in the metropolitan New York area.  Empire is affiliated with Empire North, a liquor wholesaler in upstate New York that is owned 50% by Charmer, 25% by Bulldog Ventures, and 25% by Flatbush Enterprises, Inc. (owned by members of the Andretta family). Until 2016, Charmer was part of the group of affiliated entities with interlocking ownership interests presented to the public as the "Charmer Sunbelt Group."  Thus, until 2016, the Sunbelt Entities—which were also part of the Charmer Sunbelt Group—ultimately owned Reliable Churchill.  On January 1, 2016, Sunbelt Holding, Inc. and Wirtz Corporation Beverage Holdings, LLC, along with other related entities, contributed certain equity interests to form Breakthru, which is now Reliable Churchill's ultimate parent entity.  Bulldog Ventures generally did not have visibility into The Charmer Sunbelt Group's or Breakthru's operations.

75.    Whereas the principals of the Sunbelt Entities (and later Breakthru), such as Charles Merinoff, ultimately retained a vast majority of the profits from Reliable Churchill sales, the principals of Charmer Industries were required to split the profits from Empire sales 50/50 with the principals of Bulldog Ventures.  As a result, those principals of the Sunbelt Entities who also held interests in Charmer Industries made more profit from each sale of alcohol through

---

[62]  References to Bulldog include its predecessor entity, Peerless Importers, Inc.

31

Reliable Churchill in Maryland than they did from each sale of alcohol through Empire in the New York metropolitan area.  Thus, even though Reliable Churchill was a part of the Charmer Sunbelt Group, there were strong financial incentives for Reliable Churchill to increase its sales through smuggling liquor to New York, even if such activities stole sales from Empire.

76.     The principals and employees of Empire (except for those affiliated with Reliable Churchill, such as Defendants Merinoff, Baird, and Miller) and Bulldog Ventures did not have access to sufficient data regarding the operations and sales of Reliable Churchill that would have alerted them to excess sales to Cecil County, Maryland or the bootlegging scheme as a whole.

77.     Until 2016, Merinoff also served as chairman and chief executive officer of The Charmer Sunbelt Group and Chief Executive Officer and Chairman of the Board of Managers of the Sunbelt Entities.  On January 1, 2016, he became Co-Chairman of Breakthru.  Despite being separate legal entities, as the parent company of Reliable Churchill the Sunbelt Entities (and later Breakthru)—and Merinoff—exercised ultimate control over important decisions at Reliable Churchill.  For example, on information and belief, Merinoff made the ultimate decision that Reliable Churchill would continue excess sales to Cecil County Retailers, even after 2012 when the Maryland Assistant U.S. Attorney's Office warned Reliable Churchill that those excess sales were being smuggled into New York.  *See infra* Section II.B.1.a.

78.     From 1999 into the late 2000s, Baird served as the President of Reliable Churchill, after which time he worked for the Sunbelt Entities, first as the Executive Vice President of Sales, and then as the President and Chief Operating Officer of the Charmer Sunbelt Group.  On information and belief, as President of Reliable Churchill, Baird had control of day-to-day decisions and was heavily involved in setting sales targets and monitoring sales performance.  Moreover, on information and belief, in his capacity as executive vice president of

sales at the Sunbelt Entities, Baird oversaw and supervised sales activity at Reliable Churchill and continued to be informed of excess sales to Cecil County Retailers.

79.     As the largest wholesaler in the New York metropolitan area, Empire is party to numerous distribution agreements with suppliers that grant Empire the exclusive rights to distribute those suppliers' products in the New York metropolitan area.[63]  For instance, at all relevant times, Empire had an exclusive distribution agreement with Diageo, the world's leading liquor supplier.  That agreement gives Empire the right to be the sole distributor in the New York metropolitan area for various popular brands, including Johnnie Walker, Crown Royal, Smirnoff, Ketel One, Ciroc, and Captain Morgan.  At all relevant times, Empire also had exclusive distribution arrangements with other leading alcohol suppliers, including Moet-Hennessy, Brown-Forman, and E. & J. Gallo.  As a result, Empire is also the exclusive distributor of Hennessey, Barton Vodka, Barton Gin, Seagram's Gin, 1800 Silver Tequila, Mr. Boston Blackberry Brandy, and Bolla Merlot in the New York metropolitan area.  Certain of these distribution contracts also guarantee bonus payments from the supplier to Empire, or penalty payments from Empire to the supplier or other penalties, based on Empire's depletions of the supplier's products in the New York metropolitan area.

80.     On information and belief, at all relevant times, Reliable Churchill similarly had exclusive distribution arrangements with Diageo, Moet-Hennessy, E. & J. Gallo, Brown-Forman, and possibly other suppliers, that grant Reliable Churchill exclusive distribution rights in Maryland.

---

[63]  Empire North has these exclusive distribution rights in the upstate areas of New York where Empire does not operate.

## II.   DEFENDANTS' CRIMINAL ENTERPRISE DIRECTLY HARMED EMPIRE

### A.   Overview of the Scheme

81.     From at least 2008 into at least 2014, Defendants actively participated in an interstate criminal enterprise whose "object" was "tak[ing] money from . . . New York distributors" like Empire.[64]  In connection with that scheme, the United States government has secured guilty pleas from eight different named Defendants for wire fraud or for conducting a wholesale liquor business without a permit in violation of federal law.[65]  An indictment against RNDC and three of its employees seeking over $197 million in disgorgement for federal wire fraud and money laundering violations was filed in May 2016.[66]  And, on information and belief, the United States Attorney's Office for the District of Maryland is continuing to investigate Reliable Churchill for its participation in the same smuggling scheme.

82.     The enterprise's scheme was predicated on selling liquor across state lines to take advantage of discrepancies between Maryland's and New York's excise taxes.  New York Retailers made interstate telephone calls and sent interstate emails and faxes[67] to inform the Cecil County Retailers which products they desired to smuggle.[68]  The Cecil County Retailers then informed the Maryland Wholesalers which products the New York retailers specifically

---

[64]  Ex. A at ¶ 10 (RNDC Indictment).

[65]  *See supra* notes 38–39 and accompanying text.

[66]  *See* Ex. A (RNDC Indictment).  As discussed above, the RNDC Indictment was ultimately dismissed not because of the underlying merits, but because of a conflicts issue.

[67]  *See* Appendix A (detailing the use of interstate wires in connection with Defendants' scheme); Barker Declaration ¶ 12; Jatin Patel Declaration ¶ 8.

[68]  *See* Ex. G at 8 (Anil Patel Plea Agreement); Ex. J at 8 (Bao Zheng Plea Agreement); Ex. E at 8 (Bin Luo Plea Agreement); Ex. H at 8 (Dilip Patel Plea Agreement); Ex I at 8 (Jatin Patel Plea Agreement); Ex. L at 7 (Ting Wei Plea Agreement); Ex. K at 8 (Tushar Patel Plea Agreement).

requested.[69]  The Maryland Wholesalers then sold these products to the Cecil County Retailers at deep "discounts."[70]  That liquor was then intended to, and in fact did, go "out the back door" of the Cecil County Retailers to the New York Retailers.[71]  (The Maryland Wholesalers sometimes coordinated directly with the Cecil County Retailers and New York Retailers to ensure that the discounts they were offering kept the enterprise profitable for all involved.[72])  To pick up the bootlegged liquor, the New York Retailers drove large vans or trucks across federal roads and highways from New York to Maryland, typically paid for the cases of alcohol in cash (in order to conceal the transaction and hide the source of the money), and drove the bootlegged alcohol back to New York, where the alcohol was fraudulently resold to the public as alcohol that was legitimately purchased from registered New York wholesalers like Empire.[73]  The Cecil County Retailers took the cash received from the New York Retailers, "deposited [it] in their bank accounts," and then "wrote checks against these bank accounts" to pay the Maryland Wholesalers.[74]  *See infra* Section II.B.2.b (describing in detail the bootlegging process at Northside Liquors).

---

[69]  *See, e.g.*, Ex. K at 8 (Tushar Patel Plea Agreement) ("The salesmen for the distributors routinely came into the store, looked at the faxes from New York and placed the orders."); Ex. B at 8–9 (Lisa Ward Affidavit) (out-of-state orders from New York segregated from Maryland in-store retail orders).

[70]  *See* Ex. C at 8:16–22, 9:24–10:5, 46:19–49:15, 137:9–24, 140:24–142:2, 160:18–163:24 (*RNDC v. Tech Pride* Trial Tr.).

[71]  *See id.* at 46:14–25, 129:10–130:5, 136:22–137:7, 141:9–10; Ex. A at ¶ 23(b) (RNDC Indictment); Ex. X at ¶¶ 8–10, 19 (Barker Declaration).

[72]  *See* Ex. Y at ¶ 16 (Patel Declaration).

[73]  *See, e.g.*, Ex. E at 8 (Bin Luo Plea Agreement) ("Bin Luo and Bao Zheng and a number of others routinely traveled from New York to retail liquor stores located in Cecil County, Maryland, to purchase bulk loads of wine and spirits. . . .  [They] paid cash for the bulk liquor that had been ordered . . . .  The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.").

[74]  *See* Ex. A at ¶ 19 (RNDC Indictment); Ex. B at 7 (Lisa Ward Affidavit).

83.     The scheme was profitable because of the substantial disparity in excise taxes on alcohol between Maryland and New York throughout the relevant time period.[75]  "The Maryland state excise tax rate for liquor distributed in Maryland was approximately $1.50 per gallon. . . .  Maryland state law required that excise taxes were to be paid to the State of Maryland Office of the Comptroller by the wholesale distributor."[76]  Conversely, the "New York rate of excise tax for the distribution of liquor in New York was approximately $6.44 per gallon for the State and an additional $1.00 per gallon for the City of New York for a total of approximately $7.44 per gallon.  New York state law required that excise taxes were to be paid to the State of New York by the wholesale distributor."[77]  Neither the Maryland Wholesalers, nor the Cecil County Retailers, nor the New York Retailers ever registered as importers of liquor or paid any excise taxes due to New York State and New York City.[78]

84.     Principals and employees throughout the Maryland Wholesalers knew about, participated in, and furthered the scheme.  As detailed *infra*, Reliable Churchill and RNDC employees spoke with Cecil County Retailers about the scheme and the liquor's ultimate destination in New York, and gave discounts to the Cecil County Retailers for products that were intended to go "out the back door" to New York.[79]  Upon information and belief, sophisticated distributors like the Maryland Wholesalers maintain complex tracking systems that detail which retailers are purchasing inventory and in what quantities.  Upon information and belief, the

---

[75]  Additionally, upon information and belief, because there was no paper trail showing the New York Retailers purchasing alcohol through proper channels from New York wholesalers like Empire, the New York Retailers were able to avoid paying sales tax on the smuggled liquor sold and income tax on their profits gained from selling the bootlegged liquor.

[76]  Ex. A at ¶ 5 (RNDC Indictment).

[77]  *Id.* ¶ 7.

[78]  *See id.* ¶ 15.

[79]  *See infra* Section II.B.1.a.

Maryland Wholesalers tracked retail orders on a weekly, monthly, and yearly basis.  The Maryland Wholesalers thus knew that the Cecil County Retailers were ordering excessively large quantities of liquor that would not credibly be purchased for and sold in a market the size of Cecil County, Maryland.  Indeed, "members of management for [the Maryland Wholesalers] had been to visit [one of the Cecil County Retailers] . . . and were aware of and encouraged the illegal sales to New York."[80]  By directing and facilitating the smugglers' importing bootlegged liquor into New York, the Maryland Wholesalers expressly aimed their tortious actions at the State of New York.

85.    The Maryland Wholesalers indisputably learned about the scheme when the United States Attorney's Office in Maryland informed them, in or around 2012, that their products were being smuggled into New York.  Reliable Churchill continued to ship excessively large orders to Cecil County Retailers, which were smuggled into New York, into at least 2014.

86.    Undeniably, the Cecil County Retailers and New York Retailers knew about the illicit scheme.  The Cecil County Retailers have admitted that they bought the smuggled alcohol and re-sold it to the New York Retailers, whom they knew were illegally transporting it into New York.[81]  The New York Retailers have similarly admitted that they drove to Maryland, paid the Cecil County Retailers in cash, and then drove the alcohol back to New York, where they did not pay the excise tax on alcohol and pawned the products off on the unknowing public as alcohol that was legitimate under New York State's laws and regulations.[82]

---

[80]  Ex. B at 9 (Lisa Ward Affidavit).

[81]  *See infra* Section II.B.2.

[82]  *See infra* Section II.B.3.

87. Moreover, Defendants at all levels of the scheme took affirmative steps to conceal their wrongdoing from the public. They removed labels from alcohol, spoke in code about "back door" transactions, only used first names, drove on infrequently traveled roads to avoid detection, engaged in cash transactions to hide the source of the funds and then laundered the money through bank accounts, and even lied to their business partners to perpetuate the scheme.[83] The Maryland Wholesalers "filed false and fraudulent reports to the Maryland State Comptroller's Office, indicating that all liquor sold to the Cecil County retailers was intended for resale in Maryland,"[84] and the New York Retailers and others who smuggled alcohol into New York "did not register with the state of New York and did not report to the state of New York the transportation of any liquor into the state" as they were required to by law.[85]

88. All Defendants profited greatly from this scheme. Both the Maryland Wholesalers and Cecil County Retailers were able to expand their customer bases outside of Maryland and into New York, thus allowing them to sell extra cases of liquor. These extra sales of liquor also aided the Maryland Wholesalers under their supplier contracts, which, on information and belief, provide for bonus payments or impose financial (or other) penalties based on the quantity of liquor sold. On information and belief, employees at the Maryland Wholesalers were pressured to increase their sales and then were awarded excessive commissions due to their sales of bootlegged alcohol. The New York Retailers benefitted by paying less for liquor than they otherwise would have: "This same liquor was available from the New York wholesalers at a higher price."[86]

---

[83] *See infra* Section III.

[84] *See* Ex. B at ¶ 22 (RNDC Indictment).

[85] *See* Ex. M at 7 (Alexander Lew Plea Agreement).

[86] Ex. A at ¶ 16 (RNDC Indictment).

89.     In addition to profiting from the scheme, the Defendants knew that the scheme harmed Empire's business, and that was their specific object—to steal customers and sales from licensed New York distributors such as Empire, and to coerce the principals of Empire to cede control over Empire as an independent operation by combining it completely with the larger Charmer Sunbelt Group (now merged into Breakthru).[87]  Upon information and belief, Reliable Churchill and RNDC are parties to the same types of exclusive distribution arrangements that grant Empire the exclusive right to distribute suppliers' products in New York.  As sophisticated parties knowledgeable in liquor industry practice, Reliable Churchill, RNDC and the Cecil County Retailers knew that wholesalers in New York like Empire had exclusive rights to distribute certain products in New York.  The New York Retailers knew that they could only legitimately purchase Empire's products from Empire in New York.  All Defendants therefore knew that when they illegally smuggled products into New York, they were effectively stealing money from Empire and other licensed New York distributors' pockets.  Moreover, the bootlegging scheme harmed Empire as part of Merinoff's larger goal to diminish the value of Empire so that when Empire's other principals eventually contemplated selling their Empire interests to take a minority interest in The Charmer Sunbelt Group (now Breakthru), they would be paid less than their Empire interests should have been worth.  As discussed *infra*, Section V, Breakthru recently made this goal clear by making a sham "offer" that it simultaneously publicized to buy Empire and its affiliate, Empire North, at a drastically undervalued price.

---

[87] *See* Ex. X at ¶ 22 (Barker Declaration) ("I understood that Empire was one of the exclusive distributors in New York and that Empire and Reliable Churchill each had exclusive agreements to distribute many of the same brands in New York and Maryland, respectively.  In fact, Alex [Lew] once told me that Empire 'was our Churchill,' which I understood to mean that, while Alex previously had to buy certain alcohol from Empire, he substituted Reliable Churchill for Empire because prices were cheaper in Maryland.").  Moreover, as discussed *infra*, Section IV, on information and belief, Merinoff and Reliable Churchill directed and participated in the scheme to harm Empire as a means of coercing Empire to cede control of its New York operations to Merinoff.

90.    Indeed, after this suit was filed, the Breakthru Defendants took steps to harass Empire and its affiliate, Empire North.  Specifically, as discussed more fully *infra*, Section V, Breakthru retaliated against Empire by illegitimately reducing IT and other services provided by Breakthru to Empire North pursuant to the Services Agreement; terminating Empire's insurance policies; threatening to terminate the Services Agreement (which would effectively shut down Empire North's business) by an arbitrary cut-off date of January 31, 2017; publicizing a sham "offer" bid for Empire and Empire North that undervalued the Empire Companies and was intended to undermine the industry's confidence in the Empire Companies; and helping Lloyd Sobel voluntarily file a false declaration on behalf of Empire's adversary in a Florida litigation that purported to disclose Empire's confidential information.

B.    **Each Defendant's Role**

1.    **The Maryland Wholesalers**

(a)    **Reliable Churchill and Its Employees Participated in and Benefitted from the Illegal Smuggling Scheme**

91.    The Maryland Wholesalers and their employees actively participated in almost every facet of the bootlegging scheme.  Upon information and belief, Reliable Churchill's agents worked closely with, and filled orders for, small Cecil County Retailers with the intention that these orders would be smuggled into New York, and in return, they provided kickbacks to the Cecil County Retailers.[88]  Starting in at least 2008 and continuing into at least 2014,[89] Reliable Churchill filled large orders from Cecil County Retailers and effectively flooded the New York

---

[88]  These kickbacks violated both federal and Maryland law.  *See, e.g.*, 27 U.S.C. §§ 205(b)(3), (c).

[89]  *See infra* Section II.B.2.a (Happy 40 Liquors bootlegged Reliable Churchill products to New York from 2008 through 2012); Ex. X at ¶¶ 8–9, 13–14 (Barker Declaration) (Vlamis Liquors bootlegged Reliable Churchill products from 2010 into 2014).

market with tens of millions of dollars' worth of illegal liquor or more, harming both the State of New York and licensed New York wholesalers such as Empire.

92.     Reliable Churchill indeed bootlegged an astounding quantity of liquor.  From June 2008 through June 2012, Reliable Churchill sold to five co-conspirator Cecil County Retailers (including Happy 40 Liquors, Northside Liquors, Chesapeake Wine & Spirits, and North East Liquors) over 272,000 cases of alcohol, for more than $43 million, that were smuggled into New York.  Many of these smuggled orders consisted of brands for which Empire had exclusive rights to distribute in New York, such as Johnnie Walker Black, Jack Daniels, Bacardi, Smirnoff, Hennessey, Grey Goose, and Ciroc.[90]  For example, during this time frame, Reliable Churchill sold for bootlegging to these five Cecil County Retailers alone more than 2,300 cases of Johnnie Walker Black 375 ML for over $798,000; more than 4,600 cases of Jack Daniels Black 750 ML for over $961,000; more than 3,900 cases of Bacardi Rum Superior 750 ML for over $1,230,000; more than 12,700 cases of Smirnoff Vodka 80 proof 200 ML for over $1,553,000; more than 6,300 cases of Hennessey Cognac 375 ML for over $1,834,000; more than 2,800 cases of Grey Goose 1.75 L for over $802,000; and more than 3,000 cases of Ciroc Vodka Coco 1.75 L for over $822,000.  And Reliable Churchill continued its bootlegging into 2014.  In 2013, for instance, it sold to one Cecil County Retailer (Vlamis Liquors), orders on behalf of one New York smuggler (Alex Lew) of more than 2,500 cases of Johnnie Walker Black 750 ML that Vlamis Liquors sold for more than $715,000.  As late as July 27, 2014,

---

[90]  Ex. Y at ¶ 7 (Jatin Patel Declaration); Ex. X at ¶¶ 8–9 (Barker Declaration).

Vlamis Liquors placed an order from Reliable Churchill on behalf of Alex Lew for 30 cases of Johnnie Walker Black 750 ML.

93.     Reliable Churchill took action to ensure the success of the bootlegging scheme. For example, it used volume discounts both to make the scheme profitable and to pressure Cecil County Retailers to participate.  An employee from Vlamis Liquors, a Cecil County co-conspirator in this action, explained:

> The stores involved in extensive out-of-state sales of alcohol, like Northside Liquors, were able to obtain large volume discounts from Maryland distributors Reliable Churchill and RNDC due to the massive volume of alcohol the liquor stores purchased.  These volume discounts applied both to the alcohol that was sold to New York buyers as well as any alcohol sold in the retail stores to legitimate consumers.  As a result, the stores involved in the out-of-state alcohol sales were able to pass these volume discounts onto their legitimate customers, sometimes making the prices in those stores meaningfully lower than the prices in stores not involved in similar sales.  As a result, stores not involved in sales to out-of-state buyers, like Vlamis Liquors prior to 2010, were at a competitive disadvantage and were losing market share to stores that were involved in such out-of-states sales.[91]

Because these volume discounts gave participants in the bootlegging scheme such a competitive advantage, Vlamis Liquors "felt pressure to increase the size of [its] purchases" and concluded that "in order to compete in Cecil County [it] had to make similar bulk quantity sales to New York purchasers."[92]

94.     Reliable Churchill also altered its typical delivery practices to allow the Cecil County Retailers to bootleg more efficiently.  Reliable Churchill used "an 18-wheel, tractor trailer truck" to deliver liquor to Northside Liquors even though "it was uncommon for Reliable Churchill or [RNDC] to deliver alcohol with tractor-trailer trucks to legitimate, similarly sized retailers such as Vlamis Liquors [before it joined the scheme], as [they] typically received [their]

---

[91]  Ex. X at ¶ 6 (Barker Declaration).

[92]  *Id.* ¶¶ 8–9.

deliveries from a standard cargo truck."[93]  And whereas Jatin Patel typically placed one order per week from Reliable Churchill before entering the scheme, once he "began selling liquor to the New York buyers," Reliable Churchill allowed him "to place orders twice a week."[94]

95.     In addition to selling enormous amounts of liquor to the Cecil County Retailers, Reliable Churchill also provided them with specific recommendations and assistance to further the bootlegging scheme while avoiding law enforcement and regulatory detection.  For example, a Reliable Churchill employee informed certain Cecil County Retailers, including Vlamis Liquors, that Maryland stickers could be removed more easily from cases of liquor using a torch, and that Reliable Churchill would not add Maryland stickers if Vlamis Liquors purchased a pallet (the largest amount available for purchase) of cases of liquor.[95]  Similarly, Reliable Churchill agreed not to include stickers on some of the cases it sold to Jatin Patel and North East Liquors.[96]  The removal of these stickers was done to facilitate the bootlegging scheme because the smugglers from New York were worried that any authorities stopping them on the federal highways, or inspectors in New York stores, or even New York distributors' employees visiting New York Retailers involved in making bootlegged sales, would see the stickers and ascertain the true source of the liquor.[97]

96.     Additionally, Reliable Churchill actively deceived at least one Cecil County Retailer to maintain its ongoing support.  A Reliable Churchill supervisor and salesman

---

[93]  *Id.* ¶ 5.

[94]  Ex. Y at ¶¶ 9–10 (Jatin Patel Declaration).

[95]  Ex. X at ¶ 17 (Barker Declaration).  Upon information and belief, Reliable Churchill's salesmen recruited other employees at Reliable Churchill to ensure that numerous cases (including those sold in pallets) meant for smuggling to New York did not contain Maryland stickers.

[96]  Ex. Y at ¶ 20 (Jatin Patel Declaration).

[97]  Ex. X at ¶ 17 (Barker Declaration).

43

misleadingly reassured the owner of Vlamis Liquors that Reliable Churchill and Empire were

"owned by the same company"—a falsehood which led at least one Vlamis Liquors' employee

"to believe that the massive sales of alcohol to New York buyers did not harm Empire because

Empire and Reliable Churchill were part of the same group."[98]  These Reliable Churchill

employees naturally had an incentive to reassure Vlamis Liquors and keep it involved in the

scheme because their "compensation was tied to the quantities of alcohol they sold to retailers

like Vlamis Liquors."[99]

      97.     Finally, on information and belief, Reliable Churchill communicated directly with

smugglers from New York to further this bootlegging scheme.  According to Cecil County

Retailer Jatin Patel, a New York smuggler knew details about the prices Reliable Churchill was

offering to Patel before Patel even knew those details.[100]  For example, on several occasions, the

New York smuggler told Patel that Reliable or RNDC was going to discount a certain product a

week before he received any pricing information from the distributor.[101]  Patel "suspected that

[the New York smuggler] had advance knowledge of the distributors' pricing information from

conversations he may have had directly with the Maryland distributors."[102]  On information and

---

[98]  *Id.* ¶ 20.

[99]  *Id.* ¶ 7; *accord* Ex. Y at ¶ 17 (Jatin Patel Declaration) ("Reliable Churchill and RNDC salesmen often told me their compensation and bonuses were dependent on the amount of alcohol and liquor the retailers in their territory purchases.  I understood that if North East Liquors . . . purchased substantial quantities of alcohol for the smugglers to sell in New York, the compensation of Reliable Churchill and RNDC salesmen would increase.").  On information and belief, salespeople at Reliable Churchill were pressured by management to increase sales,

[100]  Ex. Y at ¶ 16 (Jatin Patel Declaration).

[101]  *Id.*

[102]  *Id.*

belief, the New York smuggler could not have obtained it from any source other than Reliable and RNDC.

98.     Reliable Churchill knew before 2012 that the large orders it fulfilled for Cecil County Retailers were too large to stay in rural Cecil County, Maryland.  As a result of the illicit scheme, overnight Cecil County Retailers' business became "multi-million-dollar-a-year businesses," as counsel for one Cecil County Retailer acknowledged.[103]  This Cecil County Retailer, for example, had an 1,800-square-foot store that typically sold, before the smuggling scheme, five to ten cases of alcohol a week.  As a result of the smuggling scheme, the same Cecil County Retailer's sales ballooned to 400 to 500 cases a week, and as much as 3,000 cases a month—more alcohol than can possibly be stored in such a small establishment.[104]  As counsel for the owner of the store acknowledged, "overnight[,] everybody in Chesapeake City did not turn into an alcoholic.  This liquor was purchased on a daily basis going up to New York."[105]  Similarly, before it became involved in the bootlegging scheme, Vlamis Liquors typically ordered from Reliable Churchill only one case per month of Johnnie Walker Black.  When it joined the smuggling ring, Vlamis Liquors increased its purchases from Reliable Churchill to 100 cases per month of Johnnie Walker Black.[106]  In other words, Vlamis suddenly, and with no legitimate explanation, started ordering *over eight years'* worth of Johnnie Walker Black *every*

---

[103]  Ex. C at 7 (*RNDC v. Tech Pride* Trial Tr.).

[104]  *Id.* at 7:19–25, 102:17–103:1 ("[B]efore [participation in the enterprise] my sales w[ere] maybe five cases or ten cases a week.  All of a sudden I'm buying 400 and 500 cases a week.  My store is so small, 1,800 square feet, you cannot sell—just one of the reasons—200 cases in a week.").  Similarly, Reliable Churchill salesmen noticed and discussed with Jatin Patel at his small store—that "did not have its own storage area"—that "large quantities of liquor [he] had ordered on Monday for delivery the next day were already gone by Wednesday, two days later."  Ex. Y at ¶¶ 13, 15 (Jatin Patel Declaration).

[105]  Ex. C at 7:22–25 (*RNDC v. Tech Pride* Trial Tr.).

[106]  Ex. X at ¶ 15 (Barker Declaration).

*month*.  Indeed, "distributors closely track the quantities of alcohol [that] retail stores purchase,"[107] and, on information and belief, Reliable Churchill's management has monthly meetings in which they discuss sales.  Thus, at the highest levels of the company, Reliable Churchill must have known that sales of this magnitude, which occurred in stores owned by numerous Cecil County Retailers, could only be explained by the unlawful smuggling out of state of huge bulk orders of alcohol.

99.     High-level Reliable Churchill executives also knew or must have known about the bootlegging for years.  Upon information and belief, in or around 2010 or 2011, retailers in Cecil County, Maryland—with an adult population of approximately 78,000 people—purchased from Reliable Churchill the highest quantity of Johnnie Walker Black of any county in the *entire United States*.  Additionally, upon information and belief, a small store in Carroll County, Maryland, which borders Pennsylvania, bought from Reliable Churchill thousands upon thousands of cases of well-known products such as Crown Royal, Ciroc, Jack Daniels, and Hennessy, and at one point purchased the most cases of any store in Maryland.  Upon information and belief, sales targets are set by the upper levels of Reliable Churchill management (like Baird),[108] and/or its principals (like Merinoff), and are based on the previous years' sales.  Therefore, high-level Reliable Churchill executives were aware of the excessive

---

[107]  *Id.*

[108]  Upon information and belief, Baird also directed, and/or learned of, the bootlegging scheme in his role as Reliable Churchill's President (and continued to know about the scheme later in his position at the Sunbelt Entities).  As discussed *supra*, Section I.B, Baird learned of Reliable Churchill's excessive sales to Cecil County, Maryland, because, as its President, he was intimately involved with setting sales targets and monitoring sales performance.  Moreover, on information and belief, in his later position at the Sunbelt Entities, Baird was kept informed of sales figures to Cecil County.  As a result, he must have known that orders from the Cecil County Retailers were being shipped out of state because tiny Cecil County, Maryland, could not support the excessive quantities of alcohol ordered by the Cecil County Retailers.

sales to Cecil County, and knew or must have known that the alcohol was not being sold and consumed there, but rather, was being illegally smuggled into other states such as New York. And Reliable Churchill's top executives also must have known that the bootlegging directly injured Empire.  Merinoff, Miller, and Baird, in their roles at Reliable Churchill and the Sunbelt Entities, knew that smuggling liquor into New York deprived Empire of contractually guaranteed sales pursuant to exclusive distribution agreements.

100.    The federal government's investigation into Reliable Churchill's sales practices certainly informed Merinoff, Miller, and Baird of its participation in the scheme, but, upon information and belief, Reliable Churchill continued to fill excessively large orders to Cecil County Retailers even after the government began investigating it, and meanwhile affirmatively misled Empire to put Empire at ease.  For example, when, by 2013, the press reported that federal prosecutors in Maryland were targeting Reliable Churchill for bootlegging alcohol from Maryland to New York, Arlyn Miller, speaking on behalf of Reliable Churchill, and representing that she was also speaking on behalf of her boss, Charles Merinoff, falsely claimed in a July 2013 meeting in New York with Empire representative from Bulldog—Antonio Magliocco, Jr.— that, among other things, there was no criminal misconduct by Reliable Churchill.[109]  Miller further stated that Reliable Churchill and its employees had no knowledge of any shipments being smuggled by the Cecil County Retailers into New York, and that they had no reason or ability to do anything other than to fulfill the Cecil County Retailers' orders.  Moreover, she stated that she was confident Reliable Churchill would be able to resolve the issue through a

---

[109]  Miller sent emails on July 15, 2013, July 16, 2013, and July 25, 2013 to organize this meeting.  Upon information and belief, these emails were transmitted across interstate wires from New York to Washington, D.C., because one of the recipients of the emails (Michael Barta) was based in Washington D.C.  Mr. Magliocco, in New York, was another recipient of these emails.  The meeting occurred on July 31, 2013, in The Charmer Sunbelt Group's offices on 42nd Street in New York City.

modest civil settlement, in part, because Reliable Churchill had done nothing wrong and, in part, because the Assistant United States Attorney overseeing the investigation specialized in civil forfeitures, not criminal prosecutions, to make it appear that the federal government's investigation was merely a modest civil forfeiture action.  These statements were knowingly false when they were made.  On information and belief, at the time, a criminal prosecutor was overseeing the investigation of Reliable Churchill, and from the very outset of its conversations with Reliable Churchill, the federal government informed the company that it would face significant liability[110] because the products it was selling to the Cecil County Retailers were being smuggled into New York.  Merinoff knew that Miller's statements were false because he had already been informed of the criminal nature of the government's investigation into the bootlegging scheme and Reliable Churchill's significant potential liability.

101.    Similarly, in or around September 23, 2013, Miller held a conference call with Mr. Magliocco and again falsely stated that Reliable Churchill only expected a modest civil settlement to result from the Maryland United States Attorney's investigation into its bootlegging activities.[111]  Despite learning of the federal government's investigation in at least 2012, Reliable Churchill continued in this scheme to smuggle alcohol into New York into at least 2014, including colluding with Vlamis Liquors.[112]

---

[110]  Indeed, on information and belief, the government at one point demanded $20 million from Reliable Churchill for participation in this criminal bootlegging scheme.

[111]  Miller sent emails on September 10, 2013, and September 16, 2013 to organize this conference call. Upon information and belief, these emails were transmitted across interstate wires from New York to Washington, D.C. because one of the recipients of the emails (Michael Barta) was based in Washington D.C.  Mr. Magliocco, in New York, was another recipient of these emails.  Furthermore, upon information and belief, the September 23, 2013 conference call involved the use of interstate wires because one of the call's participants (Michael Barta) was based in Washington, D.C.

[112]  *See* Ex. X at ¶ 13 (Barker Declaration).  It has been represented to Empire that, at one point in late 2014, Reliable Churchill and Vlamis cooperated in a "sting" operation at the federal government's

102.    Significant additional evidence demonstrates Reliable Churchill's knowledge of, and willful participation in, the bootlegging scheme.  Reliable Churchill "salesmen were at times in the back of [Jatin Patel's] store at the same time that the smugglers were loading their out-of-state vans with dozens of cases of alcohol."[113]  Reliable Churchill advised Cecil County Retailers how to remove labels and stickers, and also sent them pallets without labels or stickers, despite there being "no legitimate reason for removing these labels from the cases of alcohol";[114] Reliable Churchill employees "must have understood that the only reason to remove these stickers was to avoid detection of the out-of-state New York sales."[115]  Furthermore, Reliable Churchill discussed rising liquor prices in New York with Vlamis Liquors employees when Reliable Churchill raised its prices in Maryland because Vlamis Liquors wanted to "ensure that the Maryland price increases would not hurt [its] business with [its] New York buyers."[116] Moreover, Reliable Churchill salesmen "discussed 'back door' sales" with a Vlamis Liquors employee, "specifically using the term . . . used in the industry for selling alcohol to out-of-state purchasers,"[117] and they also "used coded words to reference [Jatin Patel's] out-of-state buyers."[118]  In addition, Reliable Churchill made clear its role in the bootlegging scheme by its conversations with New York smugglers informing them of pricing,[119] and by misleading

---

request.  Assuming that to be true, Empire has no basis to conclude that other sales by Reliable Churchill prior to that date in late 2014 were also part of a cooperative "sting" operation.

[113]  Ex. Y at ¶ 18 (Jatin Patel Declaration).

[114]  *Id.* ¶ 19.  Moreover, Jatin Patel "specifically told the Reliable Churchill . . . salesmen that the smugglers were removing the stickers and discarding them on [his] floor," which was "litter[ed]" with stickers. *Id.* ¶¶ 19–20.

[115]  Ex. X at ¶ 17 (Barker Declaration).

[116]  *Id.* ¶ 18.

[117]  *Id.* ¶ 19.

[118]  Ex. Y at ¶ 11 (Jatin Patel Declaration).

[119]  *See id.* ¶ 16.

Vlamis Liquors' owner into believing that "Reliable Churchill and Empire . . . were owned by the same company."[120]

103.    "[B]oth Reliable and RNDC were aware that the other company was supplying massive quantities of liquor to be sold to New York smugglers due to the close relationship between Reliable's and RNDC's sales force[s]."[121]   Reliable Churchill and RNDC participated in the very same bootlegging scheme.   Indeed, both Reliable Churchill and RNDC used similar means at about the same time to further the bootlegging scheme.   For example, Reliable Churchill and RNDC initially told one Maryland Retailer, Jatin Patel, that they would remove the Maryland stickers from any cases of liquor destined for New York, regardless of quantity.   Then, in about April 2011, both Maryland Wholesalers changed their procedures and indicated that they would send orders without Maryland stickers only if the Maryland Retailer ordered in pallet quantities.[122]   Additionally, two of the RNDC employees indicted in the bootlegging scheme—Lockerman and Robbins, *see infra* Section II.B.1.b—previously worked at Reliable Churchill. According to a Vlamis employee, Lockerman, who left RNDC after the government's investigation began, was subsequently "[re]-hired by Reliable Churchill as a salesman."[123]

104.    Reliable Churchill profited greatly, financially and reputationally, from the bootlegging scheme.   It was able to sell additional cases of alcohol to customers in New York, such as the many cases that were smuggled with the assistance of Vlamis Liquors and Jatin Patel. Reliable Churchill was able to make tens or hundreds of millions of dollars of undeserved sales to New York retailers.   As a result, Reliable Churchill achieved both greater sales and higher

---

[120]   Ex. X at ¶ 20 (Barker Declaration).

[121]   *Id.* ¶ 21.

[122]   Ex. Y at ¶ 20 (Jatin Patel Declaration).

[123]   Ex. X at ¶ 21 (Barker Declaration).

bonuses (or lower financial or other penalties) from certain of its suppliers.  The extra and illegal sales unjustly enhanced its reputation in the industry.

105.     On information and belief, Reliable Churchill commingled its ill-gotten gains from Cecil County Retailers with legitimate transactions, which it then deposited in its bank accounts, in order to hide the source and origin of the criminal proceeds and the existence of the criminal smuggling scheme.[124]

        (b)     **Non-Party Co-Conspirators RNDC and Its Employees Participated in and Benefitted from the Illegal Smuggling Scheme**

106.     Empire has not named RNDC or its agents as Defendants in this action because there is very little overlap in the products that the two entities sell, meaning that RNDC's bootlegging likely did not harm Empire greatly.  By contrast, Reliable Churchill bootlegged many of the same brands for which Empire had exclusive rights to distribute in New York, such as Smirnoff and Johnnie Walker Black; approximately 64% to 78% percent of Empire's total sales come from products also distributed by Reliable Churchill.  Nevertheless, the actions of RNDC and its employees are illustrative of the racketeering enterprise and bootlegging scheme.

107.     RNDC and its employees—Eugene Gerzsenyi, Jason Lockerman, Lisa Robbins, Robert Malloy, Christopher Berg, and Richard Fe—actively participated in almost every facet of the bootlegging scheme.  Guilty pleas by various culpable retailers reveal that RNDC was involved in the smuggling enterprise from at least 2010 through 2015.[125]  Indeed, seven different

---

[124]  *See* Ex. B at 2 (Lisa Ward Affidavit) (providing redacted bank account information for Reliable Churchill accounts that were, upon information and belief, frozen for being part of a bank fraud scheme).

[125]  *See, e.g.*, Ex. E at 8 (Bin Luo Plea Agreement) ("From at least November 2013 through January 2015, Bin Luo and Bao Zheng" purchased liquor for smuggling from "Vlamis Liquors in Cecil County," which was "supplied with liquor by Republic National Distributing Company."); Alexander Lew Plea Agreement at 7 ("From at least August 2010 through July 2014, Alexander Lew" purchased liquor for

New York Retailers' and Cecil County Retailers' guilty pleas identified RNDC as the source of the liquor that that was smuggled into the metropolitan New York area:

- Jatin Patel Plea Agreement:  Defendant Jatin Patel "obtained [liquor] from RNDC and sold [it] to the New York smugglers."[126]

- Anil Patel Plea Agreement:  Anil Patel "passed the orders [from New York Retailers] on to salesmen of RNDC. . . .  RNDC then filled the orders by making a delivery by truck to Happy 40 Liquors and leaving a copy of an invoice for the liquor that was delivered."[127]

- Bin Luo Plea Agreement:  Maryland Retailer Vlamis Liquors "was supplied with liquor by Republic National Distribution Company."[128]

- Alexander Lew Plea Agreement:  "[M]anagers at the retail liquor stores in Cecil County then passed the [New York Retailers'] orders on to salesmen of Republic National Distributing Company ('RNDC').  These salesmen routinely came into the retail store, got the orders, and placed the orders with RNDC.  RNDC then filled the orders by making a delivery by truck to the Cecil County retailer and leaving a copy of an invoice for the liquor that was delivered."[129]

108.    RNDC, through its agents and employees, introduced certain New York Retailers to the Cecil County Retailers.  Between at least June 2009 and June 2012, RNDC employees, including former Reliable Churchill employee Jason Lockerman, acting within the scope of their employment, traveled to Cecil County retailers approximately once each week to review orders from New York Retailers.  These employees knew that the liquor orders were intended for retail sale in New York, but they nevertheless transmitted those orders to RNDC to be filled.[130]

---

smuggling from "a number of retail liquor stores located in Cecil County, Maryland," where the managers "passed the orders on to salesmen of Republic National Distributing Company.").

[126]   Ex. I at 9 (Jatin Patel Plea Agreement); *see also* Ex. K at 9 (Tushar Patel Plea Agreement) (same).

[127]   Ex. G at 8 (Anil Patel Plea Agreement); *see also* Ex. H at 8 (Dilip Patel Plea Agreement).

[128]   Ex. E at 8 (Bin Luo Plea Agreement); *see also* Ex. J at 8 (Bao Zheng Plea Agreement) (same).

[129]   Ex. M at 7 (Alexander Lew Plea Agreement).

[130]   Ex. A at ¶ 13 (RNDC Indictment).

109.    RNDC actively facilitated orders from the New York Retailers to the Cecil County Retailers.  For example, when non-party Robert Malloy, an RNDC salesperson, was told that the excess cases sold to one of the Cecil County Retailers had "already gone" to New York, he assured the Cecil County Retailers that he would "talk to [the New York Retailers] and we can sell you more."[131]  Further, RNDC illegally gave discounts to the Cecil County Retailers and even adjusted the prices of goods to be smuggled to New York when the Maryland sales tax increased by offering additional discounts to offset the increase in sales tax.

110.    RNDC handsomely rewarded the Cecil County Retailers by offering the participating Cecil County Retailers rebates or sometimes even Visa gift cards in exchange for their participation in the criminal scheme.  For example, RNDC offered one of the stores run by the Cecil County Retailers, Northside Liquors, "a new pricing system, designed to allow Northside Liquors to pay down debt it owed to RNDC, that involved RNDC charging less for liquor that was to go to the New York buyers and more for the liquor that would be sold to retail customers who came in through the front door."[132]  RNDC employees understood that the Cecil County Retailers would then pay down their debts to RNDC through the increased revenue the Cecil County Retailers earned through sales of bootlegged liquor to New York.[133]

111.    RNDC comingled its ill-gotten gains from Cecil County Retailers with legitimate transactions and then caused those commingled funds to be deposited, through interstate wires, in RNDC's bank accounts.[134]  On information and belief, RNDC commingled these criminal

---

[131]  *See* Ex. A at 102:7–16 (*RNDC v. Tech Pride* Trial Tr.).

[132]  Ex. A at ¶ 23(d) (RNDC Indictment).

[133]  *Id.* ¶ 23(c).

[134]  *Id.* ¶¶ 19–20.

proceeds with legitimate, non-criminal proceeds in order to hide the source and origin of the criminal proceeds and the existence of the criminal smuggling scheme.

112.    RNDC is responsible for the actions taken by the following employees "acting within the scope of their employment":[135]

a.    *Eugene Gerzsenyi*—On December 9, 2011, non-party Eugene Gerzsenyi spoke with a Northside Liquors representative over the telephone and discussed the "new pricing system" involving discounts for liquor that was intended for New York.[136] Gerzsenyi "facilitated the payment of funds to RNDC for liquor that was moved from RNDC, through the Cecil County retailers, to the New York retailers and their agents" and "discussed with a representative of Northside Liquors sales of liquor that were going 'out the back door' of Northside Liquors to New York."[137]  Moreover, according to a sworn affidavit, "EG"—believed to be Gerzsenyi—stated to an ICE undercover agent who was pretending to be a co-conspirator in the scheme that "a lot of money could be made through the 'back door' sales of liquor to New York, but that, if asked, REPUBLIC would deny knowledge of such sales.  [He] also indicated that other liquor stores in that area were also selling to New York customers.  [He] warned the undercover agent to be careful because the government was watching Northside."[138]

b.    *Jason Lockerman*—Non-Party Jason Lockerman traveled to the Cecil County Retailers' stores and reviewed communications from the New York Retailers requesting orders to be smuggled to New York.  Further, "Lockerman facilitated the payment of funds to RNDC for liquor that was moved from RNDC, through the Cecil County retailers, to the New

---

[135]  *Id.* ¶¶ 13, 23.

[136]  *Id.* ¶ 23(d).

[137]  *Id.* ¶¶ 18, 23(b).

[138]  Ex. B at 11 (Lisa Ward Affidavit).

York retailers and their agents" and "explained to representatives of Northside Liquors about the volume of liquor being sold to liquor smugglers, the amount of money earned from those sales, and that the smugglers were buying the liquor in Maryland because of taxes and prices."[139] Moreover, "[o]n or about April 15, 2012, Lockerman told a manager at Northside Liquors to use the cash proceeds from the New York smugglers to buy a cashier's check to pay to RNDC."[140]

    c. *Lisa Robbins*—Non-party Lisa Robbins "facilitated the payment of funds to RNDC for liquor that was moved from RNDC, through the Cecil County retailers, to the New York retailers and their agents,"[141] and, on October 25, 2011, "told a representative of Northside Liquors in a telephone call that she believed Northside Liquors would be making payments to RNDC from proceeds of 'the backdoor sales' of liquor that were going from Northside Liquors to New York, stating, 'I was under the same impression that, what you just said, that we would be making . . . some money off of the . . . not making money but paying down the debt . . . off of . . . you know, the profit that was going out the back door.'"[142]

    d. *Robert Malloy*—Non-party Robert Malloy introduced Cecil County Retailers to New York Retailers interested in smuggling alcohol from Maryland to New York.[143] When Malloy was told that the excess cases sold to one Cecil County Retailer had "already gone" to New York, Malloy assured the Cecil County Retailer that he would find additional demand from New York Retailers and that RNDC would continue to supply excessive amounts

---

[139] Ex. A at ¶¶ 18, 23(a) (RNDC Indictment).

[140] *Id.* ¶ 23(e).

[141] Ex. A at ¶ 18 (RNDC Indictment).

[142] *Id.* ¶ 23(c).

[143] *Id.* at 34:8–21, 84:18–85:6.

of liquor to the Cecil County Retailer as needed.[144]  Moreover, Malloy personally received the

New York Retailers' orders from Cecil County Retailers.[145]

        e.    *Christopher Berg*—Non-party Christopher Berg discussed illegal

discounts for bulk purchases of alcohol with Cecil County Retailers, knowing that the bulk

purchases were intended to be smuggled to New York.

        f.    *Richard Fe*—Non-party Richard Fe discussed illegal discounts for bulk

purchases of alcohol with Cecil County Retailers, knowing that the bulk purchases were intended

to be smuggled to New York.  Fe had personal knowledge that large quantities of RNDC liquor

were being shipped to New York.[146]

113.    RNDC and its employees were greatly—and unjustly—enriched by their

participation in the bootlegging scheme.  For example, RNDC received over $1,000,000 in

checks from Maryland liquor stores for liquor unlawfully smuggled to New York.[147]  This not

only unlawfully increased sales and profits at RNDC, it also resulted in undeserved sales

commission for RNDC salespersons.[148]

## 2.    The Cecil County Retailers

114.    Beginning in 2008, the Cecil County Retailers were approached by RNDC

salesmen with a lucrative—but criminal—business opportunity.  The Cecil County Retailers

were told that RNDC could exponentially grow the Cecil County Retailers' liquor sales by

directing liquor purchasers from New York to the Cecil County Retailers' stores to purchase

---

[144]  *Id.* at 102:7–16.

[145]  Ex. G at 8 (Anil Patel Plea Agreement).

[146]  *Id.* at 105:5–13.

[147]  Ex. A at 9 (RNDC Indictment).

[148]  *Id.* ¶ 10.

quantities of liquor that the Cecil County Retailers could never sell to local consumers.[149]  The Cecil County Retailers jumped at the opportunity.

115.    Shortly after this initial contact from RNDC, the Cecil County Retailers started to receive phone calls from New York telephone numbers to place bulk orders.[150]  One or two days after receiving the orders, the New York Retailers arrived at the Maryland liquor stores to pick up their goods for smuggling.  Before long, the Cecil County Retailers were stocking products that they knew they could not sell locally, but were intended instead for sale to New York smugglers.[151]  These products, such as one-liter-sized liquor bottles, were often not even stocked on the Cecil County Retailers' stores shelves, but instead went directly from the Cecil County Retailers' storage to be smuggled to New York.[152]

116.    The Cecil County Retailers willingly converted their stores into the "front" of the operation.  From the front door they appeared to be local liquor stores, paying Maryland excise taxes on their sales, while tens of millions of dollars of liquor or more went straight "out the back door" to the New York market.[153]

---

[149]  Ex. C at 102:22–103:1 (*RNDC v. Tech Pride* Trial Tr.).

[150]  *E.g.*, *id.* at 34:18–35:7, 94:8–12, 96:22–24.

[151]  *See, e.g.*, *id.* at 46:8–15, 114:11–115:11 (describing a list of liquor products "that we never merchandised or sold from our store . . . [but] only went to the New Yorkers").

[152]  *See, e.g.*, *id.* at 46:8–15 ("A.  One liter we never carried to sell to my customers.  Initially we never carried this product . . . on our shelf.  Q.  Where did it get sold to?  A.  To the [New Yorkers].");  Affidavit to Verified Complaint for Forfeiture at ¶ 41, *United States v. $249,728.23 in U.S. Currency (Northside Liquors)*, No. 11-cv-02579, ECF No. 1 (D. Md. Filed Sept. 12, 2011) ("Patrick Fyock Affidavit") (Ex. N) ("Based on observations of the ATF [undercover agent], confidential sources and surveillance agents, Northside Liquors segregates the distilled spirits intended for out-of-state distribution and places them near the garage door on the west side of the business (the 'staging area'), where all of the suspected trafficked liquor is transferred to vehicles.");  Ex. X at ¶ 16 (Barker Declaration).

[153]  *See, e.g.*, Ex. A at ¶ 23(b) (RNDC Indictment);  Ex. X at ¶¶ 8–10, 13(Barker Declaration).

117.    But the Cecil County Retailers' participation did not consist merely of serving as a "front" on the Maryland Wholesalers' behalves.  Between the financial incentives offered by the Maryland Wholesalers[154] and the huge quantities demanded by the New York Retailers, the Cecil County Retailers quickly realized the potential profit they could reap from their participation in the conspiracy and became active participants in its operations.

118.    For example, the Cecil County Retailers maintained frequent contact with RNDC salesmen, negotiating the discounts they needed in order to move the huge quantities demanded by the enterprise.[155]  In coordination with RNDC personnel, they made inquiries with their contacts in Delaware and New Jersey regarding the published prices for particular liquor products.[156]  This information enabled RNDC to continue to offer competitive enough discounts to keep the Cecil County Retailers profiting while offering sufficiently low prices to justify the New York Retailers' travel to Maryland.[157]

119.    On information and belief, the Cecil County Retailers had similar communications with Reliable Churchill salesmen in order to negotiate discounts and other benefits that would enhance profits for both the Cecil County and New York Retailers.

120.    Eventually, the Cecil County Retailers were not just receiving orders from the New York Retailers but contacting them to coordinate transactions.[158]

---

[154]  To further encourage the Cecil County Retailers' participation and the overall success of the joint venture, the Maryland Wholesalers offered the Cecil County Retailers deep "discounts" relative to the prices prescribed by Maryland law.  *See supra* Section II.A and accompanying text.

[155]  Ex. C at 99:18–100:13 (*RNDC v. Tech Pride* Trial Tr.) (sworn testimony by Defendant Anil Patel that he spoke with Robert Malloy, an RNDC salesman, approximately once a week to negotiate pricing and discounting).

[156]  *Id.* at 50:9-25, 106:7–107:10.

[157]  *Id.*

[158]  *E.g.*, *id.* at 50:21–25.

121.    Throughout this conspiracy, the Cecil County Retailers purchased from the Maryland Wholesalers large volumes of liquor products for sale to the New York Retailers, despite the fact that Empire and other licensed New York distributors had exclusive distribution rights to sell those products in New York, as the Cecil County Retailers surely knew.

(a)    **Anil Patel and Happy 40 Liquors**

122.    Defendant Anil Patel is a Cecil County Retailer who operated a liquor store, Happy 40 Liquors, owned by Defendant Tech Pride of America, Inc.  On or about March 12, 2015, Defendant Anil Patel pleaded guilty to one count of wire fraud in connection with his participation in the bootlegging scheme "[f]rom at least January 2010 through June 2012" out of his liquor store, Happy 40 Liquors, owned by his company, Defendant Tech Pride of America, Inc.[159]

123.    In his plea agreement, Anil Patel admitted that:

> During that period, a number of smugglers called [me] and others at Happy 40 Liquors.  These calls were made from New York City to the Cecil County store. . . .  [I] and others took these orders and passed the orders on to salesmen of RNDC.  One of these salesmen was Robert Malloy . . . .  RNDC then filled the orders by making a delivery by truck to Happy 40 Liquors and leaving a copy of an invoice for the liquor that was delivered. . . .  The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.[160]

124.    The government further concluded that Anil Patel conspired with RNDC and eleven others "to knowingly devise a scheme and artifice to defraud . . . registered New York wholesalers."[161]

---

[159]  Ex. G at 8 (Anil Patel Plea Agreement).

[160]  *Id.*

[161]  Ex. A at ¶ 9 (RNDC Indictment).

125.    Anil Patel and Happy 40 Liquors actively worked to conceal the scheme.  A Reliable Churchill salesman told a Vlamis employee that Happy 40 employees "used a torch to remove the [Maryland] stickers."[162]

126.    These Cecil County Retailers made extensive use of interstate wires to advance the bootlegging scheme.  For instance, on May 15, 2012, Happy 40 Liquors received a "facsimile transmission from New York . . . to place an order for more than 200 cases of RNDC liquor."[163] From May 31 to June 6, 2012, Happy 40 Liquors ordered 173 cases of Barton Vodka, 110 cases of Seagram's Gin, and hundreds of cases of other liquor products from RNDC in order to fill corresponding orders placed by telephone from New York.[164]

127.    Prior to 2008, Happy 40 Liquors sold on average approximately five to ten cases per week.[165]  After he told the RNDC salesmen that he would join the enterprise, Defendant Anil Patel began to receive bulk orders from customers in New York.  Defendant Anil Patel knew these customers were New Yorkers because of their New York license plates and telephone numbers with New York area codes.[166]  Soon, he was selling 400 to 500 cases per week, quantities that his small store could not even fit on its shelves.[167]  In total, between February and July 2012, Happy 40 Liquors ordered at least 895 cases of Barton Vodka, Barton Gin, and

---

[162]  Ex. X at ¶ 17 (Barker Declaration).

[163]  Ex. A at 8 (RNDC Indictment).

[164]  *See* Ex. G at 8–9 (Anil Patel Plea Agreement); Ex. G at at 68:5–72:3 (*RNDC v. Tech Pride* Trial Tr.). Anil Patel accepted interstate "telephone and facsimile transmission[s]" from a New York smuggler on at least June 5, 2012.  Information ¶ 10, *United States v. Patel*, No. 15-cr-00298, ECF No. 1 (D. Md. May 27, 2015) (Ex. O).

[165]  Ex. G at 102:22–23 (*RNDC v. Tech Pride* Trial Tr.).

[166]  *Id.* at 35:5–7, 94:5–12, 96:3–22.

[167]  *Id.* at 102:22–103:1.

Seagram's Gin liquor,[168] for which Empire had exclusive distribution rights in the New York metropolitan area and which Anil Patel knew would be smuggled to New York.[169]  The combined total loss in sales by Empire as a result of the smuggling of these 895 cases of bootlegged alcohol to New York could have easily topped $75,000, depending on the sizes of the products.  Notably, these are the losses resulting from smuggling by a single defendant over a six-month period, whereas more than five Cecil County Retailers and five New York Retailers were involved in this scheme over an eight-year period.

128.    Defendant Anil Patel also smuggled a large amount of Reliable Churchill liquor. From June 2008 through June 2012, he smuggled over 78,300 cases of Reliable Churchill liquor, that he purchased from them for over $11.5 million, into New York.  Many of these cases of liquor were brands for which Empire had exclusive distribution rights in New York.  For example, on or around October 29, 2010, Happy 40 Liquors purchased 650 cases of Hennessey Cognac 750 ML from Reliable Churchill at a price of over $169,000 to be smuggled into New York.  And on or around April 22, 2011, Happy 40 Liquors purchased 280 cases of Smirnoff Vodka 80 proof 375 ML from Reliable Churchill at a price of over $31,000 to be bootlegged into New York.

129.    Defendant Anil Patel profited handsomely from his participation in the bootlegging scheme.  He testified under oath that he never bought in bulk quantity before entering the smuggling ring.[170]  But through the criminal enterprise, Defendant Patel began

---

[168]  *See* Ex. G at 8–9 (Anil Patel Plea Agreement); Ex. 1 to L. Robbins Aff. in Support of Motion for Summary Judgment, *Republic Nat'l Distrib. Co. v. Tech Pride of Am., Inc.*, No. C-12-1545 (Md. Cir. Ct. Cecil Cty. Oct. 1, 2014) (Ex. P); Trial Ex. P-1, *Republic Nat'l Distrib. Co. v. Tech Pride of Am., Inc.*, No. C-12-1545 (Md. Cir. Ct. Cecil Cty. Oct. 20, 2014) (Ex. Q); Trial Ex. D-7, *Republic Nat'l Distrib. Co. v. Tech Pride of Am., Inc.*, No. C-12-1545 (Md. Cir. Ct. Cecil Cty. Oct. 20, 2014) (Ex. R).

[169]  Ex. G at 8 (Anil Patel Plea Agreement).

[170]  Ex. C at 35:18–20 (*RNDC v. Tech Pride* Trial Tr.).

selling in one week—400 to 500 cases—the amount of liquor that he previously sold in a year's time.[171]

130.    Defendant Anil Patel, Happy 40 Liquors, and Defendant Tech Pride of America, Inc. therefore benefited by their participation in the criminal enterprise by increasing their sales to consumers outside of their traditional market.

(b)    **Tushar C. Patel, Nileshkumar Jasbhai Patel, Pratibha Patel, and Northside Liquors**

131.    Defendants Tushar C. Patel, Nileshkumar Jasbhai Patel, and Pratibha Patel are relatives who operated Cecil County Retailer Northside Liquors.  On or about September 26, 2015, Tushar C. Patel pleaded guilty to one count of conducting a wholesale liquor business without a permit in connection with his participation in the bootlegging scheme "[f]rom at least June 2009 through early January 2011" out of his liquor store in Cecil County, Northside Liquors.[172]

132.    In his plea agreement, Tushar Patel admitted that:

> During that period, a number of smugglers called [me] and others at Northside Liquors.  These calls were made from New York City to the Cecil County store. . . .  [I] and others took these orders and passed the orders on to the liquor distributors.  The salesmen for the distributors routinely came into the store, looked at the faxes from New York and placed the orders.  The distributors then filled the orders by making a delivery by truck to Northside Liquors and leaving a copy of an invoice for the liquor that was delivered. . . .  The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.[173]

133.    The government alleged that Tushar Patel and Nileshkumar Jasbhai Patel conspired with RNDC and ten others "to knowingly devise a scheme and artifice to

---

[171] *Id.* at 102:22–103:1.

[172] Ex. K at 8 (Tushar Patel Plea Agreement).

[173] *Id.*

defraud . . . registered New York wholesalers."[174]  Through their collective participation in the smuggling scheme, "Northside Liquors was selling distilled spirits to parties who were further reselling the liquor and engaged with others in a scheme to defraud both New York State and New York City of excise taxes on distilled spirits by selling distilled spirits on which New York State and New York City taxes had not been paid."[175]

134.    According to an affidavit from a Special Agent with Homeland Security Investigations, sources described the bootlegging process at Northside Liquors as follows:

> [O]rders from New York came in by fax; each fax was then placed on a clipboard on the wall in the office, which is behind the front, retail part of the store.  Sales representatives from the [Maryland Wholesalers] routinely came into Northside two or three times every week and they would first pick up from the cashier a short list of items needed to restock the front, retail part of the store.  Then the sales rep routinely would go to the office in back, take the clipboard off the wall, and go through the faxes to add up the orders for out-of-state.  The sales rep then transmitted the order totals to the main office, and then, within days, a large truck from [the Maryland Wholesalers] would arrive and deliver the order, which would be held in the back, warehouse part of Northside.  Then, the vans from New York would arrive, the driver would pay cash, and the cases of liquor would be loaded into the van.  The cash would then be deposited into the bank and the funds would be transferred to [the Maryland Wholesalers'] bank accounts.  These deposits and transfers are confirmed by bank records.[176]

135.    For instance, between October 11 and October 20, 2010, Tushar Patel filled orders that the smugglers placed by telephone calls and faxes across state lines for 247 cases of Barton Vodka and 63 cases of Jameson Whiskey.[177]  Similarly, on April 25, 2012, Northside Liquors received a "facsimile transmission from New York . . . to place an order for about 14 cases of RNDC Liquor."[178]

---

[174]  Ex. A at ¶ 9 (RNDC Indictment).

[175]  Ex. N at ¶ 7 (Patrick Fyock Affidavit).

[176]  Ex. B at 7–8 (Lisa Ward Affidavit).

[177]  Ex. K at 8–9 (Tushar Patel Plea Agreement).

[178]  Ex. A at 8 (RNDC Indictment).

136.    Moreover, on or about January 7, 2010, while working at Northside Liquors, Pratibha Patel sold 51 cases of liquor to an ATF undercover agent and a confidential informant posing as New York retailers or affiliates for $10,491 in cash.[179]  Pratibha Patel provided her cell phone number to the agent to encourage further purchases and, later accepted an order for 50 cases of liquor on her cell phone.[180]

137.    Northside Liquors also bootlegged a considerable amount of Reliable Churchill liquor.  From June 2008 through May 2012, it bootlegged over 108,700 cases of Reliable Churchill liquor that it purchased for more than $17.4 million.  Many of these cases of liquor were brands for which Empire had exclusive distribution rights in New York.  For example, on or around October 31, 2008, Northside Liquors purchased 500 cases of Hennessey Cognac 750 ML from Reliable Churchill at a price of over $130,000 to be smuggled into New York.  And on or around October 19, 2010, Northside Liquors purchased 900 cases of Bacardi Rum Superior 100 ML from Reliable Churchill at a price of over $80,500 to be bootlegged into New York.  Indeed, Northside Liquors sold so much liquor that it took deliveries from Reliable Churchill out of an "18-wheel, tractor-trailer truck."[181]

138.    Moreover, according to publicly available documents, from at least July 2009 through December 2010, Northside Liquors and its principals sold at least 1,253 cases of liquor, believing that these products would be smuggled to New York.[182]  Defendants Tushar C. Patel,

---

[179]  Ex. N at ¶¶ 29–30 (Patrick Fyock Affidavit).

[180]  *See id.* ¶¶ 29, 31.

[181]  Ex. X at ¶ 5 (Barker Declaration).

[182]  *See* Ex. N at ¶¶ 20, 22–24, 27–35, 39–41, 45–49 (Patrick Fyock Affidavit); Ex. X at 8–9 (Tushar Patel Plea Agreement).

Nileshkumar Jasbhai Patel, and Pratibha Patel therefore benefited by their participation in the criminal enterprise by increasing their sales to consumers outside of their traditional market.

### (c)  Dilip C. Patel, Prakash Patel, and Chesapeake Wine and Spirits

139.    Defendant Dilip C. Patel is a Cecil County Retailer who operated Chesapeake Wine and Spirits.  On or about February 9, 2015, Dilip Patel pleaded guilty to one count of wire fraud in connection with his participation in the bootlegging scheme "[f]rom at least January 2011 through June 2012" out of his liquor store, Chesapeake Wine and Spirits.[183]

140.    Defendant Prakash Patel was Defendant Dilip Patel's business "partner[]" who worked the counter of Chesapeake Wine and Spirits and discussed bulk transactions with out-of-state purchasers.[184]

141.    In his plea agreement, Defendant Dilip Patel admitted that:

> During that period, a number of smugglers called [me] and others at Chesapeake Wine and Spirits.  These calls were made from New York City to the Cecil County store. . . .  [I] and others took these orders and passed the orders on to salesmen of RNDC.  RNDC then filled the orders by making a delivery by truck to Chesapeake Wine and Spirits and leaving a copy of an invoice for the liquor that was delivered. . . .  The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.[185]

142.    The government also stated that Dilip Patel conspired with RNDC and eleven others "to knowingly devise a scheme and artifice to defraud . . . registered New York wholesalers."[186]

---

[183]  Ex. H at 7–8 (Dilip Patel Plea Agreement).

[184]  Ex. C at 146:9–24, 150:20–22 (*RNDC v. Tech Pride* Trial Tr.).

[185]  Ex. H at 8 (Dilip Patel Plea Agreement).

[186]  Ex. A at ¶ 9 (RNDC Indictment).

143.     Dilip Patel habitually relied on interstate telephone calls and faxes to perpetuate the scheme.  He spoke via telephone with smugglers in New York on April 3, 2012,[187] and admitted that "between April 1 and April 6, 2012, smugglers placed several orders by telephone from New York" with him at Chesapeake Wine & Spirits in Maryland.[188]  Additionally, on both March 30, 2012 and March 31, 2012, Chesapeake Wine & Spirits sent a "facsimile transmission . . . to New York to convey pricing for an order for . . . cases of RNDC liquor."[189]

144.     From May to July 2012 alone, Chesapeake Wine & Spirits ordered at least 2,189 cases of Barton Vodka, 460 cases of Seagram's Gin and 15 cases of Barton Gin from RNDC in order to fill corresponding orders placed by telephone from New York.[190]

145.     Whereas in 2009, Chesapeake Wine & Spirits' sales did not exceed one hundred thousand dollars,[191] during two months in 2012 alone, Chesapeake Wine & Spirits' liquor purchases from RNDC totaled over half a million dollars.[192]  In November 2011, despite having a "small, retail operation," Chesapeake Wine & Spirits purchased over $300,000 of liquor from RNDC and, upon information and belief, tens, if not hundreds, of thousands of dollars of liquor from Reliable Churchill over a ten-day span.[193]  It is not possible for Chesapeake Wine & Spirits

---

[187]  Information ¶ 10, *United States v. Patel*, No. 15-cr-00309, ECF No. 1 (D. Md. June 1, 2015) (Ex. S).

[188]  Ex. H at 8 (Dilip Patel Plea Agreement).

[189]  Ex. A at 8 (RNDC Indictment).

[190]  *See* Ex. 1 to Complaint, *Republic Nat'l Distrib. Co. v. Spirit 213, LLC*, No. C-12-1624 (Md. Cir. Ct. Cecil Cty. Oct. 15, 2012) (listing products sold from RNDC to Chesapeake Wine & Spirits) (Ex. T).  *Cf. RNDC v. Spirit 213* Trial Tr. at 5:17–25 (arguing contracts for sales of liquor from RNDC to Chesapeake Wine & Spirits were "expressly or by implication forbidden by statute or by law" because they were illegal due to the bootlegging scheme); *id.* at 7:22–25 ("[O]vernight everybody in Chesapeake City did not turn into an alcoholic.  This liquor was purchased on a daily basis going up to New York.").

[191]  *See* Ex. D at 18:3–7 (*RNDC v. Spirit 213* Trial Tr.).

[192]  *Id.* at 28:25–29:15.

[193]  Ex. B at 10 (Lisa Ward Affidavit).

to have needed that much liquor to sell to citizens of Cecil County, or even citizens of neighboring states who visited the store.

146.    Chesapeake Wine & Spirits also bootlegged a substantial amount of Reliable Churchill liquor.  From June 2009 through June 2012, it bootlegged over 36,300 cases of Reliable Churchill liquor that it purchased for more than $6.7 million.  Many of these cases of liquor were brands for which Empire had exclusive distribution rights in New York.  For example, on or around June 3, 2011, Chesapeake Wine & Spirits purchased 225 cases of Hennessey Cognac 750 ML from Reliable Churchill at a price of over $66,900 to be smuggled into New York.  And on or around February 3, 2012, Chesapeake Wine & Spirits purchased 200 cases of Johnnie Walker Black 750 ML from Reliable Churchill at a price of over $64,200 to be bootlegged into New York.  Indeed, Chesapeake Wine & Spirits' "back door" sales were so large that it purchased a storage area unconnected to the retail store at another location just to house the liquor intended for New York.  Defendants Dilip Patel's and Prakash Patel's participation in the smuggling scheme therefore greatly enriched them and their business.

(d)    **Settling Defendants Jatin B. Patel and North East Liquors**

147.    Jatin B. Patel (a/k/a Jattinkumar B. Patel) is a Cecil County Retailer who operated North East Liquors, owned by J & R Company LLC.  On or about April 6, 2015, he pleaded guilty to one count of wire fraud in connection with his participation in the bootlegging scheme "[f]rom at least March 2011 to June 2012" out of North East Liquors.[194]

148.    On April 6, 2015, Jatin Patel pleaded guilty to one count of wire fraud, in violation of 18 U.S.C. § 1343.  In his plea agreement, Jatin Patel admitted that:

> During that period, a number of smugglers called [me] and others at Northeast[sic] Liquors.  These calls were made from New York City to the Cecil County

---

[194]  Ex. I at 8 (Jatin Patel Plea Agreement).

store. . . . [I] and others took these orders and passed the orders on to liquor distributors, who then filled the orders by making a delivery by truck to Northeast[sic] Liquors and leaving a copy of an invoice for the liquor that was delivered. . . . The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.[195]

149.    The government also concluded that Jatin Patel conspired with RNDC and eleven others "to knowingly devise a scheme and artifice to defraud . . . registered New York wholesalers."[196]

150.    Jatin Patel frequently spoke with salesmen from RNDC about purchasing orders for the people "from upstate."  Both Jatin Patel and the RNDC salesmen understood that this was code for smugglers from New York, since Cecil County is in the northern most part of Maryland.

151.    Jatin Patel and Reliable Churchill employees also used code words to refer to the New York smugglers.  Reliable Churchill salesmen referred to the smugglers by code words, such as your "guy."  Indeed, a Reliable salesman questioned Jatin Patel why his "guy" was no longer buying certain brands in bulk from Patel, while other "guys" (referring to smugglers) were buying those brands in bulk from other local Cecil County stores.  Reliable salesmen also asked Jatin Patel about orders from his "'guy,'" referring to the New York smugglers, were going to need.[197]

152.    For example, from May 22 to June 5, 2012, North East Liquors ordered 58 cases of Barton Vodka, 129 cases of Absolut Vodka, and 16 cases of Beefeater in order to fill corresponding orders "placed . . . by telephone from New York."[198]  Defendant Jatin Patel

---

[195] *Id.*

[196] Ex. A at ¶ 9 (RNDC Indictment).

[197] Ex. Y at ¶ 11–12 (Jatin Patel Declaration).

[198] *See* Ex. I at 8 (Jatin Patel Plea Agreement).

admitted that the New York "smugglers paid cash for the liquor that they had ordered, and then transported it from Maryland to New York for retail sale."[199]  Jatin Patel also frequently sold Reliable Churchill brands such as Johnnie Walker Black, Smirnoff, Grey Goose, and Ciroc[200] to smugglers to be sold to consumers in New York.

153.    North East Liquors and Jatin Patel smuggled thousands of cases of liquor for which Empire had exclusive distribution rights from 2010 through at least 2012, the vast majority of which were sold to retailers in the metropolitan New York area.  Furthermore, upon information and belief, the cost basis of this liquor that was resold to retailers in the metropolitan New York area was in excess of one million dollars.  Defendant Jatin Patel therefore benefited from his participation in the bootlegging scheme because he was able to sell increased quantities of liquor to customers far afield from his normal (and legal) market.

154.    In addition, Jatin Patel understood that certain New York smugglers had direct contact with Reliable Churchill and RNDC salesman because the smugglers had knowledge of the prices Reliable Churchill and RNDC intended to offer Jatin Patel for certain liquors even before Reliable Churchill and RNDC communicated those prices to Jatin Patel.  As a result of the knowledge that the smugglers had of the prices offered by Reliable Churchill and RNDC, the smugglers were able to negotiate against Jatin Patel to obtain more favorable prices, substantially reducing Jatin Patel's profits from the smuggling scheme.

(e)    **Settling Defendant Vlamis Liquors LLC**

155.    Vlamis Liquors LLC owns a liquor store doing business as Vlamis' Cut-Rate Liquors at 801 N. Bridge St., Elkton, Maryland 21921.

---

[199]  *Id.*

[200]  Ex. Y at ¶ 7 (Jatin Patel Declaration).

156.     Vlamis Liquors, its employees, and principal admit their role in the bootlegging scheme from 2010 into 2014.  Vlamis Liquors employees spoke with salesmen from Reliable Churchill and RNDC frequently about purchasing orders to be smuggled to New York.[201] Vlamis Liquors typically sold liquor meant for smuggling to three New York smugglers, who provided only their first names to Vlamis:  Kay, Alex, and Chen.[202]

157.     Participation in the bootlegging scheme greatly improved Vlamis Liquors' business.  For example, before it entered the bootlegging scheme, Vlamis Liquors typically ordered from Reliable Churchill only one case per month of Johnnie Walker Black.  In 2012, when it joined the smuggling ring, Vlamis Liquors increased its purchases from Reliable Churchill to 100 cases per month of Johnnie Walker Black.[203]

158.     Vlamis Liquors also actively participated in concealing the scheme by removing the Maryland Wholesalers' stickers, or labels, using a "heat gun."[204]  A Reliable Churchill salesman advised a Vlamis Liquors employee on how to remove the labels, and advised that it was "less time consuming" to remove the Maryland labels "using a torch instead of a heat gun."[205]  The Vlamis Liquors employees (and Reliable Churchill employee) knew there was no legitimate business rationale for removing the Maryland stickers; rather, they were removed so that inspectors and law enforcement officials could not discern the true origin of the liquor cases.[206]  Vlamis Liquors' employees also bought pallets of liquor—which contained 30 or more

---

[201] Ex. X at ¶¶ 15, 17 (Barker Declaration).

[202] *Id.* ¶¶ 8–9, 11.

[203] *Id.* ¶ 15.

[204] *Id.* ¶ 17.

[205] *Id.*

[206] *Id.*

cases—because Reliable Churchill and RNDC advised Vlamis employees that the Maryland Wholesalers would not place stickers on pallets.[207]  Prior to entering into the bootlegging scheme, Vlamis Liquors never purchased pallets.[208]  After it began selling to the New York smugglers, Vlamis Liquors "regularly ordered pallet picks almost every week."[209]

159.    Vlamis Liquors profited greatly from its participation in the bootlegging scheme, smuggling hundreds of thousands of dollars of liquor and wine into New York.  Vlamis was enriched by this amount at Empire's expense.

### 3.    The New York Retailers

#### (a)    Bin Luo, Sam Liquors Inc., Bao Zheng, and Bao Liquors Inc.

160.    Defendant Bin Luo ("Chen") was a New York Retailer who operated a retail liquor store known as Sam Liquors Inc., located in Brooklyn, New York.  Defendant Bao Zheng was a New York Retailer who owned and operated a retail liquor store known as Bao Liquor Inc., also located in Brooklyn, New York.[210]

161.    On or about March 23, 2015 and April 24, 2015, respectively, Defendants Bin Luo and Bao Zheng pleaded guilty to "one count of wire fraud" in connection with their participation, and the participation of Sam Liquors Inc. and Bao Liquor Inc., in the bootlegging scheme "[f]rom at least November 2013 through January 2015."[211]

162.    In each of their plea agreements, Defendants Bin Luo and Bao Zheng admitted that:

---

[207]  *Id.*

[208]  *Id.*

[209]  *Id.*

[210]  Ex. J at 8 (Bin Luo Plea Agreement).

[211]  *Id.* at 1, 8; Ex. J at 1, 8 (Bao Zheng Plea Agreement).

[We] and a number of others routinely traveled from New York to retail liquor stores located in Cecil County, Maryland, to purchase bulk loads of wine and spirits. During that period, Bin Luo sent emails from New York City to people working at Vlamis Liquors in Cecil County to place such orders. . . . A day or two after placing an order, [we] drove from New York to Cecil County, paid cash for the bulk liquor that had been ordered, and loaded the liquor into a black 2011 Suburban . . . . The smugglers then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.[212]

163.    A man named "Chen"—on information and belief, Bin Luo—originally approached Vlamis Liquors in the Fall of 2013 to join in the bootlegging scheme.[213]  He frequently brought another man with him; on information and belief, this was Bao Xheng.  The two men arrived at Vlamis Liquors in trucks bearing New York license plates.[214]  They frequently bought Smirnoff and Johnnie Walker products, among other products, that Vlamis Liquors bought from Reliable Churchill for interstate smuggling.[215]  They also frequently purchased Svedka Vodka, Malibu, and Barton Vodka, among other products, that Vlamis Liquors bought from RNDC for interstate smuggling.[216]  Bao Zheng emailed Vlamis Liquors from New York to place their orders for liquor.[217]

164.    There are many instances of Bin Luo's and Bao Zheng's participation in the scheme.  For example, on December 4, 2013, they caused an interstate email to be sent containing an order for 59 cases of Smirnoff and five cases of Ketel One to be smuggled into New York.  And on May 19, 2014, they placed an order via interstate email for 30 cases of

---

[212]  Ex. E at 8 (Bin Luo Plea Agreement).

[213]  Ex. X at ¶ 9 (Barker Declaration).

[214]  *Id.*

[215]  *Id.*

[216]  *Id.*

[217]  *Id.*

Smirnoff to be smuggled into New York.  Other instances of their wire fraud are listed in

Appendix A.

165.    As a result of their participation in this smuggling ring, Defendants Bin Luo and

Bao Zheng were able to underpay for cases of liquor by tens of thousands of dollars.  Indeed,

Empire's internal sales records show, for instance, that Sam Liquors Inc. (the store operated by

Bin Luo) markedly decreased its purchases of certain Smirnoff products from Empire during the

Winter holiday season of 2014—a typically busy time of year for alcohol sales, and the precise

period of time during which Bin Luo was caught receiving smuggled Smirnoff cases from

Maryland.

166.    The amounts and types of liquor that Defendants Bin Luo and Bao Zheng

acknowledged smuggling is likely just a small fraction of the liquor that they smuggled into New

York.  Internal Empire data shows that these New York Retailers suspiciously reduced or cut off

entirely their purchases of additional types of alcohol for which Empire was the exclusive

distributor in the metropolitan New York area, including Barton Vodka and Seagram's 7 Crown.

For example, internal Empire data shows that Defendant Bao Liquors Inc. purchased 37 cases of

Barton Vodka 375 ML from Empire in 2013, *0 cases* in 2014, and 48 cases in 2015.  Given that

Bao Liquors' owner, Bao Zheng, pleaded guilty to smuggling alcohol into New York between

November 2013 and January 2015, it is more likely than not that Bao Liquors Inc. did not

purchase any cases of Barton Vodka 375 ML from Empire in 2014 because it was illicitly

importing this liquor from Maryland.

167.    Similarly, Defendant Sam Liquors Inc. purchased 23 cases of Seagram's 7 Crown

from Empire in 2013, 10 cases in 2014, and 21 cases in 2015.  Given that Defendant Sam

Liquors Inc.'s owner, Bin Luo, pleaded guilty to smuggling alcohol into New York between

November 2013 and January 2015, it is more likely than not that Sam Liquors Inc. purchased markedly fewer cases of Seagram's 7 Crown in 2014 because it was illicitly importing this liquor from Maryland.

168.    On information and belief, during the time period that Bin Luo, Sam Liquors Inc., Bao Zheng, and Bao Liquors Inc. directed and participated in the bootlegging scheme, they knew that Empire was the exclusive distributor in New York for Smirnoff, Ketel One, Johnnie Walker Black, Svedka Vodka, Malibu, Barton Vodka, and Seagram's 7 Crown, and the only wholesaler from which they could lawfully buy these products.  Empire was directly harmed every time these Defendants purchased these products from Cecil Country Retailers instead of from Empire.

169.    On information and belief, Bin Luo used Sam Liquors Inc. to sell to New York consumers bottles of Smirnoff, Ketel One, Johnnie Walker Black, Svedka Vodka, Malibu, Barton Vodka, Seagram's 7 Crown, and other brands as if they were legitimate goods upon which New York excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them. Similarly, on information and belief, Bao Zheng used Bao Liquors Inc. to sell to New York consumers bottles of Smirnoff, Ketel One, Johnnie Walker Black, Svedka Vodka, Malibu, Barton Vodka, Seagram's 7 Crown, and other brands as if they were legitimate goods upon which New York excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them.

(b)    **Alexander Lew and Our Liquor, Inc.**

170.    Defendant Alexander Lew is a New York Retailer who was related to Our Liquor, Inc.  In May 2015, Lew pleaded guilty to one count of conducting a wholesale liquor business

74

without a permit in derogation of 27 U.S.C. § 203(c) from "at least August 2010 through July 2014."[218]

171.    In his plea agreement, Lew admitted the following:

From at least August 2010 through July 2014, [I] and others engaged in a scheme and artifice to defraud the state and city of New York of excise tax revenue on the wholesale distribution of liquor.  [I] had contacts in a number of retail liquor stores in New York City, including a store known as Our Liquors.  During that period, [I] routinely took orders from these retail liquor store contacts for cases of various brands of liquor.

Also during that same period, [I] routinely sent faxes and made cellular telephone calls from New York to managers at a number of retail liquor stores located in Cecil County, Maryland.  In these faxes and during these calls, [I] placed orders for bulk liquor in sufficient quantities to fill the orders from his New York retail contacts.

* * *

A day or two after placing an order, [I] drove from New York to Cecil County, paid cash for the bulk liquor and loaded the liquor into his vehicle.  [I] then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.  The amount of liquor picked up in Cecil County routinely was far in excess of 20 wine gallons at a time.  After [I] moved the bulk liquor to New York, [I] routinely distributed it to the several retail liquor stores that had earlier given [me] orders.  Those retailers then sold the liquor to retail customers in New York.[219]

172.    A man named "Alex"—on information and belief, "Alex" is Alexander Lew—approached Vlamis Liquors about the bootlegging scheme in 2010.[220]  Lew communicated via phone and text with Vlamis Liquors from Queens New York.[221]  He would pay for the liquor to be smuggled "with bags filled with as much as $20,000 in cash."[222]  Lew also purchased liquor

---

[218]  Ex. M at 7 (Alexander Lew Plea Agreement).

[219]  *Id.*  In or about June 2011, Lew made an interstate phone call from New York to Maryland to place an order for 58 cases of liquor.  *Id.*

[220]  Ex. X at ¶ 8 (Barker Declaration).

[221]  *Id.* ¶¶ 8, 11.

[222]  *Id.* ¶ 8.

for smuggling for Northside Liquors.[223]  Despite not being a licensed distributor in New York, he told Vlamis Liquors employees that he sold liquor to bars and night clubs using "runners" and also out of his store—on information and belief, Our Liquor, Inc.[224]  On information and belief, Alexander Lew drove across federal roads and highways when picking up bootlegged liquor from Maryland and smuggling it into New York.

173.    Lew frequently purchased Hennessey, Grey Goose, and Johnnie Walker Black, among other products, that Vlamis Liquors bought from Reliable Churchill for interstate smuggling.[225]  For example, on or about December 11, 2013, Lew purchased 12 cases of Bacardi, 12 cases of Hennessey, and 6 cases of Johnnie Walker Black for smuggling into New York.  And, on or about January 18, 2014, Lew picked up an order from Vlamis Liquors for 31 cases of Johnnie Walker Black and four cases of Bacardi for smuggling into New York.  Lew sent dozens of interstate wires in furtherance of this scheme, as detailed in Appendix A.

174.    Indeed, Empire sales data reveals that Our Liquor, Inc. forewent purchases from Empire in favor of bootlegged liquor because they only started buying certain types of liquor after Lew's conviction.  Internal Empire data shows that Defendant Our Liquor, Inc. purchased 0 cases of Bacardi Light Superior in 2013 and 2014, despite purchasing other Bacardi products from Empire in those years.  Then, in 2015, after Lew was charged with involvement in the bootlegging scheme, Our Liquor, Inc. purchased 50 cases of Bacardi Light Superior.  Because Empire had the exclusive rights to distribute Bacardi products in New York from 2013 through 2015, it is highly likely that Our Liquor, Inc. did not purchase any Bacardi Light Superior

---

[223] *Id.*

[224] *Id.* ¶¶ 8, 11.

[225] *Id.* ¶ 8.

products from Empire in 2013 and 2014 because it was purchasing smuggled products from the Maryland Wholesalers and Cecil County Retailers.

175.    During the time period that Lew and Our Liquors, Inc. participated in this bootlegging scheme, they knew that Empire was the exclusive distributor in New York for Hennessey, Grey Goose, Johnnie Walker Black, and Bacardi Light Superior, and the only wholesaler from which they could lawfully buy these products.  Indeed, Lew once told Vlamis Liquors employees that "Empire 'was our Churchill,'" meaning that he knew the goods he was purchasing that were supplied by Reliable Churchill should have been supplied by Empire.[226] Empire was directly harmed every time these Defendants purchased these products from Cecil Country Retailers instead of from Empire.

176.    As a result of their participation in the bootlegging scheme, Defendants Alexander Lew and Our Liquor, Inc. were able to underpay for cases of liquor between approximately 2010 and 2014.  On information and belief, Alexander Lew used Our Liquors, Inc. to sell to New York consumers bottles of Hennessey, Grey Goose, Johnnie Walker Black, and Bacardi Light Superior, and other brands as if they were legitimate goods upon which New York excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them.

(c)    **Ting Wei**

177.    Defendant Ting Wei is a New York Retailer who worked for retailers in New York.  In or about December 2, 2015, Defendant Ting Wei pleaded guilty to one count of

---

[226]  Ex. X at ¶ 22 (Barker Declaration).

conducting a wholesale liquor business without a permit in derogation of 27 U.S.C. § 203(c) "[f]rom at least 2009 through February 23, 2013."[227]

178.    In his plea agreement, Defendant Ting Wei admitted that, in connection with the bootlegging scheme, he frequently used interstate wires, and drove from New York to Maryland to smuggle liquor back into New York:

> [I] and others engaged in a scheme and artifice to defraud the state and city of New York of excise tax revenue on the wholesale distribution of liquor.  [I] had contacts in a number of retail liquor stores in New York City.  During that period, [I] routinely took orders from these retail liquor store contacts for cases of various brands of liquor.

> Also, during at least the 2009 period, [I] sent faxes and made cellular telephone calls from New York to managers at Northside Liquors, located in Cecil County, Maryland.  In these faxes and during these calls, [I] placed orders for bulk liquor in sufficient quantities to fill the orders from [my] New York retail contacts.

> *    *    *

> A day or two after placing an order, [I] drove from New York to Cecil County, paid cash for the bulk liquor and loaded the liquor into [my] vehicle.  [I] then transported that liquor to New York City and evaded the applicable excise taxes by failing to file reports with the state of New York describing the transportation of the liquor into the state of New York.  The amount of liquor picked up in Cecil County routinely was far in excess of 20 wine gallons at a time.  After [I] moved the bulk liquor to New York, [I] routinely distributed it to the several retail liquor stores that had earlier given [me] orders.  Those retailers then sold the liquor to retail customers in New York.  During the period mentioned above, [he] did not have a basic wholesaling permit issued by the Secretary of the Treasury.[228]

179.    Moreover, Defendant Ting Wei admitted to engaging in similar misconduct in 2013.  He admitted that on or about "February 23, 2013, [he] was stopped by New York Tax authorities as he was driving in New York.  At the time of the stop, [he]was in possession of approximately 20 cases of liquor that he was importing into New York without a permit."[229]

---

[227] Ex. L at 7 (Ting Wei Plea Agreement).

[228] *Id.*

[229] *Id.* at 7–8.

Upon information and belief, Ting Wei drove across federal roads and highways when smuggling liquor from Maryland to New York. Ting Wei further admitted that "[a]t all times, [he] acted knowingly and willfully."[230]

180.    Although Ting Wei's plea agreement does not specify the types of liquor that he bootlegged, Empire is the largest wholesaler in New York City and, as stated above, it is highly likely that at least some of the bootlegged cases of liquor contained brands that Empire has the exclusive right to distribute in New York City.

181.    As a result of his participation in the bootlegging scheme, Defendant Ting Wei was able to illegally underpay for cases of liquor across five different calendar years. On information and belief, New York Retailers sold to New York consumers the bottles of liquor that Ting Wei smuggled as if they were legitimate goods upon which New York excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them.

(d)    **LTT Whiskey Inc.**

182.    Defendant LTT Whiskey Inc. is a New York Retailer, which operates a liquor store known as LTT Whiskey Wine & Liquors Market in Queens.

183.    On or about October 30, 2009, LTT Whiskey Inc. received a portion of a delivery of more than twenty cases of liquor from Maryland.[231]

---

[230]  *Id.* at 8.

[231]  Ex. N at ¶ 20(b) (Fyock Affidavit).

184.    In addition to this instance of purchasing smuggled goods, internal Empire data shows that LTT Whiskey Inc. suspiciously reduced its purchases of additional types of alcohol for which Empire was the exclusive distributor in the metropolitan New York area.

185.    For example, LTT Whiskey Inc. purchased from Empire 165 cases of Bacardi Light Superior products in 2008; only *100* cases of Bacardi Light Superior products in 2009; and 199 cases of Bacardi Light Superior products in 2010—in other words, LTT Whiskey purchased at least 65 fewer cases in 2009 than in 2008.  As discussed above, other New York Retailers who pleaded guilty in the bootlegging scheme exhibited highly suspicious patterns of Bacardi Light Superior purchases.  Thus, in the year (2009) in which it was caught receiving cases of liquor from Maryland, LTT Whiskey Inc. also conspicuously reduced its purchases of Bacardi Light Superior products by at least 65 cases.  It is more likely than not that LTT Whiskey Inc. purchased fewer cases of Bacardi Light Superior products from Empire in 2009 because it was illicitly importing this liquor from Maryland.

186.    But LTT Whiskey Inc.'s involvement did not end in 2010.  According to an Empire salesman responsible for LTT Whiskey Inc., it did not purchase *any* 1 Liter or 750 ML bottles of Grey Goose from Empire in 2014 or 2015, but whenever the Empire salesman visited the store, it was stocked with these exact Grey Goose bottles.[232]  (During the same time frame, LTT Whiskey Inc. purchased many bottles of less popular vodka and other sizes of Grey Goose, revealing that it was in the market of selling vodka, including Grey Goose.)  It is more likely

---

[232] The Empire salesman assumed LTT Whiskey Inc.'s owner had another store in New York and was simply purchasing the Grey Goose bottles at the other location.  On information and belief, the owner of LTT Whiskey Inc. did not have another store in New York.

than not that LTT Whiskey Inc. did not purchase any 1 Liter or 750 ML cases of Grey Goose in 2014 and 2015 because it was illicitly importing this liquor from Maryland.

187.     It appears that LTT Whiskey Inc.'s involvement in the bootlegging scheme extended to other popular brands that were frequently smuggled.  Despite running a sustainable liquor-selling business (with the word "Whiskey" in its name) from at least 2008 through 2016, and despite ordering certain types of Johhny Walker whiskeys, LTT Whiskey Inc. never ordered a single case of Johnnie Walker Black 750 ML from Empire during this entire eight-year time period, even though Empire was the only licensed wholesaler selling this product.  Of course, Johnnie Walker Black 750 ML was a favorite product among smugglers.  *See* Appx. A.  It is more likely than not that LTT Whiskey Inc. did not purchase any cases of Johnnie Walker Black 750 ML because it was illicitly smuggling this liquor from Maryland.

188.     Upon information and belief, during the time period that LTT Whiskey Inc. participated in the bootlegging scheme, it knew that Empire was the exclusive distributor in New York for Grey Goose, Johnnie Walker Black, and the only wholesaler from which it could lawfully buy these products.  Upon information and belief Grey Goose, Bacardi Light Superior, and Johnnie Walker Black were sold by Reliable Churchill in Maryland during the relevant time periods discussed.

189.     As a result of its participation in the bootlegging scheme, LTT Whiskey Inc. was able to underpay for cases of liquor between at least approximately 2008 and 2016.  On information and belief, LTT Whiskey Inc. sold to New York consumers bottles of Grey Goose, Bacardi Light Superior, and other brands as if they were legitimate goods upon which New York

excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them.

(e)   **Ke Yao and Yi Feng Gao**

190.   Defendants Ke Yao and Yi Feng Gao are New York Retailers who smuggled liquor from Maryland to New York.  On January 20, 2015, Defendants Yao and Gao, who "often travel together and . . . bring cash from New York" to carry out the bootlegging scheme, were each indicted for a count of wire fraud under 18 U.S.C. § 1343.[233]

191.   Defendant Yao, with Defendant Gao's assistance, began smuggling alcohol from Maryland to New York at least as early as September 2013.[234]  They typically placed orders, via text message from New York to Maryland, for between 20 to 75 cases of Johnnie Walker Black (sold by Reliable Churchill) or Jamison Whiskey (sold by RNDC).[235]  They then drove across federal roads from New York to Maryland, paid for the liquor in cash, and returned across federal roads to New York.[236]

192.   For one example, on or around January 14, 2015, Yao texted a Vlamis employee from New York with an order for 35 cases of liquor, and Yao and Gao then drove across federal roads to New York, paid for the liquor with $9,618 in cash, and smuggled the liquor back to New York.[237]  Yao and Gao also bootlegged liquor in this manner on numerous other occasions.  For example, on or about October 15, 2013, they purchased 43 cases of liquor for $8,318.19 from

---

[233] *See* Criminal Complaint at 4–5, *United States v. Yao*, No. 15-mj-00080, ECF No. 1 (D. Md. Jan. 20, 2015) ("Yao Complaint") (Ex. CC); Criminal Complaint at 4–5, *United States v. Gao*, No. 15-mj-00081, ECF No. 1 (D. Md. Jan. 20, 2015) ("Gao Complaint") (Ex. DD).

[234] Ex. X at ¶ 9 (Barker Declaration).

[235] *Id.*; Ex. CC at 4 (Yao Complaint); Ex. DD at 4 (Gao Complaint).

[236] *See* Ex. CC at 3–4 (Yao Complaint); Ex. DD at 3–4 (Gao Complaint).

[237] *See* Ex. CC at 5 (Yao Complaint); Ex. DD at 5 (Gao Complaint).

Vlamis Liquors for smuggling into New York.  And on or about June 5, 2014, they purchased 65 cases of liquor for $9,564.64 from Vlamis Liquors for smuggling into New York.

193.    On information and belief, Yao and Gao facilitated the sale to New York consumers of bottles of Johnnie Walker Black, Jamison Whiskey, and other brands as if they were legitimate goods upon which New York excise taxes had been paid when, in fact, these bottles of liquor were bootlegged from Maryland and nobody ever paid the appropriate New York taxes on them.

### C.    Empire Merchants Was Directly Harmed by the Enterprise's Illegal Activity

194.    Empire possessed the exclusive right to distribute certain brands of liquor in New York.  Every time a case of liquor that Empire had the exclusive right to sell was illegally sold by the Maryland Defendants to the New York Retailers, Empire lost a sale to which it was entitled.  On information and belief, Empire lost sales of thousands of cases of alcohol and liquor that were smuggled from Maryland into New York, resulting in lost sales of millions of dollars due to Defendants' illegal bootlegging scheme.

195.    Indeed, industry analyses indicate that illicit bootlegging "amount[s] to over 25% of taxed sales" in New York and that "eliminating opportunities for tax evasion" alone "could increase liquor and wine-related tax revenues by $63 million each year."[238]  Since Empire is the largest wholesaler in New York, and Defendants' bootlegging ring operated for at least six years, Empire believes that its damages from the smuggling enterprise may well exceed $100 million.

---

[238] EconFirst Assocs. LLC, Analysis of the Economic Development and Enforcement Act Relating to the Distribution of Alcoholic Beverages in New York State 2 (Feb. 2011) (Ex. V); Regional Econ. Models, Inc., Regional Macroeconomic and Fiscal Impact of New York's Proposed At-Rest Legislation 3–4 (Oct. 3, 2012) (Ex. W).

196.    Empire's internal sales data show that several New York Retailers conspicuously reduced or eliminated their purchases of alcohol products to which Empire was the exclusive distributor during the same time period that these New York Retailers were smuggling bootlegged alcohol from Maryland—reflecting many thousands of dollars in reduced sales.  *See supra* Section II.B.3.

197.    As discussed *supra*, Section II.B.1.a, Reliable Churchill smuggled into New York tens, if not hundreds, of millions of dollars' worth of alcohol products that Empire had the exclusive right to sell.

## III.    DEFENDANTS AFFIRMATIVELY CONCEALED THEIR FRAUDULENT SCHEME FROM EMPIRE AND THE PUBLIC

198.    Defendants at all levels of the illegal bootlegging scheme effectively, affirmatively, and fraudulently concealed their wrongful acts from Empire and the public.[239] Defendant Bin Luo admitted in his plea agreement that:

> [I] asked the Cecil County retailers to make sure that there were no labels on the cases of liquor that would show that the liquor was purchased in Maryland.  [I] thereby intended to conceal the origin of the liquor from the state of New York to avoid the payment of New York State and New York City excise taxes.[240]

199.    Indeed, Reliable Churchill employees explained to Cecil County Retailers how to remove Maryland stickers using "heat guns" or torches.  Both Reliable Churchill and RNDC delivered large pallets of liquor to Cecil County Retailers for bootlegging without Maryland

---

[239]  The illegal acts committed over the last few years are indisputably timely under all relevant statutes of limitations.

[240]  Ex. E at 8 (Bin Luo Plea Agreement).

stickers so that the smugglers could more easily avoid detection.[241]  The New York Retailers "covered the boxes [of liquor] with blankets and sheets."[242]

200.    Maryland Wholesalers and Cecil County Retailers discussed their criminal scheme in code:  They referred to alcohol intended for New York as sales of liquor that were going "out the back door."[243]  RNDC salesmen and Cecil County Retailers referred to smugglers from New York as the people from "upstate."[244]  Payments to certain Cecil County Retailers "occurred in the back room office of [their] business[es]."[245]  RNDC Assistant Director of Operations Gerzsenyi stated that "[RNDC] would deny knowledge of such sales [of liquor to New York]."[246]

201.    In addition, co-conspirators in racketeering the enterprise actively avoided interactions with government authorities in order to protect their scheme from detection. Defendant Tushar Patel told a would-be New York smuggler, who was actually an undercover agent for the ATF, to "use [the] Commodore Barry Bridge to return to New York due to less police presence and also not to drive too fast or too slow to attract police attention."[247]  And RNDC employees warned at least one Maryland Retailer that "agents of the Bureau of Alcohol, Tobacco, and Firearms were scrutinizing Northside Liquors."[248]

---

[241]  *See* Ex. X at ¶ 17 (Barker Declaration); Ex. Y at ¶¶ 19–20 (Jatin Patel Declaration).

[242]  Elstein, *supra* note 1; *accord* Ex. CC at 5 (Yao Complaint) (describing Yao "conceal[ing] the [liquor cases] with blankets and sheets"); Ex. DD at 5 (Gao Complaint) (same).

[243]  Ex. A at ¶ 23(c) (RNDC Indictment); Ex. X at ¶ 10 (Barker Declaration).

[244]  Ex. Y at ¶ 11 (Jatin Patel Declaration).

[245]  Ex. N at ¶ 23 (Patrick Fyock Affidavit).

[246]  Ex. B at 11 (Lisa Ward Affidavit).

[247]  Ex. N at ¶ 24 (Patrick Fyock Affidavit).

[248]  Ex. A at ¶ 23(b) (RNDC Indictment); *accord* Ex. B at 11 (Lisa Ward Affidavit) ("[Gerzsenyi] warned the undercover agent to be careful because the government was watching Northside.").

202.    Of course, the New York Retailers and others who smuggled alcohol into the state "did not register with the state of New York and did not report to the state of New York the transportation of any liquor into the state" as they were required to by law.[249]  The Maryland Wholesalers "filed false and fraudulent reports to the Maryland State Comptroller's Office, indicating that all liquor sold to the Cecil County retailers was intended for resale in Maryland."[250]

203.    Additionally, New York Retailers who drove to Maryland to bootleg liquor actively kept their identities hidden.[251]  Indeed, Defendant Anil Patel, who admitted to participating in the smuggling ring, testified under oath that the New York Retailers only offered him their first names.[252]  Similarly, the New York smuggler that Jatin Patel dealt with "identified himself only as 'Andy.'[253]"

204.    Most egregiously, Merinoff and Miller lied about the bootlegging scheme and its effects.  As discussed above, in July 2013, Miller, on behalf of Defendant Reliable Churchill, and representing that she was also speaking on behalf of her boss, Merinoff, falsely told an Empire representative for Bulldog Ventures, Antonio Magliocco, Jr., that Reliable Churchill and its employees were not involved in criminal misconduct and that Reliable Churchill and its employees had no knowledge of any shipments being smuggled into New York.  On information and belief, in or about July 2013, Miller disclosed to an Empire representative from Bulldog Ventures, Mr. Magliocco, the fact that Reliable Churchill was under investigation so that

---

[249]  Ex. M at 7 (Alexander Lew Plea Agreement).

[250]  Ex. A at ¶ 22 (RNDC Indictment).

[251]  Ex. F at 1–2 (*RNDC v. Tech Pride* Opinion).

[252]  *See* Ex. C at 90:7–91:2 (*RNDC v. Tech Pride* Trial Tr.).

[253]  Ex. Y at ¶ 6 (Jatin Patel Declaration)

Merinoff and Miller could control the narrative, mislead Empire into believing that Reliable Churchill had not committed misconduct and that any bootlegged liquor had not gone to New York, and reassure Empire that its sales were not affected by the scheme, thus deterring Empire from making any independent investigation.  In fact, however, Merinoff and Miller knew that Reliable Churchill and at least three employees were targets of a criminal federal investigation into bootlegging and that large volumes of Reliable Churchill goods were being smuggled into New York.  Additionally, Baird also knew about the Reliable Churchill bootlegging scheme that was directly harming Empire's interests but ever told anyone at Empire.  As a result, Empire was misled and lulled into a false sense of security.

205.    The majority of the Board of Managers of Empire did not know about, and should not have been reasonably expected to know about, its injury from Defendants' criminal enterprise until the RNDC Indictment was made public on May 24, 2016.  The other court documents referenced in this complaint, most of which are dated in 2015, were filed against small Maryland and New York retailers in federal and state courts in Maryland and only came to Empire's attention after the RNDC Indictment was revealed.

206.    For these reasons, any statute of limitations affecting or limiting the rights of action by Plaintiff was equitably estopped or tolled.

## IV.    CHARLES MERINOFF HAS CONSISTENTLY SOUGHT TO GAIN EFFECTIVE CONTROL OF EMPIRE

207.    One of Merinoff's goals in participating in the scheme described herein has been to weaken and devalue Empire so that Merinoff could gain control of Empire.  Even before Breakthru was formed, Merinoff repeatedly asked Empire owners to sell their stakes in Empire in return for minority stakes in The Charmer Sunbelt Group.  As the head of The Charmer Sunbelt Group, this would have given Merinoff complete control over Empire's New York

activities, rendering others involved in Empire's ownership—including those representing the Empire joint venture's half-owner, Bulldog Ventures—essentially powerless.  After the formation of Breakthru, Merinoff's efforts to gain control over Empire continued.  Merinoff even proposed that Breakthru assume responsibility for Empire's supplier relationships so that Empire's decisions would align with Breakthru's wholesalers throughout the country.  Empire refused to do so.

208.     Merinoff also turned to illegal activities try to seize control of Empire.  By effectuating the Maryland bootlegging scheme, Merinoff sought to effectuate a purchase of Empire's equity for less than the equity was worth if Empire agreed to be subsumed within The Charmer Sunbelt Group.

209.     In addition, Merinoff, in his capacity as an officer of the Sunbelt Entities, caused Sunbelt to pay compensation to Sobel, who was then the CEO of Empire and had no employment relationship with Sunbelt or Breakthru, in the form of a stock appreciation right ("SAR") retirement vehicle that Sobel had been receiving from Sunbelt Beverage Co. LLC prior to the formation of Empire.  In 2006, when Empire was being formed, Merinoff had specifically asked Antonio Magliocco, Jr. (one of the principals of Bulldog Ventures, the eventual 50% owner of Empire) to have Empire agree to continue to pay Sobel those SARs after Empire's formation, but Mr. Magliocco refused.  The understanding was that, upon Empire's formation, Sobel would only be paid by Empire and would cease being paid by any entity other than Empire.  There was no carve-out for Sobel to accept compensation from elsewhere because he was only supposed to be paid by Empire.  Nevertheless, unbeknownst to the Empire managers from Bulldog Ventures and others,[254] Merinoff caused Sunbelt to continue paying the SARs to

---

[254] While the Empire managers from Bulldog Ventures knew that Sobel had been paid SARs prior to Empire's formation they understood and expected that Sobel would not continue to receive SARs after he

Sobel after he commenced working at Empire, thus ensuring Sobel's continued loyalty to
Sunbelt and Breakthru and compromising his loyalty to Empire.

210.    When Empire declined to participate in the Breakthru joint venture, Sobel met
with managers of Empire in or around December 3, 2015, disclosed to all of Empire's managers
(including those from Bulldog Ventures) that he had continued to receive the SARs while
employed at Empire, and requested that Empire assume the responsibility for paying the SARs.
The Empire managers—particularly Antonio Magliocco, Jr.—refused Sobel's request, told him
to stop taking the SARs, and informed him that they believed his receipt of the SARs was
unethical and improper, and that Merinoff should have never given the SARs to Sobel and Sobel
never should have accepted them.  Sobel acknowledged that the SARs are "not an Empire issue,"
meaning that SARs were not the responsibility of or for the benefit of Empire.  In March 2016,
the issue came up again in a discussion between Sobel and three of Empire's managers, who
again admonished Sobel for having received the SARs from the Sunbelt Entities while he was
Empire's CEO.  On information and belief, even after the Empire managers' rebuke, Sobel
decided to continue to receive money towards his SARs from other sources arranged by
Merinoff.

211.    Indeed, even after the rebuke from Empire's managers, Sobel continued to enlist
Merinoff's help to receive SARs.  In or around August 9, 2016, Merinoff, in his capacity as an
officer of Breakthru, informed Antonio Magliocco, Jr. that Merinoff would continue to ensure
that Sobel received SAR compensation outside of his Empire compensation.  Magliocco told

---

joined Empire.  During the period after Empire's formation, invoices for these SARs were sent from
Sunbelt to Steven Meresman in his capacity as an employee of Charmer Industries, and were marked
"Personal and Confidential" because they were not to be shared (and, in fact, were not shared) with the
Empire Managers from Bulldog Ventures.

Merinoff that Sobel's acceptance of the SAR compensation was unethical and that Sobel should never have accepted them.  As a result of this sequence of events—whereby Sobel sought to continue receiving the SARs even after Empire's managers told him the SARs were unethical and unacceptable—Sobel was fired by Empire on September 20, 2016.

212.    Within weeks of his Empire termination, Sobel joined Merinoff at Breakthru.  But even before he joined Breakthru, Sobel conspired with and joined Merinoff, Breakthru, and Reliable in their retaliation against Empire and its affiliate, Empire North, as described in Section V.  That is evidenced, in part, from the declaration he submitted on behalf of Bacardi in the Florida litigation against Empire, which was filed with the court just seven business days after he joined Breakthru as an executive, must have been done with Breakthru's approval, and, on information and belief, must have been something he conspired to do with Breakthru before he became a Breakthru executive.  Additionally, Breakthru's sham "acquisition" letter was delivered a mere four days after Sobel joined Breakthru and, on information and belief, he conspired with Breakthru regarding its strategy and contents before he was hired as an executive there.

## V.    THE BREAKTHRU DEFENDANTS RETALIATED AGAINST THE EMPIRE COMPANIES FOR THE FILING OF THIS ACTION

213.    After the filing of this suit, the Breakthru Defendants have pursued an aggressive campaign to undermine Empire and retaliate against it for bringing this case.  Beginning the very day after the Complaint was filed in this action, the Breakthru Defendants repeatedly retaliated against Empire and Empire North for Empire's filing this lawsuit against Reliable Churchill, Merinoff, and Baird.  As detailed below, their retaliatory efforts included:  (A) reducing Empire North's access to its own systems; (B) terminating Empire's insurance coverage (C) threatening to completely shut down Empire North's vital IT and other enterprise systems by an arbitrary

January 31, 2017 cut-off date; (D) publicizing a sham acquisition offer intended to harm the perception of Empire in the marketplace; and (E) maliciously having a Breakthru employee formerly at Empire (Sobel) voluntarily aid Empire's adversaries in a lawsuit in Florida.

A.   **Breakthru Retaliates Against Empire's Affiliate, Empire North, by Breaching and Threatening to Terminate Its Services Agreement with Empire North**

1.   **Empire North's Services Agreement with Sunbelt**

214.   Empire North is a wholesaler throughout the State of New York except the areas of metropolitan New York City within Empire's territory.  Empire North has exclusive distribution agreements with suppliers and carries the same brands that Empire does in metropolitan New York City.  Empire North is the largest distributor in its region and employs approximately 675 employees.

215.   The backbone of Empire North's business is a system of electronic hardware and software that provides up-to-the-minute information on critical aspects of its supply chain and inventory, including quantities of alcohol ordered from suppliers, stored in its warehouses, and being shipped to retailers—an enterprise software system on which all of Empire North's data is housed and from which all of its operations are run.  For example, Empire North has electronically stored sales data that identify which retailers may need additional orders of given products or could benefit from in-store marketing.  Empire North's programs quickly calculate the volume discounts that can be given to retailers based on a proposed order.  Based on this software, Empire North is even able to optimize the routes its delivery trucks take when shipping liquor to retailers.  Without access to this critical hardware and software, Empire North cannot effectively operate and service its customers.

216.   On July 1, 2010, Empire North entered into a Services Agreement with Sunbelt in which Sunbelt agreed to provide to Empire North many of these essential hardware and software

services for a monthly fee.[255]  The initial term of the agreement was five years, with Empire North having the exclusive right to extend the Services Agreement "for up to twenty four (24) months, on the same terms and conditions . . . by giving S[unbelt] notice of the extension and the length thereof, at least two (2) months before the end of the Term or any extension under this Section."[256]  The Services Agreement includes provisions to adjust the Annual Services Fees paid by Empire North in the fourth and fifth, and, if applicable, the sixth and seventh years of the contract.[257]  By course of performance and conduct, from July 1, 2015 going forward, both Sunbelt (and then Breakthru) and Empire North have continued performing and exchanging payment under the Services Agreement, effectuating the two-year extension, as described *infra*. Moreover, the Services Agreement provided that "[n]o delay or omission by either Party to exercise any right or power it has under this Agreement will impair or be construed as a waiver of such right or power."[258]

217.    Pursuant to the Services Agreement, Sunbelt contracted to provide to Empire North its vital electronic business systems and services.  The most important of these defined "Services" is the SAP enterprise electronic platform, which is responsible for functions such as, *inter alia*, sales and distribution; warehouse management; commissions profit analysis; pricing; samples management; incentives and payback; payroll; finance; and human resources.[259] Sunbelt also agreed to provide other crucial electronic services such as on-line pricing; bottle picking; case picking; tracking and routing; document management; sales reporting; and sales

---

[255] *See, e.g.*, Services Agreement between Empire Merchants North, LLC and Sunbelt Beverage Company, LLC ¶¶ 3.2, 9.1 (July 1, 2010) ("Services Agreement") (Ex. FF).

[256] *Id.* ¶¶ 2.1–2.2.

[257] *Id.* sched. 5-3 ¶¶ 9(a)–(b).

[258] *Id.* ¶ 21.6.

[259] *Id.* ¶ 3.2; sched. 1-3, 3-4.

force automation.[260]  Moreover, Sunbelt agreed to provide all these "Services" at defined "Service Levels" which, *inter alia*, require Sunbelt to respond to issues or requests within given pre-determined timeframes.[261]

218.    Due to the crucial nature of the Services to Empire North's business, the Services Agreement provides a number of significant protections for Empire North.  For example, the Services Agreement dictates that Sunbelt (and later Breakthru) "will use commercially reasonable efforts to ensure that . . . it does not . . . adversely affect or alter (1) the operation, functionality or technical environment of the software and hardware used by or on behalf of [Empire North] in connection with its business or (2) the processes used by [Empire North] in connection with its business."[262]  Furthermore, the Services Agreement mandates that Sunbelt (and later Breakthru) "will provide [Empire North] with access to [its] Software as necessary to enable [Empire North] to receive the Services and perform its operational responsibilities in respect of the Services."[263]  Moreover, Empire North is entitled to request "all copies of [Empire North] Data in [Sunbelt's] possession or control" "at anytime."[264]

219.    Indeed, the Services Agreement recognizes that the Services are so important to Empire North's business that it expressly obligates Sunbelt to continue performing those Services while any "dispute" between the Parties is being resolved, and expressly allows Empire North to seek and obtain an injunction if Sunbelt breaches this contractual obligation:  Sunbelt "will continue performing its obligations while a dispute is being resolved except to the extent

---

[260]  *Id.*

[261]  *Id.* ¶¶ 5.1–5.4; sched. 1-3, 4-1–4-4.

[262]  *Id.* ¶ 3.9.

[263]  *Id.* ¶ 13.2(A).

[264]  *Id.* ¶ 14.5.

the issue in dispute precludes performance. . . .  If there is a breach of this obligation, EMN will be entitled to seek and obtain injunctive relief, without posting bond or proving damages."[265]

220.    The Services Agreement also contains numerous provisions meant to ensure that Empire North is able to effectively transition the Services—and therefore continue to function as a business—in the event that the Services Agreement is terminated by either party.  Indeed, Empire North is entitled to contractually defined "Termination Assistance Services," which include:

> (A) the continuation of the Services, to the extent EMN requests such continuation during the Termination Assistance Period, (B) S[unbelt]'s cooperation with EMN or another supplier designated by EMN in the transfer of the Services to EMN or such other supplier in order to facilitate the transfer of the Services to EMN or such other supplier and (C) any other services requested by EMN in order to facilitate the orderly transfer of the Services to EMN or another supplier designated by EMN without causing interruption or adverse effect to EMN.[266]

The "Termination Assistance Period" is "a period of time designated by [Empire North] . . . and continuing up to twenty four (24) months after such expiration or termination."[267]  Other provisions similarly provide that:

> S[unbelt] will grant to the EMN Group, effective as of the termination of this Agreement, a global, perpetual, non-exclusive, non-transferable, fully paid up license to Use the S[unbelt] Owned Software to the extent necessary for the EMN Group to internally perform the Services or to have a third party provider perform such Services for EMN.[268]

Notably, the only situation in which Sunbelt is permitted to terminate the Services Agreement "for Cause" occurs if "[Empire North] fails to make undisputed payments due to" Sunbelt.  But

---

[265] *Id*. ¶ 22.6.

[266] Id. ¶¶ 17.1–17.2, sched. 1-4.

[267] *Id*. sched. 1-4.

[268] *Id*. ¶ 13.2(B); *accord id*. ¶ 13.2(C) (Empire North entitled to "a global . . . fully paid up license to Use the S[unbelt] Third Party Software following termination"); *id*. ¶ 14.5 (Empire North entitled to copies of its confidential information "[u]pon expiration or termination").

even then, Empire North has the right to "cure such default" before Sunbelt can terminate, and Sunbelt still must provide up to two years of transition services.[269]  The other termination provisions all grant Empire North the exclusive right to terminate the Services Agreement.[270]

221.    The parties continued to honor the Services Agreement after Sunbelt merged with Wirtz to form Breakthru into the Fall of 2016, and Breakthru assumed all of Sunbelt's obligations under the Services Agreement.  The parties understood and repeatedly represented in writing that the Services Agreement would extend to at least July 1, 2017.  Numerous written and oral statements by Sunbelt (and then Breakthru) explicitly and implicitly recognized and ratified that the Services Agreement was extended and remained valid and in effect until at least July 1, 2017, and that Sunbelt (and then Breakthru) was required to abide by its terms.  For example:

- August 3, 2015:  Arlyn Miller, then-Executive Vice President and General Counsel of Sunbelt, emailed counsel for Empire Metro, stating "[w]e're working on the SAP agreement, based on the Upstate one."

- August 18, 2015:  Arlyn Miller emailed counsel for Empire Metro, stating "I've asked Malcolm to start on the draft SAP contract, and to pull the upstate agreement as a starting point."

- February 23, 2016:  Breakthru counsel Sabrina Clergé sent a letter to Empire North stating that a fee paid by Empire North "is inaccurate and subject to an increase in accordance with the terms of the [Services] Agreement" and that "the Service Fee will be increased in accordance with the terms of [the Services] Agreement when the CPI Current Indices for 2016 and 2017 are published."

- April 5, 2016:  Greg Baird sent an email to Empire Metro and Empire North stating that "the Empire North SAP [and] shared services agreements . . . stand on their own as separate service agreements."

- June 16, 2016:  Arlyn Miller, Executive Vice President and General Counsel of Breakthru, stated that Empire North is "on SAP, and our business services department

---

[269] *Id*. ¶¶ 16.4, 17.1–17.2.

[270] *See id.* ¶¶ 16.1–16.3, 16.5–16.6.

processes their accounts payable under the SAP agreement between Breakthru and Empire North."

- July 14, 2016: The Board of Managers of Breakthru sent a letter to the Boards of Directors of Empire Metro and Empire North stating that "BBG will of course continue to comply with its contractual obligations under the SAP contract with Empire North."

- July 25, 2016: "Sunbelt Beverage Co., LLC DBA Berkshire Beverage Group" sent a "July 2016" invoice for "Monthly charge for SAP On-going support per agreement with CSG" noting that "per agreement monthly amount subject to increase effective 7/1/2016." This invoice also set forth the payment terms for the next two years, laying out a "Service Fee Adjustment" schedule for "July 1, 2016 to June 30, 2017" and "July 1, 2017 to June 30, 2018."

- August 19, 2016: Empire North CEO John Devin spoke via phone with Greg Baird, who agreed with Devin that the Services Agreement runs through June 30, 2017 at a minimum.

- August 30, 2016: Arlyn Miller emailed an Empire representative, stating "[I] don't know why we wouldn't just say the SAP services will be provided in accordance with the terms and conditions of the SAP Agreement."

222.   In addition, except as discussed below in Sections V.A.2 and V.A.3, between July 1, 2015 and November 2016, Breakthru continued to provide services pursuant to the Services Agreement. Throughout this period, Breakthru continued to send monthly invoices to Empire North for services rendered pursuant to the Services Agreement, and Empire North continued to pay those invoices—just as the parties had done pursuant to the Services Agreement before July 1, 2015. Indeed, since July 1, 2015, Breakthru has accepted millions of dollars in payment from Empire North for services rendered pursuant to the Services Agreement.

### 2.   Breakthru Reduces Empire North's Services in Breach of the Services Agreement the Day After This Action Is Filed

223.   As explained above, Breakthru is obligated "to use commercially reasonable efforts to ensure that . . . it does not . . . adversely affect or alter (1) the operation, functionality or technical environment of the software and hardware used by or on behalf of Empire North in

connection with its business or (2) the processes used by Empire North in connection with its business."[271]

224.    On September 21, 2016, the day after Empire filed its lawsuit, Breakthru removed Empire North's administrative access to all of the systems that Breakthru provides without any advance warning to Empire North and in violation of Breakthru's obligations under the Services Agreement.  Consequently, Empire North could not add new users to its systems or alter existing users' privileges.  For example, Empire North could no longer provide basic access to its computer systems to new employees without asking Breakthru first.  Additionally, Empire North no longer could attempt to fix technical issues that arose on these systems, but instead needed to address all technical issues by requesting assistance from Breakthru.  This poses risks to Empire North's business, since it can no longer fix any problems by itself, but must wait for Breakthru to do so.

225.    Similarly, starting on or about September 21, 2016, Breakthru also reduced its responsiveness to Empire North's requests to levels below those mandated by the Services Agreement.[272]  Whereas help-desk requests were previously responded to and processed in a timely fashion, Breakthru began delaying its responses to Empire North's requests for long periods of time before responding.  In the most egregious example of an unnecessary delay to Empire North's requests, Breakthru waited over two weeks to send Empire North its own data even though Empire North explained that it needed the data to respond to an inquiry by its regulator, the New York State Liquor Authority.  These are all adverse impacts on EMN's

---

[271]  Ex. FF at § 3.9 (Services Agreement).

[272]  *See* Services Agreement ¶¶ 5.1–5.4; sched. 4-3–4-4.

business[273] because they delay Empire North's ability to address issues that hinder its employees' efficiency.

226.     In oral communications with Empire North's representatives, Breakthru acknowledged the change in its service levels.  Breakthru's proffered explanation for the change in service levels was that, since the filing of this RICO action, every single service request, including simple help-desk requests, had to first be reviewed and approved by Breakthru's legal department.  This explanation was clearly pretextual.  Neither Empire North nor Breakthru were parties to this action and, in any event, there was no good-faith basis to claim that every routine task (and non-routine task) had to be delayed by legal review and approval.  Empire North simply sought to exercise its rights under the Services Agreement as it had for the previous six years and three months.  Due to the timing of Breakthru's actions, it is clear that Reliable Churchill, Merinoff, and Baird influenced Breakthru to retaliate against Empire North as punishment for filing this RICO action.

227.     All of these breaches have caused Empire North ongoing harm, as its employees are unable to perform as quickly or efficiently as they would without the breaches, and Empire North's systems also are not performing in the efficient manner that they should be.

### 3.     Breakthru Threatens to Terminate Empire North's IT and Other Services on an Arbitrary January 31, 2017 Cut-Off Date

228.     One month after reducing its provision of services to Empire North, Breakthru took its retaliatory conduct one step further.  On October 21, 2016, Breakthru sent Empire North a letter stating that it would "no longer provide the services contemplated by" the Services

---

[273]  Letter from Sean F. O'Shea to Randy M. Mastro (Nov. 2, 2016) (Ex. GG).

Agreement "as of January 31, 2017."[274]   As Breakthru well knows, a termination of the Services on January 31, 2017, would completely shut down Empire North's business.[275]   As discussed *supra*, Section V.A.1, the SAP enterprise electronic platform is responsible for functions such as, *inter alia*, sales and distribution; warehouse management; commissions profit analysis; pricing; samples management; incentives and payback; payroll; finance; and human resources.  Without the SAP system and other systems comprising the Services,[276] Empire North would be unable to, *inter alia*, track its inventory; process orders placed by retailers and orders placed to suppliers; or deliver cases of liquor and wine to retailers.  In other words, it would be unable to conduct business.  Moreover, it would be impossible for Empire North to switch from SAP and the other relevant systems by January 31, 2017 (which is likely why Breakthru chose this arbitrary date).  Because Breakthru had represented on numerous occasions, prior to the filing of this suit, that it would honor the Services Agreement through June 30, 2017, it is clear that Reliable Churchill, Merinoff, and Baird induced Breakthru to anticipatorily breach the Services Agreement in retaliation for the filing of this action.

229.   Empire North attempted in good faith to resolve the dire situation created by Breakthru's anticipatory breach before pursuing relief from this Court.  On October 27, 2016, counsel for Empire North and Empire sent Breakthru's counsel a letter explaining that the

---

[274]   *See* Letter from Sean F. O'Shea to Board of Managers of Empire Merchants, LLC (Oct. 21, 2016) (Ex. AA).

[275]   This would not only harm Empire North and its employees, but also liquor consumers and retailers in upstate New York, as well as national and international liquor supply companies.  Because Empire North has the exclusive right to distribute certain brands in upstate New York, liquor suppliers would be unable to distribute their brands without breaching their contracts with Empire North and retailers (and subsequently consumers) would be unable to purchase these brands.  Termination of the Services Agreement on January 31, 2017, would effectively shut down a large portion of the flow of alcohol to upstate New York.

[276]   *See supra* Section V.A.1.

Services Agreement is still in effect and requesting a "prompt" response.[277]  And on October 30, 2016, counsel for Empire North explained to Breakthru's counsel what assistance Empire North would need to receive to facilitate an orderly transition of services, although Empire North maintained that Breakthru's arbitrary January 31, 2017 deadline was not feasible.[278]  Breakthru responded on November 2, 2016, stating that it "remains willing to cooperate with EMN to ease the transition to new service providers by January 31, 2017."[279]

230.    But Breakthru's invocation of "cooperation" was a ruse meant to delay Empire North from protecting its rights while Breakthru could concoct more schemes to retaliate against the Empire Companies.  Breakthru delayed until November 22, 2016, before telling counsel for Empire North that it would extend its arbitrary and unjustified deadline to March 31, 2017—a date that is no more feasible for a successful transition of the extensive IT systems than the January 31 deadline was.  Additionally, Breakthru stated that this March 31, 2017 date would be a "hard" deadline, meaning it would shut off Empire North's services—and thereby shut down Empire North's business—if the transition was not completed by that date.  Such a "hard" deadline is contrary to the industry standard, in part, because errors sometimes happen during a transition, and, in part, because it is impossible to predict beforehand how many iterations of testing are necessary to confirm that a transition is technologically successful.  Indeed, Empire North's consultant, Clarkston Consulting, estimates that it would take until at least July 1, 2017 to complete the transition and that this is a "soft" deadline, as that work may take longer.  Breakthru cannot seriously dispute this timeline, both because they have engaged Clarkston

---

[277]  Letter from Randy M. Mastro to Sean F. O'Shea (Oct. 27, 2016) (Ex. HH).

[278]  Letter from Randy M. Mastro to Sean F. O'Shea (Oct. 31, 2016) (Ex. II).

[279]  Letter from Sean F. O'Shea to Randy M. Mastro (Nov. 2, 2016) (Ex. GG).

Consulting for similar transitions in the past, and because they are currently transitioning similar services in a similar, but less-complicated, manner in Illinois using an approximately nine-month timeline.

231.     Breakthru's unilateral decision to pretextually and arbitrarily terminate the Services on March 31, 2017 is expressly disallowed in the Services Agreement and will cause a catastrophic loss of business for Empire North.

**B.     Breakthru Terminates Empire's Insurance Coverage**

232.     On October 14, 2016, Breakthru sent Empire a notice stating that it "will no longer provide insurance and risk management services to Empire . . . under the Breakthru Beverage Group Insurance Program. . . .  This termination of insurance and risk management services also includes coverages provided through Clam Shell Insurance Company, the Sunbelt Holding, Inc. captive insurance company."  Breakthru's conduct was clearly retaliatory:  just months earlier, Breakthru had promised in writing to continue providing insurance coverage to Empire, but then terminated Empire's coverage pursuant to the operative insurance agreements as payback for Empire's suit against its subsidiary.

**C.     Breakthru Makes a Sham "Acquisition Proposal" to Devalue the Empire Companies and Harm Their Industry Standing**

233.     On November 11, 2016, Breakthru sent the Boards of Managers of the Empire Companies an "Acquisition Proposal" letter that was marked "PRIVATE AND CONFIDENTIAL" in the header on the letter's first page.[280]  This purported offer severely undervalued the Empire Companies.  Indeed, before making this "offer," Breakthru had hired Sobel and, on information and belief, consulted him about the terms of the letter, so it therefore

---

[280] *See* Ex. BB.

knew that its valuation was significantly understated.  Breakthru simultaneously published their sham "offer."  Within minutes of Empire's receipt of the "offer" letter—and before the letter was even provided to Flatbush Enterprises, Inc., a 25% owner of Empire North—two different news outlets reported both that Empire had received the offer from Breakthru and that Breakthru had announced in a memo to its employees that it was attempting to acquire Empire.[281]  The Empire Companies are privately held entities, and there is no good-faith business reason for a potential buyer to immediately leak an acquisition offer if it is serious about purchasing a private company

234.    Of course, Breakthru did not send the "Acquisition Proposal" in good faith. Rather, the offer letter was sent—and immediately publicized by Breakthru, despite the "PRIVATE AND CONFIDENTIAL" header—in order to undermine the industry's perception of Empire.  Supplier confidence in a wholesalers' viability and longevity is of paramount importance in the liquor industry, and by implying that Empire and its principals were looking to sell, Breakthru purposely sought to damage suppliers' confidence in Empire, as well as Empire's goodwill.  This retaliatory gambit went hand in hand with Merinoff's strategy of attempting to devalue the Empire Companies so that he can eventually purchase them on the cheap.  For obvious reasons, the Empire Companies rejected Breakthru's ludicrous public relations ploy and warned Breakthru to cease and desist all communications on the matter.[282]

---

[281]  Peter Zweibach, *Breakthru Makes Offer For Empire Amid Controversy*, SHANKEN NEWS DAILY (Nov. 11, 2016), http://www.shankennewsdaily.com/index.php/2016/11/11/17194/breakthru-makes-offer-empire-amid-controversy/; Emily Pennington & Sarah Barrett, *Alert: Breakthru Makes "Substantial" Offer for Empire Merchants*, WINE & SPIRITS DAILY (Nov. 11, 2016), http://www.winespiritsdaily.com/publications_daily.php?id=2966.

[282]  *See* Letter from Randy M. Mastro to Sean F. O'Shea (Nov. 14, 2016) (Ex. JJ).

**D.**     <u>Lloyd Sobel Divulges Empire's Privileged Litigation Strategy to Empire's Adversary in a Lawsuit</u>

235.     On January 8, 2016, Bacardi U.S.A., Inc. ("Bacardi") sued Empire in Florida for a declaratory judgment that Bacardi did not violate its distribution agreement with Empire when it terminated its relationship with Empire on September 29, 2015. Empire moved to dismiss that action on the ground that there was no case or controversy because it never intended to sue Bacardi. On the day before oral argument on Empire's motion to dismiss, November 17, 2016, Bacardi filed a declaration voluntarily provided by Sobel to help Bacardi oppose Empire's motion. Equally disturbing, Sobel claimed in his declaration that his statements were based on discussions he heard and participated in while CEO of Empire. He purported to reveal Empire's legal strategy that he confidentially learned when he was Empire's CEO, in flagrant disregard of Empire's attorney-client privilege and Sobel's confidentiality obligations to Empire. Indeed, Sobel received dozens of emails to and from outside counsel, some of them labeled "attorney-client privileged," about Bacardi's suit against Empire while he was CEO of Empire.

236.     There was no legitimate good-faith reason for Sobel to purport to disclose confidential communications to Empire's adversary in a lawsuit or for Sobel to divulge the alleged contents of Empire's attorney-client privileged communications. On information and belief, Sobel submitted his declaration as a Breakthru executive and with the knowledge, consent, and at the behest of the Breakthru Defendants. This filing clearly demonstrates the Breakthru Defendants' intention to harm Empire.

<b><u>CLAIMS FOR RELIEF</u></b>

<b><u>FIRST CLAIM FOR RELIEF</u></b><br><b><u>(Violations of RICO, 18 U.S.C. § 1962(c) – By Empire Against the RICO Defendants)</u></b>

237.     Empire repeats and realleges the allegations set forth above as though fully set forth herein.

103

238.    At all relevant times, Empire was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

239.    At all relevant times, Reliable Churchill, Tushar Patel, Nileshkumar Patel, Prathiba Patel, Tech Pride of America, Inc., Anil Patel, Dilip Patel, Prakash Patel, Sam Liquors Inc., Bin Luo, Bao Liquors Inc., Bao Zheng, Our Liquor, Alexander Lew, Ting Wei, Inc., LTT Whiskey Inc., Ke Yao, Yi Gao, and John Doe Defendants Nos. 1–50 (the "RICO Defendants") were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

240.    At all relevant times, all Defendants were and are each a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

241.    At all relevant times, each of the RICO Defendants was, and is, a person that exists separate and distinct from the RICO enterprise, described below.

THE RICO ENTERPRISE

242.    Defendants constitute an association-in-fact enterprise (the "Enterprise" or "Bootlegging Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

243.    Defendants are a group of persons associated together in fact for the common purpose of carrying on an ongoing criminal enterprise.  In particular, the Bootlegging Enterprise has a common goal of defrauding both Empire and the State and City of New York of tens, if not hundreds, of millions of dollars through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive conduct, wire fraud and wire fraud conspiracy, financial institution fraud, money laundering, and tax evasion, in order to funnel its ill-gotten gains from Defendant to Defendant and thereby promote and conduct its criminal activities, reward and incentivize participation in the scheme, and frustrate efforts to recover the Defendants' illicit profits by making it difficult or impossible to trace and collect those funds.

244.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure, operating in, and directed from, the United States.  Although the organization of the Enterprise may have been changed over time and its members may have held different roles at different times, the Enterprise has been structured to operate as a unit in order to accomplish the common goals and purposes of its criminal scheme, including as follows:

a.    Directly and through their agent officers, directors, board members, employees, and representatives, Maryland Wholesalers RNDC and Reliable Churchill have been active participants and central figures in the operation of the Enterprise and its affairs, and in the orchestration, planning, perpetuation, and execution of the scheme to defraud Empire.  These Maryland Wholesalers are in significant part responsible for initiating fraudulent transactions that funneled fraudulently obtained funds from the New York Retailers to the Cecil County Retailers to the Maryland Wholesalers.  The funds were paid by New York Retailer Defendants to Maryland Retailer Defendants in exchange for the fraudulently sold products.  In turn, Maryland Retailer Defendants paid Maryland Wholesaler Defendants their share of the funds in exchange for the fraudulently sold products.  Those transfers of funds were used to promote, conduct, or engage in the Defendants' criminal activities, to serve as payment and reward for participation in the scheme, and to incentivize and motivate participants for their continuing and future participation, as well as to frustrate anticipated and actual efforts to recover the Defendants' ill-gotten gains by making it difficult or

impossible to trace and collect the funds.  The Maryland Wholesalers also benefitted directly from the scheme to defraud.

b.      Charles Merinoff, has been involved in, and held a position of responsibility with respect to, the planning and execution of the scheme to defraud Empire, is a principal authority figure with final say on business decisions of the Enterprise, and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the criminal enterprise.  From and through his business and familial relationships, including his positions of responsibility at the Charmer Sunbelt Group, Sunbelt Beverage Company, LLC and Sunbelt Holding, Inc., and consequently Reliable Churchill, he has conducted and participated in the operation and management of the Enterprise and its affairs and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Empire.  Merinoff also benefitted from the scheme's funneling of funds to Sunbelt Beverage Company, LLC, Sunbelt Holding, Inc., and Reliable Churchill.

c.      Gregory Baird has been involved in, and held a position of responsibility with respect to, the planning and execution of the scheme to defraud Empire, is a principal authority figure with final say on business decisions of the Enterprise, and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the criminal enterprise.  From and through his business relationships, including his positions of responsibility at the Charmer Sunbelt Group, Sunbelt Beverage Company, LLC, Sunbelt Holding, Inc., and also Reliable Churchill, he has conducted and participated in the

operation and management of the Enterprise and its affairs and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Empire. Baird also benefitted from the scheme's funneling of funds to the Charmer Sunbelt Group, Sunbelt Beverage Company, LLC, Sunbelt Holding, Inc., and Reliable Churchill.

d.      Arlyn Miller has been involved in, and held a position of responsibility with respect to, the planning and execution of the scheme to defraud Empire, is a principal authority figure with final say on business decisions of the Enterprise, and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the criminal enterprise. From and through her business relationships, including her positions of responsibility at the Charmer Sunbelt Group, Sunbelt Beverage Company, LLC and Sunbelt Holding, Inc., and consequently Reliable Churchill, she has conducted and participated in the operation and management of the Enterprise and its affairs and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Empire. Miller also benefitted from the scheme's funneling of funds to the Charmer Sunbelt Group, Sunbelt Beverage Company, LLC, Sunbelt Holding, Inc., and Reliable Churchill.

e.      Non-party Eugene Gerzsenyi has been involved in, and held a position of responsibility with respect to, the planning and execution of the scheme to defraud Empire, is a principal authority figure with final say on business decisions of the Enterprise, and has taken actions, and directed other members of the Enterprise to take actions, necessary to accomplish the overall aims of the

107

criminal enterprise.  From and through his business relationships, including his position of responsibility at RNDC, he has conducted and participated in the operation and management of the Enterprise and its affairs and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Empire.  Gerzsenyi also benefited from the scheme's funneling of funds to RNDC.

f.      Non-party Lisa Robbins has been involved in, and held a position of responsibility with respect to, the planning and execution of the scheme to defraud Empire, and has taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise. From and through her business relationships, including her position as an accounting manager for RNDC, she has conducted and participated in the operation and management of the Enterprise and its affairs and has been a central participant in the orchestration, planning, and execution of the scheme to defraud Empire.  Robbins also benefitted from the scheme's funneling of funds to RNDC.

g.      Non-parties Jason Lockerman, Robert Malloy, Christopher Berg, and Richard Fe have been involved in, and held positions of responsibility with respect to the planning and execution of the scheme to defraud Empire, and have taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise.  From and through their business relationships, including their positions as sales representatives controlling numerous accounts for RNDC, particularly those accounts affiliated with Cecil County Retailers, they have conducted and participated in the

operation and management of the Enterprise and its affairs and have been central participants in the orchestration, planning, and execution of the scheme to defraud Empire.  They also benefitted from the scheme's funneling of funds to RNDC.

h.　　Directly and through their agent officers, directors, board members, employees, and representatives, Cecil County Retailers Tech Pride of America, Inc. and Happy 40 Liquors, Happy 40 Wines & Spirits, and Happy 40 Discount Liquors; J & R Company, LLC and North East Liquors; and Vlamis Liquors LLC and Vlamis' Cut-rate Liquors, have been active participants and central figures in the operation of the Enterprise and its affairs, and in the orchestration, planning, perpetuation, and execution of the scheme to defraud Empire.  These Cecil County Retailers are in significant part responsible for initiating fraudulent transactions and receiving payments from New York Retailers, and paying Maryland Wholesalers, for fraudulently purchased products.  These transfers of funds have been used to promote, conduct, or engage in the Defendants' criminal activities, serve as payment and reward for participation in the scheme, and as incentive and motivation for continuing and future participation, and are intended to frustrate anticipated and actual efforts to recover the Defendants' ill-gotten gains by making it difficult or impossible to trace and collect the funds.  Cecil County Retailers also benefitted directly from the scheme to defraud.

i.　　Defendants Tushar C. Patel, Nileshkumar Jasbhai Patel, Pratibha Patel, Anil Patel, Dilip C. Patel, Prakash Patel, and Jatin B. Patel have been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to defraud Empire, and have taken actions, and directed other

conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise.  From and through their business relationships, including their positions as proprietors and/or agents of the Cecil County Retailers, they have conducted and participated in the operation and management of the Enterprise and its affairs and have been central participants in the orchestration, planning, and execution of the scheme to defraud Empire.  They also benefitted from the scheme's fraudulent transactions.

j.       Directly and through their agent officers, directors, board members, employees, and representatives, New York Retailers Sam Liquors Inc., Bao Liquors Inc., Our Liquor, Inc., and LTT Whiskey Inc. have been active participants and central figures in the operation of the Enterprise and its affairs, and in the orchestration, planning, perpetuation, and execution of the scheme to defraud Empire.  These New York Retailers are in significant part responsible for initiating fraudulent transactions and paying Cecil County Retailers, who in turn paid Maryland Wholesalers their share of the funds for fraudulently purchased products.  Those transfers of funds were used to promote, conduct, or engage in the Defendants' criminal activities, serve as payment and reward for participation in the scheme, and to incentivize and motivate participants for their continuing and future participation, as well as to frustrate anticipated and actual efforts to recover the Defendants' ill-gotten gains by making it difficult or impossible to trace and collect the funds.  The New York Retailer Defendants also benefitted directly from the scheme to defraud.

k.    Defendants Bin Luo, Bao Zheng, Alexander Lew, and Ting Wei have been involved in, and held positions of responsibility with respect to, the planning and execution of the scheme to defraud Empire, and have taken actions, and directed other conspirators to take actions, necessary to accomplish the overall aims of the criminal Enterprise. From and through their business relationships, including their positions as proprietors and/or agents of New York Retailers, they have conducted and participated in the operation and management of the Enterprise and its affairs and have been central participants in the orchestration, planning, and execution of the scheme to defraud Empire. They also benefitted from the scheme's fraudulent transactions.

### Pattern of Racketeering Activity

245.    The RICO Defendants conducted or participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit, they have consistently and regularly committed multiple acts of racketeering activity since at least 2009 through at least 2014. Those multiple acts shared a common or related purpose, goal, result, participants, victim, and method of commission, which are described below:

*Multiple Instances of Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341, 1343*

246.    Defendants engaged in a scheme to defraud Empire and the State of New York in connection with their purchase, sale, and deceptive business practices regarding products sold in New York—products which could be sold lawfully only by Empire. Defendants funneled their ill-gotten gains from the New York Retailers to the Cecil County Retailers to the Maryland Wholesalers, in order to promote and conduct criminal activities, reward and incentivize participation in the scheme, and frustrate efforts to recover Defendants' illicit profits by making

it difficult or impossible to trace and collect the funds.  The ultimate objective of the scheme was to deceive and place hundreds of millions of dollars in secret, illegal sales from hundreds, if not thousands, of separate and independent transactions, which have benefited Defendants individually and collectively.

247.   Defendants accomplished their scheme to defraud Empire and the State of New York by regularly and systematically misrepresenting, concealing, and falsifying financial records and the true nature of their fraudulent business practices.  In furtherance of the scheme, and as described herein, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, and also caused matters and things to be placed in a post office or authorized depository, or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, including, but not limited to, the following:

a.   Emails, telephone calls, and other communications by wire and mail sent between and among Defendants (i) encouraging or facilitating the fraudulent sales of products from the Maryland Wholesalers to Cecil County Retailers and ultimately to New York Retailers, and (ii) otherwise promoting or furthering the scheme to defraud;

b.   Emails, telephone calls, and other communications by wire and mail to third parties, such as Fiscal Agents (as defined below), in furtherance of the scheme to defraud, with or without those third parties' knowledge of the true purpose of those communications, including:  (i) requests for payment, (ii) misrepresentations about sales transactions, (iii) authorizations of payment, and

(iv) authorization and facilitation of the transfer of funds from New York Retailers to Cecil County Retailers to Maryland Wholesalers;

c.     Funds transferred between and among Defendants as payment and rewards for participation in the scheme, as incentive and motivation for continuing and future participation in the scheme, with the intent that the funds be used to promote, conduct, or engage in the Defendants' criminal activities, to frustrate anticipated and/or actual efforts to recover Defendants' ill-gotten gains by making it difficult or impossible to trace and/or collect the funds, or otherwise promoting or furthering the scheme to defraud;

d.     Funds transferred between and among Defendants and third parties, with the intent that those funds be used to promote, conduct, or engage in Defendants' criminal activities, or otherwise promote or further the scheme to defraud, with or without those third parties' knowledge of the true purpose of those transactions.

248.    Empire incorporates by reference Section II.B and Appendix A, which set forth examples of particular transactions where wire and mail communications were made or transmitted in furtherance of Defendants' scheme or artifice to defraud that violates 18 U.S.C. §§ 1341 and 1343.  Each of the Defendants, through their control of and/or participation in the Enterprise, knew of, and participated in, numerous acts of mail and wire fraud.  In particular, each of the Defendants, through their control of and/or participation in the Enterprise, sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mails or wire communications would follow in the ordinary operation of the Enterprise, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of Defendants' acts in furtherance of the transactions discussed above.  Each of the

Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice that will be proven at trial.

249.    As demonstrated by the transactions listed in Section II and Appendix A, Defendants caused fraudulent information to be transmitted to third parties, such as Fiscal Agents (as defined below), at numerous points, whereby Defendants concealed the true nature of the transactions.  Defendants portrayed each transaction as a lawful sale from Maryland Wholesalers to Cecil County Retailers, when in reality the sales were going to New York Retailers to be sold without paying excise taxes,[283] and in violation of Maryland, New York, and federal law.  Defendants' concealment and/or misrepresentations were relied upon by various third parties, such as Fiscal Agents, in, among other things, causing funds to be sent to or from Defendants, transferring ownership of products to and from Defendants, and avoiding investigation of Defendants' scheme.

250.    Defendants' misrepresentations, individually and in the aggregate, have caused Empire substantial damages.  The damages to Empire were contemplated and intended by Defendants.

### Multiple Instances of Financial Institution Fraud in Violation of 18 U.S.C. § 1344

251.    Defendants engaged in a scheme to defraud Empire and the State of New York concerning Defendants' purchase, sale, and deceptive business practices regarding products illegally sold in New York—products which could be sold lawfully only by Empire.  Defendants funneled their ill-gotten gains from the New York Retailers to the Cecil County Retailers to the Maryland Wholesalers, in order to promote and conduct criminal activities, reward and

---

[283]  And, upon information and belief, New York Retailers were able to avoid paying sales tax on the smuggled liquor sold and income tax on their profits gained from selling the bootlegged liquor.

incentivize participation in the scheme, and frustrate efforts to recover Defendants' illicit profits by making it difficult or impossible to trace and collect the funds.  The ultimate objective of the scheme was to deceive and place hundreds of millions of dollars in secret, illegal sales from hundreds, if not thousands, of separate and independent transactions, which have benefited Defendants individually and collectively.

252.    In furtherance of their scheme to defraud Empire and the State of New York, Defendants knowingly executed a scheme to obtain the monies, funds, credits, assets, securities, or other property (collectively, "Funds") owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises.  In addition, the Funds obtained by Defendants through this scheme were the product of the Defendants' defrauding of Empire.

253.    The targets of Defendants' scheme or artifice to obtain Funds owned by, or under the custody or control of, financial institutions—as part of the overall scheme to defraud Empire—included the Wells Fargo Bank and other unknown banks (the "Agent Banks"),[284] with whom Defendants contracted to act as "Fiscal Agents."  Defendants' pattern or course of conduct was designed to deceive the Agent Banks into releasing Funds, with the intent to expose the Agent Banks to actual or potential loss.

254.    Agent Banks are financial institutions as that term is defined by 18 U.S.C. § 20.

255.    Defendants deposited and withdrew Funds between and among accounts controlled by Defendants for the purpose of executing fraudulent, illegal transactions, and Agent Banks, at Defendants' direction, transferred Funds between and among Defendants, in

---

[284]  Ex. A at 9, ¶ 20 (RNDC Indictment).

satisfaction of fraudulent purchase orders, which were made via mail, courier, telephone, or electronic means.

256.    Empire incorporates by reference the attached Exhibits A, Q, and T, which set forth examples of particular transactions where fraudulent transfers were made in furtherance of Defendants' scheme to defraud.  Each of the Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice that will be proven at trial.

257.    As demonstrated by the transactions listed in Exhibits A, Q, and T, Defendants caused fraudulent information to be transmitted to third parties such as Fiscal Agents at numerous points, whereby Defendants concealed the true nature of the transactions.  Defendants portrayed each transaction as a lawful sale from Maryland Wholesalers to Cecil County Retailers, when in reality, the sales were going to New York Retailers to be sold without paying excise taxes,[285] and in violation of Maryland, New York, and federal law.  Defendants' concealment and/or misrepresentations have been relied upon by numerous third parties such as Fiscal Agents in, among other things, causing funds to be sent to or from Defendants, transferring ownership of products to and from Defendants, and avoiding investigation of Defendants' scheme.

258.    In this way, Defendants obtained for themselves Funds under the custody or control of the Agent Banks.  These Funds were the product of the Defendants' scheme to defraud Empire.

---

[285]  And, upon information and belief, New York Retailers were able to avoid paying sales tax on the smuggled liquor sold and income tax on their profits gained from selling the bootlegged liquor.

259.    Each of the Defendants, through their control of the Enterprise, knew of and participated in acts of financial institution fraud.  In particular, Defendants, through their control of the Enterprise, caused each purchase order and other relevant sales documents to be sent, and expected that they would be sent, via email and mail in the ordinary operation of the Enterprise.

260.    Defendants obtained these Funds under the custody or control of the Agent Banks by means of false or fraudulent pretenses, representations, or promises.  In particular, Defendants regularly and systematically misrepresented and concealed information and falsified transaction and financial records, including in communications and documents provided to Agent Banks, and hid the true nature of their fraudulent business practices.  Agent Banks relied on these misrepresentations when making transfers of Funds between and among Defendants.

261.    Each of the Defendants participated in the scheme or artifice knowingly and willfully.

262.    Defendants' misrepresentations, individually and in the aggregate, have been reasonably relied upon by Empire and Agent Banks, and have caused Empire substantial damages.  The damages to Empire were contemplated and intended by Defendants.

### *Multiple Instances of Money Laundering in Violation of 18 U.S.C. § 1956*

263.    Defendants engaged in numerous financial transactions over the course of operating and managing their scheme to defraud Empire, including (i) financial transactions constituting predicate acts of mail and wire fraud; (ii) financial transactions in furtherance of financial institution fraud; and (iii) financial transactions by which Defendants funneled the proceeds of their scheme between and among Defendants in Maryland and New York.

264.    Specifically, Defendants engaged in financial transactions whereby they sold products secretly and illegally, from Maryland Wholesalers to Cecil County Retailers to New

York Retailers.  The purpose of those financial transactions was to shield the illegitimate proceeds of Defendants' scheme from recovery by Empire.

265.    Examples of such money laundering transactions are set forth in Exhibits A, N, P, Q, and T.  Evidence of further transactions among Defendants is particularly within their control. Defendants' numerous additional acts of money laundering in furtherance of their scheme or artifice will be proven at trial.

266.    The financial transactions involved the proceeds of the specified unlawful activities, namely mail, wire, and financial institution fraud.  At times, these financial transactions were part of a set of parallel or dependent transactions, at least one of which involved the proceeds of specified unlawful activity, and which were part of a single plan or arrangement.

267.    Defendants knew that the property involved in these financial transactions represented the proceeds of unlawful activities, namely mail, wire, and financial institution fraud. Defendants' knowledge was obtained through their orchestration, operation, and management of the scheme to defraud Empire.

268.    Defendants conducted these financial transactions with the intent to promote the carrying on of the specified unlawful activity, and knowing that the financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity and to prevent recovery of the proceeds by Empire.

269.    Empire has been harmed by these transactions.

*Multiple Instances of Violation of the Travel Act, 18 U.S.C. § 1952*

270.     Defendants engaged in a scheme to defraud Empire and the State of New York concerning Defendants' purchase, sale, and deceptive business practices regarding products sold in New York—products that could be sold lawfully only by Empire.

271.     Defendants traveled in interstate or foreign commerce or used the mail or facilities in interstate or foreign commerce, with intent to distribute the proceeds of unlawful activity, and to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of unlawful activity, including but not limited to, money laundering conduct indictable under 18 U.S.C. §§ 1956 and/or 1957.

272.     Defendants engaged in numerous financial transactions in the course of operating and managing their scheme to defraud Empire, including (i) financial transactions constituting predicate acts of mail and wire fraud; (ii) financial transactions in furtherance of financial institution fraud; and (iii) financial transactions by which Defendants funneled the proceeds of their scheme between and among Defendants in Maryland and New York.

273.     Specifically, Defendants engaged in financial transactions whereby they sold products secretly and illegally, from Maryland Wholesalers to Cecil County Retailers to New York Retailers.  One purpose of those financial transactions was to shield the illegitimate proceeds of Defendants' scheme from recovery by Empire.

274.     Examples of such transactions are set forth above.  Evidence of further transactions among Defendants is particularly within their control.  Defendants' numerous additional acts in furtherance of their scheme or artifice will be proven at trial.

275.     The financial transactions involved the proceeds of the specified unlawful activities, namely mail, wire, and financial institution fraud.  At times, these financial transactions were part of a set of parallel or dependent transactions, at least one of which

involved the proceeds of specified unlawful activity, and which were part of a single plan or arrangement.

276.    Defendants knew that the property involved in these financial transactions represented the proceeds of unlawful activities, namely mail, wire, and financial institution fraud. Defendants' knowledge was obtained through their orchestration, operation, and management of the scheme to defraud Empire.

277.    Defendants conducted these financial transactions with the intent to promote the carrying on of the specified unlawful activity, and knowing that the financial transactions were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity and to prevent recovery of the proceeds by Empire.

278.    Empire has been harmed by these transactions.

SUMMARY OF THE PATTERN OF RACKETEERING ACTIVITY<br>ALLEGED AGAINST EACH RICO DEFENDANT

279.    Each of the RICO Defendants has directly or indirectly conducted or participated in the conduct of the affairs of the Enterprise through the commission of at least two, and in all cases numerous, predicate acts, constituting a pattern of racketeering, as described above.

280.    Reliable Churchill (acting through its employees, officers, and directors), has committed numerous acts of racketeering including mail, wire, and financial institution fraud, money laundering, and violation of the Travel Act, including by authorizing or aiding and abetting the commission of such acts by others.  These predicate acts include receiving payments by wire from New York and Cecil County Retailers to Reliable Churchill and others; actions and mail and wire communications that induced such payments; wire communications between and among Defendants; mail and wire communications with Agent Banks; additional acts in

furtherance of an overarching plan to hide the fraudulent scheme from state and federal investigators and civil litigants; and additional acts in furtherance of an overarching plan to diminish the value of the Empire Companies and to retaliate against the Empire Companies as punishment for Empire filing this action.

281.    Cecil County Retailers Tech Pride of America, Inc. and Happy 40 Liquors, Happy 40 Wines & Spirits, and Happy 40 Discount Liquors; J & R Company, LLC and North East Liquors; and Vlamis Liquors LLC and Vlamis' Cut-rate Liquors, have committed numerous acts of racketeering including mail, wire, and financial institution fraud, money laundering, and violation of the Travel Act, including by authorizing or aiding and abetting the commission of such acts by others.  These predicate acts include receiving funds from New York Retailer Defendants and paying funds to Maryland Wholesaler Defendants via wire transfers, directly or indirectly; engaging in mail and wire communications with other Defendants in connection with fraudulent transactions; directing and causing the predicate acts undertaken by other Defendants; and additional acts in furtherance of an overarching plan to hide the fraudulent scheme from state and federal investigators and civil litigants.

282.    Tushar C. Patel, Nileshkumar Jasbhai Patel, Pratibha Patel, Anil Patel, Dilip C. Patel, Prakash Patel, and Jatin B. Patel have committed numerous acts of racketeering including mail, wire, and financial institution fraud, money laundering, and violation of the Travel Act, including by authorizing or aiding and abetting the commission of such acts, through their positions as proprietors of Maryland Retailer Defendants.  These predicate acts include receiving funds via wire transfers, directly or indirectly, from New York Retailers and paying funds to Maryland Wholesalers; engaging in mail and wire communications with other Defendants in connection with fraudulent transactions; directing and causing the predicate acts undertaken by

other Defendants; and additional acts in furtherance of an overarching plan to hide the fraudulent scheme from state and federal investigators and civil litigants.

283.    Directly and through their agent officers, directors, board members, and employees, New York Retailers Sam Liquors Inc., Bao Liquors Inc., Our Liquor, Inc., and LTT Whiskey Inc. have committed numerous acts of racketeering including mail, wire, and financial institution fraud, money laundering, and violation of the Travel Act, including by authorizing or aiding and abetting the commission of such acts by others.  These predicate acts include paying funds via wire transfers, directly or indirectly, to Cecil County Retailers and Maryland Wholesalers; engaging in mail and wire communications with other Defendants in connection with fraudulent transactions; directing and causing the predicate acts undertaken by other Defendants; and additional acts in furtherance of an overarching plan to hide the fraudulent scheme from state and federal investigators and civil litigants.

284.    Bin Luo, Bao Zheng, Alexander Lew, and Ting Wei have committed numerous acts of racketeering including mail, wire, and financial institution fraud, money laundering, and violation of the Travel Act, including by authorizing or aiding and abetting the commission of such acts, through their positions as proprietors of New York Retailer Defendants.  These predicate acts include paying funds via wire transfers, directly or indirectly, to Cecil County Retailers and Maryland Wholesalers; engaging in mail and wire communications with other Defendants in connection with fraudulent transactions; directing and causing the predicate acts undertaken by other Defendants; and additional acts in furtherance of an overarching plan to hide the fraudulent scheme from state and federal investigators and civil litigants.

INJURY AND CAUSATION

285.     Empire has been and will continue to be injured in its business and property by reason of the RICO Defendants' violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.  The injuries to Empire, proximately and reasonably foreseeably, resulting from or caused by these violations of 18 U.S.C. § 1962(c) include, but are not limited to, tens, if not hundreds, of millions of dollars in fraudulent sales to New York retailers, where Empire is the only licensed wholesaler with exclusive rights to distribute products sold by Defendants to New York retailers; lost opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent, criminal activities.

286.     Pursuant to 18 U.S.C. § 1964(c), Empire is entitled to recover treble damages, plus costs and attorneys' fees from the RICO Defendants.  The Court should also enter such equitable relief as it deems just and proper to prevent any future smuggling of alcohol into New York.

## SECOND CLAIM FOR RELIEF
## (Conspiracy to Violate RICO, 18 U.S.C. § 1962(d) – By Empire Against the RICO Defendants)

287.     Empire repeats and realleges the allegations set forth above as though fully set forth herein.

288.     Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

289.     By and through each of the Defendants' close business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and

coordination, each Defendant knew that the Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

290.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, perpetuation, and execution of the scheme to defraud Empire.  In the absence of agreement, the Enterprise could not have operated as it did. Further evidence of an agreement among the Defendants is particularly within the control of the Defendants.

291.    The participation and agreement of each of the RICO Defendants was necessary to allow the commission of this pattern of racketeering activity.

292.    Empire has been and will continue to be injured in its business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.  The injuries to Empire directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, tens, if not hundreds, of millions of dollars in fraudulent sales to New York retailers, where Empire is the only licensed wholesaler with exclusive rights to distribute products sold by Defendants to New York retailers; lost opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and prosecuting Defendants' fraudulent, criminal activities.

293.    Pursuant to 18 U.S.C. § 1964(c), Empire is entitled to recover treble damages, plus costs and attorneys' fees from the RICO Defendants.  The Court should also enter such

equitable relief as it deems just and proper to unwind the Defendants' relationship going forward and permit Empire to control the wind-down of this operation.

### THIRD CLAIM FOR RELIEF
**(Violation of 42 U.S.C. § 1985 – By Empire Against Breakthru and Reliable Churchill)**

294.    The Empire Companies repeat and reallege all the allegations set forth above as though fully set forth herein.

295.    Defendants Breakthru and Reliable Churchill and non-party Sobel (the "Conspirators") unlawfully conspired to discriminate and retaliate against the Empire Companies on account of Empire's filing this federal court proceeding and its anticipated testimony in this federal court proceeding.  These Conspirators are sued for their voluntary, malicious, and deliberate conspiracy to harm the Empire Companies.

296.    The Conspirators conspired to injure the Empire Companies on account of Empire's filing this proceeding in a United States District Court and/or "to deter, by . . . intimidation, or threat, . . . [any] witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully" in violation of 42 U.S.C. § 1985(2).

297.    In the above-referenced conspiracy, each of the Conspirators performed or caused to be performed acts in furtherance of the object of such conspiracy as described fully, above, section V.

298.    As a direct result of the Conspirators' actions, the Empire Companies have suffered economic harm, damage to their reputation, the deprivation of their rights under state and federal law, retaliation for their anticipated testimony in a federal court proceeding, and other harms entitling them to compensatory damages in an amount to be proved at trial, as well as equitable injunctive relief to address the Conspirators' continuing retaliation.

299.    The Conspirators' actions were willful, intentional, malicious, and conducted in bad faith, thereby entitling Plaintiff to an award of punitive damages.

300.    The Conspirators' actions constitute crimes against the United States and constitute a criminal conspiracy, the predominate purpose of which was to retaliate against the Empire Companies on account of Empire's filing this action and Empire's anticipated testimony in this action.  Thus, the conspiracy is actionable under 18 U.S.C. § 1985(2).

## FOURTH CLAIM FOR RELIEF
### (Tortious Interference with Contract – By Empire Against All Defendants Except Breakthru)

301.    Empire repeats and realleges the allegations set forth above as though fully set forth herein.

302.    As discussed in detail above, Plaintiff Empire had a number of valid, enforceable exclusive distribution agreements with liquor suppliers that granted Empire the exclusive rights to distribute those suppliers' products in the New York metropolitan area.

303.    Reliable Churchill, through its agents, including Charmer Sunbelt Group executives Merinoff, Baird, and Miller, had knowledge of these exclusive distribution agreements because, among other reasons, Reliable Churchill was a party to certain of these exclusive distribution agreements, which prohibited it from selling those suppliers' products directly to retailers in the New York metropolitan area, and because, upon information and belief, it was party to other of its own exclusive distribution agreements and knew wholesalers in each state have similar exclusive distribution agreements.  The Cecil County Retailers had knowledge of these exclusive distribution agreements, because, among other reasons, they are familiar with similar exclusive distribution agreements in Maryland, as, upon information and belief, they could only buy certain brands of liquors from certain wholesalers, and generally know that wholesalers have exclusive distribution agreements with suppliers.  The New York

Retailers had knowledge of these exclusive distribution agreements because, among other reasons, the New York Retailers purchased the products governed by these exclusive distribution agreements exclusively from Plaintiff and had knowledge that they could not purchase such products from other wholesalers.

304.     Each Defendant's fraudulent and unlawful conduct, described above, intentionally induced the liquor suppliers party to Empire's exclusive distribution agreements to breach their contractual obligations to Empire by allowing entities other than Empire to distribute their products in New York.  Moreover, they intentionally induced the liquor suppliers party to Empire's exclusive distribution agreements to breach their contractual obligations to Empire by incorrectly calculating the bonuses or penalties tied to Empire's depletions because they did not account for the sales of their products to the New York Retailers by the Cecil County Retailers— sales that rightly should have been attributed to Empire.  Each Defendant's actions were intended to induce the suppliers' breach of contract, as follows:

a.   The New York Retailers intended to induce the suppliers' breach of contract by placing orders with the Cecil County Retailers for products that the New York Retailers knew they were obligated to purchase exclusively from Empire.

b.   The Cecil County Retailers intended to induce the suppliers' breach of contract by placing orders with the Maryland Wholesalers for products that they knew they could not sell to Maryland consumers but would instead sell to New York Retailers in order to facilitate the circumvention of the New York Retailers' obligations to buy such products exclusively from Empire.

      c.   The Maryland Wholesalers intended to induce the suppliers' breach of contract by placing orders with the suppliers that would co-opt and displace Empire's rightful sales.

305.    Each Defendant's unlawful actions were a necessary link in the chain to cause the suppliers' products to be sold in the New York metropolitan area in violation of their agreements with Empire and to cause the suppliers to breach their contracts by incorrectly calculating the bonuses or penalties (where applicable) tied to Empire's depletions.

306.    The Defendants also acted in concert and entered into a civil conspiracy and corrupt agreement to bootleg liquor to the New York metropolitan area and thereby interfere with Empire's exclusive distribution agreements.  Accordingly, each Defendant is being sued both individually as a primary violator of this law and as a co-conspirator, in the intentional interference with Empire's contracts.

307.    As a direct and proximate result of the Defendants' actions, Empire suffered damages resulting from the lost sales and profits that would have resulted from the purchase by the New York Retailers and other unknown New York retailers of the products governed by its exclusive distribution agreements.  Additionally, as detailed above, certain of Empire's exclusive distribution agreements granted Empire the right to receive bonuses as the result of selling certain quantities of its exclusively distributed products and obligated Empire to pay penalties (or suffer other negative consequences) if it did not order a sufficient amount of product from its suppliers.  Defendants' intentional interference with Empire's contracts also caused Plaintiff to lose such bonus payments and/or owe such penalties.

308.    As a direct and proximate result of the Defendants' intentional interference with Empire's contractual relations, Empire has been damaged in an amount to be proved at trial.

**FIFTH CLAIM FOR RELIEF**
**(Deceptive Trade Practices under New York General Business Law § 349 –**
**By Empire Against All Defendants Except Breakthru)**

309.     Empire repeats and realleges the allegations set forth above as though fully set forth herein.

310.     The Defendants' conspiracy, as detailed above, was designed to evade New York State and New York City excise taxes on liquor.[286]  The Defendants' unlawful actions were designed to induce consumers in the New York metropolitan area to unknowingly purchase liquor products for which New York State and New York City excise taxes were not paid. Consumers in the New York metropolitan area believed that they were buying legitimate products that were properly being sold according to federal and New York law, while in actuality they were purchasing bootlegged goods that were smuggled into the state by a criminal enterprise.

311.     This evasion of New York State and New York City excise taxes harmed the public at large by depriving the State of New York and the City of New York of tax revenue and inducing consumers to buy untaxed, bootlegged liquor products.

312.     Plaintiff suffered direct harm as a result of these deceptive trade practices. Plaintiff experienced significantly reduced demand for its lawfully taxed products from the New York Retailers and other unknown retailers in the New York metropolitan area, which were purchasing untaxed liquor products at a lower price from the Cecil County Retailers and indirectly from the Maryland Wholesalers.  As Plaintiff's sales were usurped by the Cecil County Retailers and the conspiracy of all the Defendants, Plaintiff suffered lost sales.  Reduced

---

[286]  Upon information and belief, New York Retailers were able to avoid paying sales tax on the smuggled liquor sold and income tax on their profits gained from selling the bootlegged liquor.

sales meant lost profits, as well as lost bonus payments and/or increased penalty payments owed (where applicable), as detailed further above.

313.    As a direct and proximate result of Defendants' deceptive trade practices, Empire has been damaged in an amount to be proved at trial.

### SIXTH CLAIM FOR RELIEF
**(Unfair Competition – By Empire Against All Defendants Except Breakthru)**

314.    Empire repeats and realleges the allegations set forth above as though fully set forth herein.

315.    As discussed in detail above, Plaintiff Empire had a number of valid, enforceable exclusive distribution agreements with liquor suppliers which granted Empire the exclusive rights to distribute those suppliers' products in the New York metropolitan area.

316.    In conducting their illegal bootlegging conspiracy to sell liquor products for which Empire had exclusive distribution rights in the New York metropolitan area, the Maryland Wholesalers and Cecil County Retailers misappropriated Empire's exclusive right to purchase certain liquor products from suppliers and sell those products to retailers in the New York metropolitan area.  By misappropriating these rights, the Cecil County Retailers were able to illegally entice the New York Retailers to purchase, and therefore sell, liquor products at a lower price than that at which Empire could lawfully sell such products.

317.    To secure such exclusive distribution rights in the New York metropolitan area, Empire expended substantial time, effort, and money.  Based on Empire's skill and reputation and the quality of its operations, suppliers granted Empire exclusive distribution rights in the New York metropolitan area, giving Empire the right to control the manner and quantity of the distribution of its products.  All Defendants misappropriated such rights.

318.    The Maryland Wholesalers and Cecil County Retailers sold liquor products to the New York Retailers and other unknown retailers in the New York metropolitan area that only Empire was authorized to sell.  The Defendants participated in this scheme to secure a commercial advantage for their businesses.  Through their misappropriation of Empire's distribution rights, the Maryland Wholesalers sold more products to the Cecil County Retailers than they otherwise would have, enhancing their profits, triggering employee bonuses and securing bonus payments from liquor suppliers that would have otherwise rightfully accrued to Empire.  The Cecil County Retailers' misappropriation of sales to the New York Retailers— which were Empire's by contractual right—generated sale volumes that the Cecil County Retailers would never have otherwise achieved.  The New York Retailers were able to purchase liquor products at lower prices that were offered only because the products did not emanate from their rightful New York wholesaler, Empire, and as a result of their bootlegging and fraudulent concealment, no taxes were remitted to the State or City of New York.

319.    The actions of the Defendants were in bad faith, in that they unlawfully evaded taxes and broke federal and state laws to compete with Empire.  Moreover, the Defendants undertook substantial efforts to conceal their misappropriation of Plaintiff's rights, such as by only selling the liquor to the New York Retailers for cash, ensuring that no labels were present on the liquor that would alert consumers or authorities that they were smuggled goods, and speaking in code about product going "out the back door."

320.    Defendants' unfairly competitive acts resulted in lost sales and profits for Plaintiff which should have accrued under Plaintiff's exclusive distribution agreements, as detailed further above.

321.     As a direct and proximate result of Defendants' unfair competition, Empire has been damaged in an amount to be proved at trial.

## SEVENTH CLAIM FOR RELIEF
**(Common Law Fraud – By Empire Against Reliable Churchill LLLP, Charles Merinoff, and Arlyn B. Miller)**

322.     Empire repeats and realleges the allegations set forth above as though fully set forth herein.

323.     At all relevant times, Reliable Churchill was a subsidiary of the Sunbelt Beverage Company, LLC and Sunbelt Holding, Inc.

324.     At all relevant times, Empire has been 50% owned by Reliable Churchill's affiliate, Charmer Industries, Inc.

325.     Charles Merinoff, through his leadership position with the Sunbelt Entities, and Arlyn Miller, through her role as counsel for Reliable Churchill and her leadership position with the Sunbelt Entities, were informed that the United States Attorney's Office for the District of Maryland in 2012 was actively investigating participation in the bootlegging scheme that was depriving Empire of tens of millions of dollars.

326.     During at least one meeting with representatives of Empire, Miller, in her capacity a representative of Reliable Churchill, and representing that she was also speaking on behalf of her boss, Merinoff, made material misrepresentations and/or omissions, as detailed further above, regarding the government's investigation into Reliable Churchill's excess sales to Cecil County Retailers and Reliable Churchill's knowledge that the excess alcohol was being smuggled into New York.

327.     These material misrepresentations and/or omissions were a calculated move by Reliable Churchill to induce Plaintiff not to conduct further inquiries or to exercise its legal rights to protect its business interests.

328.     In light of Merinoff's and Miller's positions as top executives at the Charmer

Sunbelt Group, and Miller's role as counsel to Reliable Churchill, Empire reasonably relied on

this misrepresentation.

329.     As a result of Merinoff's and Miller's misrepresentations and/or omissions,

including on behalf of Reliable Churchill and parent of Reliable Churchill, the Sunbelt Entities,

Empire believed it had no cause to investigate reports of bootlegging from Maryland or to file

suit to prevent this bootlegging from continuing.  Instead, the conspiracy continued through at

least 2014, causing Empire to lose tens, if not hundreds, of millions of dollars' worth of sales.

330.     As a direct and proximate result of the fraudulent conduct, misrepresentations and

omissions of Reliable Churchill, Merinoff and Miller, Empire has been damaged in an amount to

be proved at trial.

### EIGHTH CLAIM FOR RELIEF
### (Unjust Enrichment – By Empire Against All Defendants Except Breakthru)

331.     Empire repeats and realleges the allegations set forth above as though fully set

forth herein.

332.     As a result of Defendants' misconduct, each Defendant has been enriched at

Empire's expense.

333.     As discussed in detail above, Plaintiff Empire had a number of valid, enforceable

exclusive distribution agreements with liquor suppliers, which granted Empire the exclusive

rights to distribute those suppliers' products in the New York metropolitan area.

334.     In conducting their illegal bootlegging conspiracy to sell liquor products for

which Empire had exclusive distribution rights in the New York metropolitan area, the Maryland

Wholesalers and Cecil County Retailers misappropriated Empire's exclusive right to purchase

certain liquor products from suppliers and sell those products to retailers in the New York

metropolitan area.  By misappropriating these rights, the Cecil County Retailers were able to illegally entice the New York Retailers to purchase untaxed liquor products at a lower price than that at which Empire could lawfully sell such products.

335.    As a result of this scheme, the Maryland Wholesalers have been unjustly enriched through increased liquor sales, which enhanced their profits, triggered employee bonuses, and secured bonus payments from liquor suppliers.

336.    The Cecil County Retailers have been unjustly enriched through increased liquor sales to the New York Retailers and increased profit margins due to the discounts they received from the Maryland Wholesalers.

337.    The New York Retailers have been unjustly enriched by their purchases of liquor at prices below those prescribed by the New York State Liquor Authority and which reflect that excise taxes were not paid to the State or City of New York.  The New York Retailers were then able to sell this liquor to consumers at prices competitive with those offered by other retailers in the New York metropolitan area on whose liquor excise tax had been properly paid, thereby increasing the New York Retailers' profit margins.

338.    All of this enrichment came at Plaintiff's expense, in that Defendant Maryland Wholesalers and Cecil County Retailers usurped Plaintiff's position as an exclusive distributor of certain liquor products.  Absent Defendants' criminal scheme, Plaintiff would have made the sales at issue to the New York Retailers.

339.    At all relevant times, Empire was in privity with the New York Retailers, contracting to sell the New York Retailers liquor products, including but not limited to those products for which Empire had exclusive distribution rights.

340.     As explained in detail above, the New York Retailers conspired with the

Maryland Wholesalers and the Cecil County Retailers to execute their fraudulent scheme to

unjustly enrich themselves at Empire's expense.

341.     The circumstances are such that it would be against equity and good conscience to

permit Defendants to retain their ill-gotten gains from Empire.  Defendants have an obligation to

Empire to make restitution for their ill-gotten gains.

342.     Defendants have failed to make restitution to Empire for their ill-gotten gains.

343.     Restitution should therefore be made by Defendants to Empire in an amount to be

proved at trial.

### NINTH CLAIM FOR RELIEF
**(Civil Conspiracy – By Empire Against All Defendants Except Breakthru)**

344.     Empire repeats and realleges each allegation above as if fully set forth herein.

345.     This count is for civil conspiracy to tortiously interfere with Plaintiffs' contracts

and business relations, to engage in deceptive trade practices, and to unfairly compete with

Plaintiffs' rightful distribution agreements, brought against all Defendants for joint and several

liability for all losses associated with all predicate acts set forth above.  Accordingly, each

Defendant is being sued both individually as a primary violator of the law, as stated in the

Complaint, and as a co-conspirator.

346.     Defendants entered into an illegal agreement to commit the torts described above.

347.     Defendants each committed numerous overt acts in furtherance of that agreement,

as detailed above, including (but not limited to) offering illegal discounts and accounts-

receivable abatements for the primary purpose of enticing Cecil County Retailers to sell Reliable

Churchill and RNDC liquor to New York Retailers, making 'back door' sales of liquor to avoid

detection, and continuing to fill excessively large orders from small Cecil County Retailers with

intention that these orders would be bootlegged, and all the other acts described in this Complaint.

348.    Defendants intentionally took these and other overt acts described above to further the corrupt agreement between Defendants and to carry out a common plan to tortiously interfere with Plaintiffs' contracts and business relations, to engage in deceptive trade practices, to unfairly compete with Plaintiffs' rightful distribution agreements, and to benefit Defendants.

349.    Defendants intended to injure Plaintiffs by, among other things, depriving Empire of liquor sales they were entitled to receive and interfering with Plaintiff's contracts and business relations.

350.    Defendants acted with malice, and intended to injure Plaintiffs by, among other things, intentionally inducing the liquor suppliers party to Empire's exclusive distribution agreements to breach their contract obligations to Empire by allowing entities other than Empire to distribute their products in New York and interfering with Plaintiffs' contracts and business relations.

351.    Each Defendant was at all relevant times fully aware of the conspiracy and substantially furthered it as set forth above.

352.    As a direct and proximate result of Defendants' conspiracy, Plaintiffs have been deprived of, but are not limited to, tens, if not hundreds, of millions of dollars in fraudulent sales to New York retailers, since Empire is the only licensed wholesaler with exclusive rights to distribute products sold by Defendants to New York retailers.

353.    As a result of Defendants' unlawful conspiracy, Plaintiffs have the right to rescissory damages; in the alternative to rescissory damages, Plaintiffs have suffered damages according to proof.

## TENTH CLAIM FOR RELIEF
### (Breach of Contract – By Empire North Against Breakthru)

354.    Empire North repeats and realleges the allegations set forth above as though fully set forth herein.

355.    Breakthru and Empire North have a valid and enforceable contract for the provision of IT and other services up to at least July 1, 2017.

356.    Empire North has performed all of the material conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the Services Agreement.

357.    Breakthru has repeatedly and materially breached its obligations to Empire North under the Services Agreement by refusing to comply with the terms of the Services Agreement, including, but not limited to, as set forth above, and has threatened to terminate the Services Agreement by an arbitrary cut-off date of January 31, 2017 and has refused to resolve the dispute by agreeing to a reasonable transition period, thereby anticipatorily further breaching the Services Agreement.

358.    Empire North is entitled to equitable injunctive relief to address Breakthru's breaches and anticipatory breaches, and, in addition, has suffered damages as a direct and proximate result of Breakthru's breaches of the Services Agreement in an amount to be proved at trial.

## ELEVENTH CLAIM FOR RELIEF
### (Breach of the Implied Covenant of Good Faith and Fair Dealing – By Empire North Against Breakthru)

359.    Empire North repeats and realleges the allegations set forth above as though fully set forth herein.

360.    Breakthru and Empire North have a valid and enforceable contract for the provision of IT and other services up to at least July 1, 2017.

361.    There is implied in the Services Agreement a covenant of good faith and fair dealing such that Breakthru may not do anything that will have the effect of destroying or injuring Empire North's right to receive the fruits of the Services Agreement.  Breakthru was bound by this implied covenant to perform its obligations under the Services Agreement in good faith, and to not take any action that would have the effect of depriving or impeding Empire North of the right to receive the benefits of its bargains.

362.    Assuming, *arguendo*, that Breakthru did not violate any express contractual provision of the Services Agreement, Breakthru failed to exercise good faith and deal fairly with Empire North in the course of fulfilling its obligations under the Services Agreement.

363.    Breakthru reasonably understood that the Services Agreement includes duties not to change its services levels (or to terminate the Services Agreement early in a manner not provided for in the Services Agreement) in retaliation for an affiliate of Empire North filing a lawsuit against an affiliate of Breakthru.

364.    Breakthru breached its implied covenants of good faith and fair dealing towards Empire North by, inter alia, taking the actions set forth above, and has further threatened to terminate the Services Agreement by an arbitrary cut-off date and has refused to resolve the dispute by agreeing to a reasonable transition period, thereby anticipatorily further breaching the Services Agreement.

365.    Empire North is entitled to equitable injunctive relief to address Breakthru's breaches of its covenants of good faith and fair dealing and, in addition, has suffered damages as

a direct and proximate result of Breakthru's breaches of its covenants of good faith and fair dealing.

## TWELFTH CLAIM FOR RELIEF
### (Anticipatory Breach of Contract – By Empire North Against Breakthru)

366.    Empire North repeats and realleges the allegations set forth above as though fully set forth herein.

367.    Breakthru and Empire North have a valid and enforceable contract for the provision of IT and other services up to at least July 1, 2017.

368.    Empire North has performed all of the material conditions, covenants, and promises required to be performed by it in accordance with the terms and conditions of the Services Agreement.

369.    Breakthru has confirmed it will materially breach its obligations to Empire North under the Services Agreement including, but not limited to, as set forth above.

370.    Empire North is entitled to equitable injunctive relief to address Breakthru's anticipatory breaches, and, in addition, has suffered damages as a direct and proximate result of Breakthru's breaches and anticipatory breaches of the Services Agreement in an amount to be proved at trial.

## THIRTEENTH CLAIM FOR RELIEF
### (Tortious Interference with Contract – By Empire North Against Reliable Churchill )

371.    Empire North repeats and realleges the allegations set forth above as though fully set forth herein.

372.    As discussed above, Empire North has a valid, enforceable Services Agreement with Breakthru that entitles it to certain services.

373.    Reliable Churchill has knowledge of the Services Agreement because, on information and belief, it is subject to a similar Services Agreement with Breakthru and obtains

certain of the same services under its services agreement that Empire North obtains under the Services Agreement.

374.    Reliable Churchill's fraudulent and unlawful conduct, discussed above, induced Breakthru to breach the Services Agreement by reducing its services and by declaring it would illicitly terminate the contract on January 31, 2017.  Reliable Churchill acted unreasonably, maliciously, and tortiously by inducing Breakthru to breach the Services Agreement, and there was no legitimate justification, economic or otherwise, for Reliable Churchill to induce Breakthru to breach the Services Agreement.

375.    Each of these Defendants was a necessary link in the chain to cause Breakthru to breach the Services Agreement.

376.    Empire North is entitled to equitable injunctive relief to address Breakthru's anticipatory breach, and, in addition, has suffered damages as a direct and proximate result of these Defendants' actions from the reduced services in an amount to be proved at trial.

### FOURTEENTH CLAIM FOR RELIEF
**(Promissory Estoppel – By Empire North Against Breakthru)**

377.    Empire North repeats and realleges the allegations set forth above as though fully set forth herein.

378.    Breakthru repeatedly made to Empire North the clear and unambiguous promise to continue providing services pursuant to the parties' contract for the provision of IT and other services until at least July 1, 2017.

379.    Empire North reasonably and foreseeably relied to its detriment on this promise made by Breakthru.

380.    Breakthru has breached this promise to Empire North, including, but not limited to, as set forth above, by refusing to comply with the terms of its promise, and by

threatening to further breach this promise by discontinuing IT and other services altogether before July 1, 2017.  Breakthru has acted in bad faith in retaliation for Empire filing suit against a Breakthru subsidiary and against industry practice in setting an arbitrary cutoff date of services.

381.    Empire North is entitled to equitable injunctive relief to address Breakthru's breached promise, and, in addition, has suffered damages as a direct and proximate result of Breakthru's threatened breach of its promise.  Indeed, Empire carried on its business in reliance on Breakthru's promise, and has fully performed and continues to fully perform its obligations to Breakthru.

## PRAYER FOR RELIEF

WHEREFORE, Empire prays for relief and judgment against Defendants as follows:

A.    General and compensatory damages according to proof at trial;

B.    Treble damages according to statute;

C.    Necessary and appropriate injunctive relief, including an order prohibiting Defendants from smuggling alcohol into New York;

D.    Declarations that:

    a.    Defendants have violated 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d);

    b.    Defendants have violated New York General Business Law § 349 and New York's common law of unfair competition, and have tortiously interfered with Empire's supplier contracts;

    c.    Defendants have been unjustly enriched at Empire's expense;

    d.    Defendants are liable for civil conspiracy to commit the torts described above;

    e.    Reliable Churchill, Charles Merinoff, and Arlyn Miller committed fraud;

      f.      Breakthru is liable for breaching its contract with Empire North for the provision of IT and other services, which is valid and enforceable up to at least July 1, 2017;

      g.      Breakthru is liable for anticipatory breach of its contract with Empire North;

      h.      Reliable Churchill has tortuously interfered with Empire North's contract with Breakthru; and

      i.      Breakthru and Reliable Churchill have retaliated against the Empire Companies in violation of 42 U.S.C. § 1985.

E.      Injunctive relief that:

      j.      Enjoins the Breakthru Defendants from retaliating against the Empire Companies;

      k.      Enjoins Breakthru from terminating the Services Agreement; and

      l.      Orders Breakthru to continue to provide services at the levels as set forth in the Services Agreement and prohibits Breakthru from taking any action to reduce or discontinue those services.

F.      Disgorgement of all moneys received by Defendants as a result of their enterprise's effect on Empire;

G.      An award of Empire's reasonable attorneys' fees and costs and expenses according to statute;

H.      Punitive damages;

I.      Prejudgment interests; and

J.      Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Empire demands a trial by jury in this action of all issues so triable.

Dated: New York, New York
December 9, 2016

GIBSON, DUNN & CRUTCHER LLP

By:     /s/ Randy M. Mastro
Randy M. Mastro
Lawrence J. Zweifach
Joel M. Cohen
Avi Weitzman
Michael Marron*

200 Park Avenue
New York, New York 10166
Tel.: (212) 351-4000
Fax: (212) 351-4035
RMastro@gibsondunn.com

*Attorneys for Plaintiffs*

*Admitted *pro hac vice*